UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HIGHLAND PARK CDO I GRANTOR
TRUST, SERIES A

        Plaintiff,

    v.

WELLS FARGO BANK, N.A., AS TRUSTEE
FOR THE MORGAN STANLEY CAPITAL I
INC. COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES SERIES 2006-
XLF

        Defendant.

08 Civ.

**COMPLAINT**

**Jury Demanded**

Plaintiff Highland Park CDO I Grantor Trust, Series A ("**Highland**"), as successor-in-interest to Morgan Stanley Mortgage Capital, Inc., ("**Morgan Stanley**"), by its attorneys, Orrick, Herrington & Sutcliffe LLP, hereby alleges for its Complaint against Defendant Wells Fargo N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF ("**Wells Fargo**"), as follows:

NATURE OF THE ACTION

1.     This declaratory judgment action involves a dispute between Highland and Wells Fargo over Highland's ability to sue and collect against guarantors of now defaulted debt. Highland and Wells Fargo are competing lenders seeking to collect on separate defaulted debt. Wells Fargo is owed $24.5 million from a subsidiary that owns a property interest in a former Holiday Inn hotel in Columbus, Ohio. Highland is owed $10.5 million from the parent company of Wells Fargo's borrower (Highland's borrower has no direct interest in the hotel property).

2.     Although both Highland's and Wells Fargo's loans were made to separate companies for different amounts on different dates and are governed by different loan agreements, both loans are guaranteed personally by the same four individuals, albeit in separate guaranty agreements. Highland

1

and Wells Fargo now find themselves in a race to successfully enforce their respective guaranties against these same individuals who presumably have limited assets. Highland initiated a breach of contract action in this Court to enforce the guaranties and Wells Fargo initiated a foreclosure action (on the hotel property) in Ohio state court to which Wells Fargo recently added a claim for breach against the guarantors.

3.      Wells Fargo now seeks to intervene in and dismiss Highland's New York enforcement action on the ground that an intercreditor agreement between Highland and Wells Fargo bars Highland's claim. Wells Fargo contends that until its $24.5 million loan balance is paid in full, Highland is precluded from enforcing its $10.5 million loan against the guarantors. By contrast, Highland believes that there are no such barriers in any of the operative agreements, including the intercreditor agreement. Wells Fargo's exploitation of the intercreditor agreement runs afoul of well settled New York law (the intercreditor agreement calls for New York law). From Highland's perspective, Wells Fargo is simply trying to gain an unfair advantage in the race for funds by delaying, through motion practice, Highland's effort to collect against the guarantors.

4.      This declaratory judgment action is intended to resolve Highland's dispute with Wells Fargo. Specifically, Highland seeks a declaration that it has the right to bring suit under the operative agreements regardless of the repayment status of Wells Fargo's loan.

PARTIES

5.      Plaintiff Highland, a successor-in-interest to Morgan Stanley, is a Cayman Islands trust, having an address at The Bank of New York Trust Company, National Association, 601 Travis Street, 16th Floor, Houston, Texas.

6.      Upon information and belief, Defendant Wells Fargo is a national banking association acting as trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF, and having a place of business at c/o Midland Loan Services, Inc., 10851 Mastin,

2

Suite 300, Overland Park, Kansas.

JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201, 2202, because this is a civil action between a citizen of a state and foreign state, the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is based upon an actual controversy between Highland and Wells Fargo regarding the interpretation of certain agreements.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Upon information and belief, a substantial part of the events giving rise to the claim occurred in this District.  Under the Senior Loan (as defined below), Wells Fargo submitted to personal jurisdiction in the State of New York. Furthermore, the intercreditor agreement at issue is governed by the laws of New York and states that all matters of performance are interpreted to be wholly performed within the State of New York.

THE RELEVANT AGREEMENTS

9.     On July 18, 2006, Morgan Stanley, together with its successors and assigns, (in this capacity, the "**Senior Lender**"), and Platinum Lodging, LLC ("**Senior Borrower**") executed a Loan Agreement for a loan in the original principal amount of $28,500,000 ("**Senior Loan**").[1]  Morgan Stanley subsequently assigned to Wells Fargo its interests arising under the Senior Loan and the related senior loan documents.[2]

10.     On July 18, 2006, Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola (the "**Guarantors**") executed a Guaranty of Payment and Guaranty of Recourse Obligations of Borrower (the "**Senior Guaranty**"), and each thereby agreed to personally guaranty the Senior Loan.  The Senior

---

[1] The Senior Loan is secured by, among other things, a hotel near Columbus, Ohio that was formerly a Holiday Inn but is now being operated as the Fort Rapids Hotel (the "**Premises**").  By the terms of the Intercreditor Agreement, Highland is prohibited from having a lien upon the Premises.

[2] A copy of the Senior Loan is attached hereto as Exhibit 1.

3

Guaranty is in favor of Wells Fargo (as assignee). Highland is not a party to the Senior Guaranty and has no interest in the Senior Guaranty.

11.    On August 3, 2006, Morgan Stanley, together with its successors and assigns, (in this capacity, the "**Mezzanine Lender**") and Platinum Lodging Mezz, LLC ("**Mezzanine Borrower**") executed a Mezzanine Loan Agreement for a loan in the original principal amount of $10,500,000 ("**Mezzanine Loan**").[3] Morgan Stanley subsequently assigned to Highland its interests arising under the Mezzanine Loan and the related mezzanine loan documents. The Mezzanine Borrower owns 99.5 percent of the Senior Borrower.[4]

12.    On August 3, 2006, the Guarantors executed a Mezzanine Guaranty of Payment and Guaranty of Recourse Obligations of Borrower ("**Mezzanine Guaranty**"), and each thereby agreed to personally guaranty the Mezzanine Loan. The Mezzanine Guaranty is in favor of Highland (as assignee). Wells Fargo is not a party to the Mezzanine Guaranty and has no interest in the Mezzanine Guaranty.[5]

13.    Pursuant to the Mezzanine Guaranty, the Mezzanine Lender could "proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person...."

---

[3] The Mezzanine Loan is secured by, among other things, a Pledge and Security Agreement, dated as of August 3, 2006, made by Mezzanine Borrower in favor of Mezzanine Lender, which grants Mezzanine Lender a first priority security interest in all of Mezzanine Borrower's ownership interests in Borrower and its managing member. Thus, the Mezzanine Loan is secured not by any lien upon the Premises, but only by a pledge of the equity ownership of the Senior borrower.

[4] A copy of the Mezzanine Loan Agreement is attached hereto as Exhibit 2.

[5] A copy of the Mezzanine Guaranty is attached hereto as Exhibit 3.

14.    Contemporaneous with the execution of the Mezzanine Guaranty, Senior Lender and Mezzanine Lender executed an Intercreditor Agreement dated August 3, 21006 (the "**Intercreditor Agreement**").[6]

15.    The Intercreditor Agreement specifies certain rights as between Wells Fargo and Highland with respect to the Senior Loan and the Mezzanine Loan. Only Highland and Wells Fargo, as assignees, are parties to and have rights under the Intercreditor Agreement (e.g., the Agreement expressly precludes third party beneficiaries).[7]

16.    As is the case with intercreditor agreements generally, the Intercreditor Agreement sets forth in detail the priority that the Senior Lender has over the Mezzanine Lender with respect to (i) the Premises and other collateral at issue, and (ii) payments from the Senior Borrower. The central tenet of the Intercreditor Agreement is to give the Senior Lender priority over the collateral (e.g., the Premises). The Mezzanine Lender had to give a representation and warranty that "the Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower." The Intercreditor Agreement also places conditions on the Mezzanine Lender's ability to bring an enforcement action against the Mezzanine Borrower (indeed, the Agreement defines this as an "Equity Collateral Enforcement Action"). The Intercreditor Agreement does not expressly prohibit or otherwise restrict Highland's right to enforce the Mezzanine Guaranty.

<u>DEFAULT PROCEEDINGS</u>

17.    The Mezzanine Loan matured on February 9, 2008 and the Mezzanine Borrower defaulted. Neither the Mezzanine Borrower nor any of the Guarantors have responded to Highland's demands for cure.

---

[6] A copy of the Intercreditor Agreement is attached hereto as Exhibit 4.

[7] Section 21 of the Intercreditor Agreement states in part: "The parties hereto do not intend the benefits of this Agreement to inure to [Senior] Borrower, Mezzanine Borrower or any other Person."

18.     Having received no response thereto, Highland exercised its right under the Mezzanine Guaranty and initiated an action in this Court on February 12, 2008 against the Guarantors (Case No. 08 Civ 01670*) (the "**Guaranty Enforcement Action**").  The Mezzanine Guaranty designated this Court with jurisdiction.[8]

19.     The Senior Loan matured on February 9, 2008.  Upon information and belief, the Senior Borrower defaulted on the Senior Loan.

20.     On March 11, 2008, Wells Fargo filed a foreclosure action (the "**Foreclosure Action**") against the Senior Borrower and other defendants in the Court of Common Pleas, Franklin County, Ohio.[9]  Wells Fargo subsequently amended its Ohio complaint to add a breach of contract claim against the Guarantors to enforce the Senior Guaranty.

21.     On March 25, 2008, Wells Fargo filed a Notice of Claim of Interest (the "**Notice of Claim**") in the Guaranty Enforcement Action.[10]  In the Notice of Claim, Wells Fargo contends that it is a secured creditor of Highland and that it has a lien upon any collections by Highland pursuant to the terms of the Intercreditor Agreement.

22.     On June 10, 2008, Wells Fargo moved to intervene and dismiss the Guaranty Enforcement Action ("**Motion to Dismiss**").[11]

CONTRACT DISPUTE

---

[8] A copy of Plaintiff's complaint in the Guaranty Enforcement Action is attached hereto as Exhibit 5.

[9] Complaint for Foreclosure of Commercial Mortgage, Appointment of Receiver and Other Equitable Relief, Wells Fargo Bank, N.A., As Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF v. Platinum Lodging, LLC et al., filed March 11, 2008, Court of Common Pleas, Franklin County, Ohio, case number 8CVE03-03668.

[10] A copy of Wells Fargo's Notice of Claim is attached hereto as Exhibit 6.

[11] A copy of Wells Fargo's Motion to Dismiss is attached hereto as Exhibit 7.

23.     As stated above, the Mezzanine Guaranty grants Highland the right to "proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower."

24.     Notwithstanding the plain language of the Mezzanine Guaranty, Wells Fargo contends that until the Senior Loan is paid in full, Highland is precluded from enforcing the Mezzanine Guaranty against the Guarantors.  In its Motion to Dismiss, Wells Fargo argues that the Intercreditor Agreement bars the Guaranty Enforcement Action and, as a result, should be dismissed.

25.     In its Notice of Claim, Wells Fargo cites to the following language within Section 9(a) of the Intercreditor Agreement in support of its claim:

> If a **Proceeding** shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan.

Exhibit 4 at 3 (emphasis added).  That language, however, relates only to a "Proceeding," which is defined in the Agreement as bankruptcy proceedings against the Senior Borrower.  The Guaranty Enforcement Action has absolutely nothing to do with bankruptcy or the Senior Borrower.

26.     In its subsequently filed Motion to dismiss, Wells Fargo quickly disposed of that interpretation and shifted to another portion of Section 9(a):

> Except (i) as otherwise provided in this Agreement and (ii) in connection of the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are *hereby subordinated* to all of Senior Lender's rights to *payment by [Senior] Borrower* of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) *from [Senior] Borrower* and/or from the Premises prior to the date that all obligations of [Senior] Borrower to Senior Lender under the Senior Loan Documents are paid.

Exhibit 4 at 17 (emphasis added).

27.    Wells Fargo's reliance on Section 9(a) is misplaced.  The scope of subordination in Section 9(a) is limited to payments made by the <u>Senior Borrower</u>.[12]  Section 9(a) does not address, let alone preclude, payments to Highland from the Guarantors.

28.    What Section 9(a) does do is specify what is being subordinated (payment from Senior Borrower) and the duration of the subordination (until the Senior Loan is paid).  The same cannot be said for the other Section that Wells Fargo relies on in its Motion to Dismiss.  That Section, 8(a), states:

> Mezzanine Lender hereby **subordinates** and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and securities created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a).  Mezzanine Lender hereby acknowledges and agrees that *the Mezzanine Loan is not secured by a lien on the Premises* or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

Exhibit 4 at 17 (emphasis added).

29.    Wells Fargo construes the term "subordinates" in this Section to prohibit <u>enforcement</u> of the Mezzanine Guaranty against the Guarantors and, separately, the Mezzanine Lender's ability to collect any <u>payments</u> under the Mezzanine Guaranty from the Guarantors until the Senior Loan is paid in full.  This interpretation is materially flawed.

30.    According to Black's Law Dictionary, subordinate simply means "the act or process by which a person's rights are ranked below the rights of others."  Ranking below one's rights does not

---

[12] In their Motion to Dismiss, Guarantors refer to the potential for Highland to receive payments indirectly from the Foreclosure Action, per Section 2.4.2 of the Mezzanine Loan.  To the extent that Highland is entitled to payment from the Senior Borrower, directly or indirectly, under the Mezzanine Loan, Highland does not dispute that such right is subordinated per Section 9(a) to Wells Fargo.

equate to a bar or outright prohibition of enforcing contractual rights, particularly rights not against the borrower or collateral but against the Guarantors. Courts look to the operative contract to specify which rights are subordinated and <u>how</u> they are subordinated. And New York law construes subordination agreements narrowly.

31.    Here, Section 8(a) does not specify what it means for the Mezzanine Loan to be subordinated to the Senior Loan other than in reference to liens on the Premises, which are not in dispute. Section 8(a) does not address restrictions to enforcing the Mezzanine Guaranty, conditions or duration of any purported restrictions, or when Highland could proceed against the Guarantors. To have imposed such burdens would have required the kind of detail evidenced in other provisions of the Intercreditor Agreement (<u>e.g.</u>, Section 9(a)'s restriction on receiving payments from the Senior Borrower) but not found in Section 8(a). This is particularly true where the Mezzanine Guaranty, executed contemporaneously with the Intercreditor Agreement, expressly permits Highland to proceed against the Guarantors without any prohibition. Wells Fargo's interpretation of the Intercreditor Agreement would render null and void the express grant of the Mezzanine Guaranty, something New York law dictates cannot be done unless unambiguously set forth in writing.

<u>CAUSE OF ACTION</u>
(Declaratory Judgment)

32.    Highland incorporates by reference all of the allegations contained in paragraphs 1 through 31, inclusive, of this Complaint.

33.    Highland has satisfied any and all of its conditions, covenants and obligations incumbent on it pursuant to the Mezzanine Guaranty, the Mezzanine Loan and the Intercreditor Agreement.

34.    Highland initiated the Guaranty Enforcement Action in accordance with the Mezzanine Guaranty and the Intercreditor Agreement.

35.    Through its Notice of Claim and Motion to Dismiss Wells Fargo has taken the position

that Sections 8(a) and 9(a) of the Intercreditor Agreement bar the Guaranty Enforcement Action.

36.    An actual controversy, as contemplated by 28 U.S.C. § 2201, has arisen and now exists between Plaintiff on the one hand and Defendant on the other concerning Plaintiff's ability to proceed with and collect in the Guaranty Enforcement Action.

37.    Plaintiff desires a judicial determination that Plaintiff has the right to bring the Guaranty Enforcement Action under the Mezzanine Guaranty and Intercreditor Agreement.

38.    Plaintiff further requests a judicial declaration that Plaintiff has the right to retain any and all proceeds from the Guaranty Enforcement Action.

39.    A judicial declaration is necessary and appropriate at this time under the circumstances.

WHEREFORE, Plaintiff Highland prays as follows:

1.    For a declaration that Plaintiff has the right to enforce the Mezzanine Guaranty through, among other things, the Guaranty Enforcement Action.

2.    For a declaration that Plaintiff is entitled to any and all proceeds from the Guarantors, including but not limited to the Guaranty Enforcement Action.

3.    For such other and further relief as the Court deems just and proper, including but not limited to Plaintiff's costs and attorneys' fees.

Dated: New York, New York
        June 25, 2008

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
        Michael Stolper

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
(212) 506-5000

Attorneys for Plaintiff Highland Park CDO I
Grantor Trust, Series A

11

# Exhibit 1

D7732 - J23



MSMCI Loan No. 06-26034

**LOAN AGREEMENT**

Dated as of July 18, 2006

Between

**PLATINUM LODGING, LLC,**
as Borrower

and

**MORGAN STANLEY MORTGAGE CAPITAL INC.,**
as Lender

LEGAL02/782579fv12

D7732 - J24

# TABLE OF CONTENTS

Page

**I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

Section 1.1       Definitions. ....................................................................................1
Section 1.2       Principles of Construction. .............................................................21

**II.    THE LOAN**

Section 2.1       The Loan. ......................................................................................21
Section 2.2       Interest Rate. ................................................................................22
Section 2.3       Loan Payments. ............................................................................25
Section 2.4       Prepayments. ................................................................................27

**III.    REPRESENTATIONS AND WARRANTIES**

Section 3.1       Borrower Representations. .............................................................31
Section 3.2       Survival of Representations. ..........................................................40

**IV.    BORROWER COVENANTS**

Section 4.1       Borrower Affirmative Covenants. ....................................................41
Section 4.2       Borrower Negative Covenants. .......................................................48

**V.    INSURANCE, CASUALTY AND CONDEMNATION**

Section 5.1       Insurance. .....................................................................................50
Section 5.2       Casualty and Condemnation. ........................................................54
Section 5.3       Delivery of Net Proceeds. .............................................................55

**VI.    RESERVE FUNDS**

Section 6.1       Intentionally Omitted. ....................................................................59
Section 6.2       Tax Funds. ....................................................................................59
Section 6.3       Insurance Funds. ..........................................................................59
Section 6.4       FF&E Expenditure Funds. .............................................................60
Section 6.5       Intentionally Omitted. ....................................................................62
Section 6.6       Debt Service Reserve Funds. .......................................................62
Section 6.7       Application of Reserve Funds. .......................................................62
Section 6.8       Security Interest in Reserve Funds. ...............................................63
Section 6.9       Interest on Reserve Funds. ...........................................................63

D7732 - J25

## VII.   PROPERTY MANAGEMENT

Section 7.1    The Management Agreement and the Franchise Agreement ....................63
Section 7.2    Prohibition Against Termination or Modification..................................64
Section 7.3    Replacement of Manager..................................................................64
Section 7.4    Matters Concerning the Franchisor. ....................................................65

## VIII.   PERMITTED TRANSFERS

Section 8.1 .......................................................................... Intentionally Omitted.    63

Section 8.2 ......................................................Permitted Transfers of Equity Interests.    63

Section 8.3 ................................................................Future Mezzanine Option.    64

## IX.   SALE AND SECURITIZATION OF MORTGAGE

Section 9.1 ...................................................... Sale of Mortgage and Securitization.    66

Section 9.2 ...........................................................Securitization Indemnification.    69

Section 9.3 .................................................................Rating Agency Costs.    71

Section 9.4 ..............................................................Reserves / Escrows.    71

Section 9.5 ............................................................Lender's Mezzanine Option.    71

Section 9.6 ............................................Conversion to Registered Form..    74

## X.   DEFAULTS

Section 10.1    Event of Default..........................................................................76
Section 10.2    Remedies........................................................................................78
Section 10.3    Right to Cure Defaults..................................................................79

D7732 – J26

Section 10.4    Remedies Cumulative...................................................80

XI.    MISCELLANEOUS

Section 11.1    Successors and Assigns. .......................................80
Section 11.2    Lender's Discretion. .............................................80
Section 11.3    Governing Law. ...................................................80
Section 11.4    Modification, Waiver in Writing. ...........................82
Section 11.5    Delay Not a Waiver. .............................................82
Section 11.6    Notices. ...............................................................82
Section 11.7    Trial by Jury. .......................................................83
Section 11.8    Headings. .............................................................84
Section 11.9    Severability. .........................................................84
Section 11.10   Preferences. .........................................................84
Section 11.11   Waiver of Notice. .................................................84
Section 11.12   Remedies of Borrower. ........................................84
Section 11.13   Expenses; Indemnity. ...........................................85
Section 11.14   Schedules Incorporated. .......................................86
Section 11.15   Offsets, Counterclaims and Defenses. ..................86
Section 11.16   No Joint Venture or Partnership; No Third Party Beneficiaries. .....86
Section 11.17   Publicity. ..............................................................86
Section 11.18   Waiver of Marshalling of Assets. ..........................86
Section 11.19   Waiver of Offsets/Defenses/Counterclaims. ..........87
Section 11.20   Conflict; Construction of Documents; Reliance. .....87
Section 11.21   Brokers and Financial Advisors. ............................87
Section 11.22   Recourse. ..............................................................88
Section 11.23   Prior Agreements. .................................................89
Section 11.24   Servicer. ................................................................90
Section 11.25   Joint and Several Liability. ....................................90
Section 11.26   Creation of Security Interest. .................................90
Section 11.27   Assignments and Participations. ............................90
Section 11.28   Set-Off. .................................................................91
Section 11.29   Component Notes. .................................................91

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT  EXHIBIT A

SCHEDULES

Schedule I       -    Organizational Chart
Schedule II      -    Form of Subordination, Non-Disturbance and Attornment Agreement
Schedule III(a) -    Form of Interest Rate Cap Confirmation – Lender or its Affiliate
Schedule III(b) -    Form of Interest Rate Cap Confirmation – Third Party
Schedule IV      -    Form of Smith Travel Research Report
Schedule V       -    Legal Description of Adjacent Properties
Schedule VI      -    Form of Future Mezzanine Intercreditor

D7732 - J27

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of July 18, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between **PLATINUM LODGING, LLC**, an Ohio limited liability company ("Borrower"), whose principal place of business is 4560 Hilton Corporate Drive, Columbus, Ohio 43232, and **MORGAN STANLEY MORTGAGE CAPITAL INC.**, a New York corporation, having an address at 1221 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "Lender").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H :

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1   Definitions.**

For all purposes of this Agreement, except as otherwise expressly provided:

"**Acceptable Delaware LLC**" shall mean a limited liability company formed under Delaware law which (i) has at least one springing member, which, upon the dissolution of all of the members or the withdrawal or the disassociation of all of the members from such limited liability company, shall immediately become the sole member of such limited liability company, and (ii) otherwise meets the Rating Agency criteria then applicable to such entities.

"**Acquired Property Statements**" shall have the meaning set forth in Section 9.1(c).

"**Adjacent Properties**" shall mean those certain parcels of real property adjacent to the Property, each of which are more particularly described on Schedule V attached hereto and made a part hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than forty percent (40%) of, is in Control of, is Controlled by or is under

-1-

D7732 – J28

common ownership or Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Guarantor, any SPC Party (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**Aggregate Debt Service**" shall mean, with respect to any particular period of time, the sum of scheduled principal and interest payments under the Note and the promissory note entered into in connection with the making of the Mezzanine Loan, if any, and the Future Junior Mezzanine Loan, if any.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean $700,000.

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth Borrower's good faith estimate of Gross Revenue, Operating Expenses, and FF&E Expenditures for the applicable Fiscal Year.

"**Applicable Interest Rate**" shall mean 9.13% per annum for the initial Interest Period and thereafter either (i) the LIBOR Interest Rate plus the Spread with respect to any period when the Loan is a LIBOR Loan or (ii) the Substitute Rate plus the Substitute Spread with respect to any period when the Loan is a Substitute Rate Loan provided, however, that in no event shall the Applicable Interest Rate ever be less than 7.00% per annum.

"**Approved Accounting Method**" shall mean the (i) the Uniform System of Accounts reconciled in accordance with GAAP or (ii) such other method of accounting as may be reasonably acceptable to Lender, consistently applied.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(e).

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated the date hereof among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Protection Agreement**" shall mean that certain Assignment of Interest Rate Protection Agreement of even date herewith between Borrower and Lender and acknowledged by IXIS FINANCIAL PRODUCTS INC. and any other Assignment of Interest Rate Protection Agreement hereafter delivered.

D7732 – J29

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Basic Carrying Costs**" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the first paragraph hereof.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"**Capital Expenditures**" shall mean for any period the amount expended for items capitalized under the Approved Accounting Method (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Capped LIBOR Rate**" shall mean 5.50%.

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.3.2(c).

"**Casualty Retainage**" shall have the meaning set forth in Section 5.3.2(d).

"**Closing Date**" shall mean the date of funding the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Counterparty**" shall mean (a) the counterparty under the Interest Rate Protection Agreement or (b) a Person that guarantees such counterparty's obligations under the Interest Rate Protection Agreement or otherwise provides to such counterparty credit support acceptable to Lender or, after a Securitization, the Rating Agencies, provided, however, that such guarantor shall be deemed the "Counterparty" for so long as the long-term credit rating issued by

D7732 - J30

the Rating Agencies to such guarantor is better than the long-term credit rating of the actual counterparty under the Interest Rate Protection Agreement.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Debt**" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon (including, without limitation, any interest that would accrue on the outstanding principal amount of the Loan through and including the end of any applicable Interest Period, even if such Interest Period extends beyond any applicable Monthly Payment Date, Prepayment Date or the Maturity Date) and all other sums (including, without limitation, the Spread Maintenance Premium and any Breakage Costs) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage, the Environmental Indemnity or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and/or interest payments under the Note.

"**Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender on a quarterly basis of (i) Underwritable Cash Flow for the twelve (12) calendar month period immediately preceding the date of calculation to (ii) the projected Debt Service (or, in the event that a Mezzanine Loan has been entered into pursuant to and in accordance with the terms and provisions of Section 9.5 hereof or a Future Junior Mezzanine Loan has been entered into pursuant to and in accordance with the terms and provisions of Section 8.3 hereof, the projected Aggregate Debt Service) that would be due for the twelve (12) calendar month period immediately following such calculation (assuming a mortgage and mezzanine loan constant of 11.33% (or such other mortgage and mezzanine loan constant as may be expressly and specifically set forth herein)).

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate.

"**Determination Date**" shall mean, with respect to each Interest Period, the date that is two (2) London Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Period commences; provided, however, that Lender shall have the right to change the Determination Date to any other day upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"**Disclosure Document**" shall have the meaning set forth in Section 9.2(a).

LEGAL02/7825791v12

D7732 - J31

"**Eligible Account**" shall mean an identifiable account which is separate from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a federal or state chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Equity Collateral**" shall have the meaning set forth in Section 9.5.

"**ERISA**" shall have the meaning set forth in Section 4.2.11.

"**Event of Default**" shall have the meaning set forth in Section 10.1.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a).

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1(c)(vi).

"**Exculpated Parties**" shall have the meaning set forth in Section 11.22 hereof.

"**Excusable Delay**" shall mean a delay due to acts of God, governmental restrictions, stays, judgments, orders, decrees, enemy actions, civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other causes beyond the reasonable control of Borrower and/or Guarantor (or any of their respective constituent owners), but lack of funds in and of itself shall not be deemed a cause beyond the control of Borrower and/or Guarantor (or any of their respective constituent owners).

"**Exit Fee**" shall mean an amount equal to two and fifty hundredths percent (2.50%) of the original principal amount of the Note.

-5-

D7732 — J32

"**Extension Option**" shall have the meaning set forth In Section 2.3.2(b) hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.3.2(b) hereof.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(e).

"**FF&E Expenditures**" for any period shall mean amounts expended for FF&E as set forth in the Approved Annual Budget.

"**FF&E**" shall mean repair and/or replacement of the furnishings, fixtures, equipment and other items to the extent the same are properly capitalized in accordance with the Approved Accounting Method.

"**FF&E Expenditure Funds**" shall have the meaning set forth in Section 6.4.1.

"**FF&E Expenditures Work**" shall mean any labor performed or materials installed in connection with any FF&E Expenditure.

"**FF&E Reserve Monthly Deposit**" shall be an amount equal to six percent (6.0%) of Gross Rooms Revenue (as defined in the Franchise Agreement) relating to the Property for the immediately preceding calendar month.

"**Fiscal Year**" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Franchise Agreement**" shall mean that certain License Agreement, dated as of April 9, 2004, between Platinum Lodging, LLC, an Ohio limited liability company and Franchisor, and as the same may be amended or modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, the Replacement Franchise Agreement executed in accordance with the terms and provisions of this Agreement.

"**Franchisor**" shall mean Holiday Hospitality Franchising Inc., a Delaware corporation, or, if the context requires, a Qualified Franchisor.

"**Future Junior Mezzanine Borrower**" shall have the meaning set forth in Section 8.3 hereof.

"**Future Junior Mezzanine Loan**" shall have the meaning set forth in Section 8.3 hereof.

"**Future Junior Mezzanine Option**" shall have the meaning set forth in Section 8.3 hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting

-6-

D7732 - J33

Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"Governmental Authority" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"Gross Revenue" shall mean all revenue, derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, non-recurring revenues as determined by Lender, payments received by Borrower under the Interest Rate Protection Agreement, proceeds from the sale or refinancing of the Property, security deposits (except to the extent determined by Lender to be properly utilized to offset a loss of Rent), refunds and uncollectible accounts, proceeds of casualty insurance and Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), and any disbursements to Borrower from the Reserve Funds or any other fund established by the Loan Documents. Without limiting the generality of the foregoing, Gross Revenue shall also include all sustainable income and proceeds (whether in cash or on credit, and computed on an accrual basis) received by Borrower or Manager for the use, occupancy or enjoyment of the Property, or any part thereof, or received by Borrower or Manager for the sale of any goods, services or other items sold on or provided from the Property in the ordinary course of the Property operation, including without limitation: (a) all income and proceeds received from rental of rooms, Leases and commercial space, meeting, conference and/or banquet space within the Property including net parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property even though rendered outside of the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); (d) all Awards for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Gross Revenue" if received in the ordinary course of the Property operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); and (f) interest on credit accounts, rent concessions or credits, and other required pass-throughs and interest on Reserve Funds; but excluding, (1) gross receipts received by lessees, licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (3) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (4) federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes; (5) Awards (except to the extent provided in clause (d) above); (6) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (7) gratuities collected by the Property employees; (8) the proceeds of any financing; (9) other income or proceeds resulting

-7-

D7732 - J34

other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; and (10) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.

"**Guarantor**" shall mean Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively, as the context may require.

"**Guaranty**" shall mean that certain Guaranty of Payment and Guaranty of Recourse Obligations of even date herewith from Guarantor for the benefit of Lender.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b).

"**Independent Director**" shall have the meaning set forth in Section 3.1.24(p)(i).

"**Initial Maturity Date**" shall mean February 9, 2008.

"**Insurance Funds**" shall have the meaning set forth in Section 6.3.1.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1.1(b).

"**Interest Period**" shall mean (a) for the first interest period hereunder, (i) if the Closing Date occurs on or before the fourteenth (14th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the fourteenth (14th) day of the calendar month in which the Closing Date occurs, and (ii) if the Closing Date occurs on or after the fifteenth (15th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the fourteenth (14th) day of the following calendar month and (b) for each interest period thereafter commencing August 15, 2006, the period commencing on the fifteenth (15th) day of each calendar month and ending on (and including) the fourteenth (14th) day of the following calendar month. Each Interest Period as set forth in clause (b) above shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

-8-

D7732 – J35

"**Interest Rate Protection Agreement**" shall mean one or more interest rate caps (together with the schedules relating thereto) in form and substance reasonably satisfactory to Lender, with a confirmation from Lender or its Affiliate in the form attached hereto as Schedule III(a) and/or a confirmation from any other Counterparty in the form attached hereto as Schedule III(b), between Borrower and, subject to Section 4.1.11, a Counterparty reasonably acceptable to Lender with a Minimum Counterparty Rating, and all amendments, restatements, replacements, supplements and modifications thereto.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the first paragraph hereof.

"**Lender Indemnitees**" shall have the meaning set forth in Section 11.13(b).

"**Lender's Mezzanine Option**" shall have the meaning set forth in Section 9.5.

"**Lender's Notice**" shall have the meaning set forth in Section 2.2.3(b).

"**Liabilities**" shall have the meaning set forth in Section 9.2(b).

"**LIBOR**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/1000 of 1%) for deposits in U.S. dollars, for a one-month period, that appears on Telerate Page 3750 (or the successor thereto) as of 11:00 a.m., London time, on the related Determination Date. If such rate does not appear on Telerate Page 3750 as of 11:00 a.m., London time, on such Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, if at least two such offered rates so appear. If fewer than two such offered rates appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the

-9-

D7732 - J36

principal London Office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the then outstanding principal amount of the Loan. If at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the then outstanding principal amount of the Loan. If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. LIBOR shall be determined by Lender or its agent and at Borrower's request, Lender shall provide Borrower with the basis for its determination.

"**LIBOR Interest Rate**" shall mean with respect to each Interest Period the quotient of (i) LIBOR applicable to the Interest Period divided by (ii) a percentage equal to 100% minus the Reserve Requirement applicable to the Interest Period.

"**LIBOR Loan**" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at LIBOR Interest Rate plus the Spread in accordance with the provisions of Article II hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of TWENTY-EIGHT MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,500,000.00) made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Assignment of Protection Agreement, the Assignment of Management Agreement and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan.

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England or New York, New York are not open for business.

"**LTV**" shall mean a percentage, calculated by taking a fraction, the numerator of which is the aggregate outstanding principal balance of each of the Loan and, if any, the proposed or actual, as applicable, amount of the Mezzanine Loan and the Future Junior

-10-

D7732 – J37

Mezzanine Loan (each as reasonably adjusted by Lender, to the extent applicable, to add to the principal amount thereof any future advance, negative amortization or other similar features that may increase the principal amount thereof) and the denominator of which is the value of the Property based on a current appraisal acceptable to Lender thereof, multiplied by one hundred (100) percent.

"**Major Lease**" shall mean (i) any commercial or retail Lease that demises 1,000 square feet or more of the Property's gross leasable area, (ii) any Lease which contains any option, offer, right of first refusal or other similar entitlement to acquire all or any portion of the Property (which such rights shall be deemed to be exclusive of any rights under any Lease to extend the term thereof or to lease additional space at the Property), or (iii) any instrument guaranteeing or providing credit support for any Lease meeting the requirements of (ii) above.

"**Management Agreement**" shall mean the management agreement entered into by and between Borrower and the Manager, pursuant to which the Manager is to provide management and other services with respect to the Property.

"**Manager**" shall mean Focus Lodging Group, LLC, an Ohio limited liability company or any other manager approved in accordance with the terms and conditions of the Loan Documents.

"**Manager Termination Ratio**" shall have the meaning set forth in Section 7.3.

"**Material Agreements**" means each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, under which there is an obligation of Borrower to pay more than $25,000 per annum.

"**Maturity Date**" shall mean the Initial Maturity Date or, if applicable, the Extended Maturity Date, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall have the meaning set forth in Section 9.5.

"**Mezzanine Lender**" shall have the meaning set forth in Section 9.5.

"**Mezzanine Loan**" shall have the meaning set forth in Section 9.5.

"**Minimum Counterparty Rating**" shall mean a credit rating from S&P and Fitch of at least "AA" and from Moody's of at least "Aa2"; provided, however, that if Lender or

D7732 – J38

its Affiliate is the Counterparty, the Minimum Counterparty Rating shall mean a credit rating from S&P and Fitch of at least "AA-" and from Moody's of at least "Aa3".

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

"**Monthly Payment Date**" shall mean the ninth (9th) calendar day of every calendar month occurring during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately preceding such day, commencing on September 9, 2006 and continuing to and including the Maturity Date.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Morgan Stanley**" shall have the meaning set forth in Section 9.2(b).

"**Morgan Stanley Group**" shall have the meaning set forth in Section 9.2(b).

"**Mortgage**" shall mean that certain first priority Mortgage and Security Agreement, dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Mortgage Lender**" shall have the meaning set forth in Section 9.5.

"**Mortgage Loan**" shall have the meaning set forth in Section 9.5.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.3.2(f).

"**Note**" shall have the meaning set forth in Section 2.1.3.

"**Notice**" shall have the meaning set forth in Section 11.6.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Expenses**" shall mean all costs and expenses relating to the operation, maintenance and management of the Property, including, without limitation, utilities, repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes, equipment lease payments, a management fee equal to the greater of 4% of annual rents or the actual management fee, but excluding actual Capital Expenditures, depreciation, amortization, Extraordinary Expenses and deposits required to be made to the

D7732 – J39

Reserve Funds; provided, however such costs and expenses shall be subject to adjustment by Lender to normalize such costs and expenses.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Otherwise Rated Insurer**" shall have the meaning set forth in Section 5.1.2.

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Equipment and/or the Personal Property provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Equipment and/or Person Property which is (A) used in connection with the operation and maintenance of the Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the Mortgage.

"**Policies**" shall have the meaning specified in Section 5.1.1(b).

"**Post Closing Agreement**" shall mean that certain Post Closing Obligations Agreement, dated as of the date hereof, executed by Borrower in favor of Lender.

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

-13-

D7732 – J40

"**Property**" shall mean the parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, all as more particularly described in the granting clause of the Mortgage.

"**Qualified Equityholder**" shall mean any one of the following Persons:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C) above;

(E)    a Qualified Trustee (or in the case of a CDO, a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the Future Junior Mezzanine Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("CDO") secured by, or (C) a financing through an "owner trust" of, a Future Junior Mezzanine Loan (any of the foregoing, a "Securitization Vehicle", provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of a Future Junior Mezzanine Loan to such Securitization Vehicle); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer of such Securitization Vehicle has a Required Special Servicer Rating (such entity, an "Approved Servicer") and such Approved Servicer is required to service and administer such Future Junior Mezzanine Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a Qualified Trustee, or a CDO Asset Manager which is a Qualified Equityholder, are each a Qualified Equityholder under clauses (ii)(A), (ii)(B), (ii)(C) or (ii)(D) of this definition; or

D7732 - J41

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Equityholders under clauses (ii)(A), (B), (C) or (D) of this definition.

Notwithstanding the foregoing, no person or entity shall be deemed to be a Qualified Equityholder if (y) such person or entity (or any other person or entity owned or Controlled by such person or entity or affiliated with such person or entity) has been, within the last ten (10) years, (I) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institutional lender or (II) the subject of any action or proceeding under applicable Bankruptcy Code; or (z) any of the principals or entities which Control such person or entity or own a material direct or indirect equity interest in such person or entity have ever been convicted of a felony.

As used in the above definition of "Qualified Equityholder", the following terms shall have the following meanings:

(i)    "CDO Asset Manager" with respect to any Securitization Vehicle which is a CDO, shall mean the entity which is responsible for managing or administering the Future Junior Mezzanine Loan as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of the Future Junior Mezzanine Loan).

(ii)    "Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

(iii)    "Intervening Trust Vehicle" with respect to any Securitization Vehicle which is a CDO, shall mean a trust vehicle or entity which holds the Future Junior Mezzanine Loan as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

(iv)    "Permitted Fund Manager" means any Person that on the date of determination is (i) an entity that is a Qualified Equityholder under clauses (ii)(A), (B), (C) or (D) of the definition thereof or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to any case, proceeding or other action against Borrower, Future Junior Mezzanine Borrower or any SPC Party under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors.

(v)    "Qualified Trustee" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state

-15-

D7732 - J42

or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

(vi)    "Required Special Servicer Rating" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Mortgage Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"Qualified Franchisor" shall mean either (a) Franchisor; or (b) in the reasonable judgment of Lender, a reputable and experienced franchisor possessing experience in flagging hotel properties similar in size, scope, use and value as the Property, provided, that at Lender's option, Borrower's delivery to Lender of a Rating Agency Confirmation with regard to such franchisor shall be a prerequisite to Lender's approval of such franchisor hereunder.

"Rating Agencies" shall mean, prior to the final Securitization of the Loan, each of S&P, Moody's and Fitch, or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

"Rating Agency Confirmation" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"Rating Surveillance Charge" shall have the meaning set forth in Section 9.3.

"Registrar" shall have the meaning set forth in Section 9.6 hereof.

"Registration Statement" shall have the meaning set forth in Section 9.2(b).

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect, including any successor or other Regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"REMIC Trust" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

-16-

D7732 – J43

"**Rents**" shall mean all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income or insurance, including, without limitation, all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Franchise Agreement**" shall mean either (a) a franchise, trademark and license agreement with a Qualified Franchisor substantially in the same form and substance as the Franchise Agreement, or (b) a franchise, trademark and license agreement with a Qualified Franchisor, which franchise, trademark and license agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (b), Lender, at its option, may require that Borrower shall have obtained a Rating Agency Confirmation with regard to such franchise, trademark and license agreement.

"**Replacement Guarantor**" shall mean a new guarantor or guarantors of the Loan that replaces one or more of Guarantor, such replacement to occur upon satisfaction of the following conditions: (a) such Person shall (i) be satisfactory to Lender based solely on a thorough credit investigation (including review of such Replacement Guarantor's credit reports, judgment and lien searches and such other credit information as Lender reasonably requests), (ii) have the same net worth and liquidity as that of the Guarantor being replaced, as of the date hereof, (iii) assume the obligations of Guarantor under the Loan Documents and, in connection therewith, shall execute, without any cost or expense to Lender, such documents and agreements as Lender shall require to evidence and effectuate said assumption and (iv) own, directly or indirectly, an interest in the Borrower in an amount no less than interest of the Guarantor that such Person replaces; (b) Lender shall have received (i) if required by Lender, (i) a Rating Agency Confirmation and (ii) an opinion in form and substance (and from counsel) acceptable to Lender and the Rating Agencies stating that the consummation of the substitution of the original Guarantor would not constitute a "significant modification" of the Loan under Section 1001 of the IRS Code or otherwise cause a tax to be imposed on a "prohibited transaction" by any REMIC Trust (a "**REMIC Opinion**"), provided that a Rating Agency Confirmation and REMIC Opinion shall only be required in the event a Securitization has occurred; and (c) no Event of Default shall have occurred and be continuing. Notwithstanding the foregoing, no Person shall be deemed to be an acceptable Replacement Guarantor if (a) such Person (or any other Person

-17-

D7732 - J44

owned or Controlled by such Person or affiliated with such Person) has been, within the last ten (10) years (i) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institution lender or (ii) the subject of any action or proceeding under the applicable Bankruptcy Code, or (b) any of the principals or entities which Control such Person or own a material direct or indirect equity interest in such Person have ever been convicted of a felony.

"**Replacement Interest Rate Cap Agreement**" means an interest rate cap agreement from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating, with terms identical to the Interest Rate Protection Agreement except that the same shall be effective in connection with replacement of the Interest Rate Protection Agreement following a downgrade, withdrawal or qualification of the long-term unsecured debt rating of the Counterparty; provided that to the extent any such interest rate cap agreement does not meet the foregoing requirements, a "Replacement Interest Rate Cap Agreement" shall be such interest rate cap agreement approved in writing by each of the Rating Agencies with respect thereto.

"**Reporting Failure**" shall have the meaning set forth in Section 4.1.6.

"**Required Financial Item**" shall have the meaning set forth in Section 4.1.6.

"**Required Repair Funds**" shall have the meaning set forth in Section 6.1.1.

"**Reserve Funds**" shall mean, collectively, FF&E Expenditure Funds, the Insurance Funds, the Tax Funds, and the Debt Service Reserve Funds.

"**Reserve Requirements**" means with respect to any Interest Period, the maximum rate of all reserve requirements (including, without limitation, all basic, marginal, emergency, supplemental, special or other reserves and taking into account any transitional adjustments or other schedule changes in reserve requirements during the Interest Period) which are imposed under Regulation D on eurocurrency liabilities (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against any category of extensions of credit or other assets which includes loans by a non-United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits) during the Interest Period and which are applicable to member banks of the Federal Reserve System with deposits exceeding one billion dollars, but without benefit or credit of proration, exemptions or offsets that might otherwise be available from time to time under Regulation D. The determination of the Reserve Requirements shall be based on the assumption that Lender funded 100% of the Loan in the interbank eurodollar market. In the event of any change in the rate of such Reserve Requirements under Regulation D during the Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including, without limitation, the imposition of Reserve Requirements, or differing Reserve Requirements, on one or more but not all of the holders of the Loan or any participation therein, Lender may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining the rate of such

D7732 - J45

Reserve Requirements which shall be used in the computation of the Reserve Requirements. Lender's computation of same shall be final absent manifest error.

"**Restoration**" shall have the meaning set forth in Section 5.2.1.

"**Restoration Threshold**" shall mean $700,000.

"**Restricted Party**" shall mean Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager or any non-member manager.

"**Rollover Funds**" shall have the meaning set forth in Section 6.5.1.

"**Rollover Monthly Deposit**" shall have the meaning set forth in Section 6.5.1

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"**Sale**" shall have the meaning set forth in Article 8 hereof.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1(a).

"**Securities**" shall have the meaning set forth in Section 9.1(a).

"**Securities Act**" shall have the meaning set forth in Section 9.2(a).

"**Securitization**" shall have the meaning set forth in Section 9.1(a).

"**Servicer**" shall have the meaning set forth in Section 11.24.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(c).

"**SPC Party**" shall have the meaning set forth in Section 3.1.24(o).

"**Spread**" shall mean 375 basis points.

"**Spread Maintenance Premium**" shall mean, in connection with a prepayment of all or any portion of the outstanding principal balance of the Loan pursuant to Section 2.3.3, Section 2.4.1(a) (as modified therein) or Section 2.4.3 hereof, an amount equal to the present

-19-

D7732 - J46

value, discounted at LIBOR on the most recent Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, discounted at an interest rate that Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available), of all future installments of interest which would have been due hereunder through and including the end of the Interest Period in which the Maturity Date occurs, on the portion of the outstanding principal balance of the Loan being prepaid as if interest accrued on such portion of the principal balance being prepaid at an interest rate per annum equal to greater of (a) the Spread or (b) the Spread plus the difference between (i) 7.00% and (ii) LIBOR on such Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, an interest rate that Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available). The Spread Maintenance Premium shall be calculated by Lender and shall be final absent manifest error.

"**Standard Statement**" shall have the meaning set forth in Section 9.1(c).

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Substitute Rate**" shall have the meaning set forth in Section 2.2.3(b).

"**Substitute Rate Loan**" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at the Substitute Rate plus the Substitute Spread in accordance with the provisions of Article II hereof.

"**Substitute Spread**" shall have the meaning set forth in Section 2.2.3(b).

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Funds**" shall have the meaning set forth in Section 6.2.1.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Title Insurance Policy**" shall mean an ALTA mortgage title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the lien of the Mortgage.

"**Trustee**" shall mean any trustee holding the Loan in a Securitization.

LEGAL02/7825791v12

D7732 - J47

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Underwritable Cash Flow**" shall mean the excess of Gross Revenue over Operating Expenses. Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Gross Revenue or Operating Expenses) shall be calculated by Lender based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall have the meaning set forth in Section 9.2(b).

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"**Updated Information**" shall have the meaning set forth in Section 9.1(b)(i).

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

**Section 1.2    Principles of Construction.**

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

**II.    THE LOAN**

**Section 2.1    The Loan.**

**2.1.1    Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

**2.1.2    Single Disbursement to Borrower.**  Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3    The Note.**  The Loan shall be evidenced by that certain Promissory Note of even date herewith, in the stated principal amount of TWENTY-EIGHT MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($28,500,000.00) executed by Borrower and payable to the order of Lender in evidence of the Loan (as the same may hereafter be amended, supplemented, restated, increased, extended or consolidated from time to time, the "Note") and shall be repaid in accordance with the terms of this Agreement and the Note.

-21-

D7732 - J48

**2.1.4  Use of Proceeds.**  Borrower shall use proceeds of the Loan to (i) pay and discharge any existing loans relating to the Property, (ii) pay all past-due Basic Carrying Costs, if any, in respect of the Property, (iii) deposit the Reserve Funds, (iv) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (v) fund any working capital requirements of the Property, as approved by Lender and (vi) retain the balance, if any.

### Section 2.2    Interest Rate.

**2.2.1  Applicable Interest Rate.**  Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to and including the Maturity Date (including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through the end of the Interest Period during which the Maturity Date occurs (even if such period extends beyond the Maturity Date)) at the Applicable Interest Rate.  Interest on the outstanding principal balance of the Loan existing on the commencement of an Interest Period shall accrue for the entire Interest Period and shall be owed by Borrower for the entire Interest Period regardless of whether any principal portion of the Loan is repaid prior to the expiration of such Interest Period.

**2.2.2  Interest Calculation.**  Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.

**2.2.3  Determination of Interest Rate.**

(a)  Any change in the rate of interest hereunder due to a change in the Applicable Interest Rate shall become effective as of the first day on which such change in the Applicable Interest Rate shall become effective.  Each determination by Lender of the Applicable Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(b)  In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall, by notice to Borrower ("Lender's Notice"), which notice shall set forth in reasonable detail such circumstances, establish the Applicable Interest Rate at Lender's then customary spread (the "Substitute Spread"), taking into account the size of the Loan and the creditworthiness of Borrower, above a published index used for variable rate loans as reasonably determined by Lender (the "Substitute Rate").

(c)  If, pursuant to the terms of this Agreement, the Loan has been converted to a Substitute Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower, and the Substitute Rate Loan shall automatically convert to a LIBOR Loan on the effective date

-22-

D7732 — J49

set forth in such notice. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to convert a LIBOR Loan to a Substitute Rate Loan.

(d)    With respect to a LIBOR Loan, all payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof (such non-excluded taxes being referred to collectively as "Foreign Taxes"), excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (including Puerto Rico). If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(e)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR Loan as contemplated hereunder, (i) the obligation of Lender hereunder to make a LIBOR Loan shall be cancelled forthwith and (ii) Lender may give Borrower a Lender's Notice, establishing the Applicable Interest Rate at the Substitute Rate plus the Substitute Spread, in which case the Applicable Interest Rate shall be a rate equal to the Substitute Rate in effect from time to time plus the Substitute Spread. In the event the condition necessitating the cancellation of Lender's obligation to make a LIBOR Loan hereunder shall cease, Lender shall promptly notify Borrower of such cessation and the Loan shall resume its characteristics as a LIBOR Loan in accordance with the terms herein from and after the first day of the Interest Period next following such cessation. Borrower hereby agrees promptly to pay Lender, upon demand, any additional amounts necessary to compensate Lender for any out-of-pocket costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be set forth in reasonable detail and Lender's calculation shall be conclusive absent manifest error.

(f)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could

LEGAL02/7825791v12



D7732 – J50

have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(ii)    shall hereafter impose, modify, increase or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the rate hereunder; or

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Borrower shall not be required to pay same unless they are the result of requirements imposed generally on lenders similar to Lender and not the result of some specific reserve or similar requirement imposed on Lender as a result of Lender's special circumstances. If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Lender shall provide Borrower with not less than thirty (30) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence, executed by an authorized signatory of Lender and submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(g)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense (other than consequential and punitive damages) which Lender sustains or incurs as a consequence of (i) any default by Borrower in payment of the principal of or interest on a LIBOR Loan, including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder, (ii) any prepayment (whether voluntary or mandatory) of the LIBOR Loan on a day that (A) is not a Monthly Payment Date or (B) is a Monthly Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Loan hereunder and (iii) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate to the Substitute Rate plus the Substitute Spread with respect to any portion of the outstanding principal amount of the Loan then bearing interest at a rate other than the Substitute Rate plus the Substitute Spread on a date other than the first day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder (the amounts referred to in clauses (i), (ii) and (iii) are herein referred to collectively as the "Breakage Costs"). Whenever in this Section 2.2.3 the term "interest or fees payable by Lender to lenders

-24-

D7732 – J51

of funds obtained by it" is used and no such funds were actually obtained from such lenders, it shall include interest or fees which would have been payable by Lender if it had obtained funds from lenders in order to maintain a LIBOR Loan hereunder.  Lender will provide to Borrower a statement detailing such Breakage Costs and the calculation thereof.

(h)    The provisions of this Section 2.2.3 shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

2.2.4  Usury Savings.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.3    Loan Payments.

2.3.1  Payment Before Maturity Date.  Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period.  On the Monthly Payment Date occurring in September, 2006 and on each Monthly Payment Date thereafter to and including the Maturity Date, Borrower shall make a payment to Lender of interest accruing hereunder during the entire Interest Period in which such Monthly Payment Date occurs, calculated in the manner set forth herein.

2.3.2  Payment on Maturity Date; Extension of Maturity Date.  (a)  Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents, including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through and including the end of the Interest Period in which the Maturity Date occurs (even if such Interest Period extends beyond the Maturity Date).

(b)    Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for two (2) successive terms (each, an "Extension Option") for consecutive six (6) month periods (the Initial Maturity Date following the exercise of each such option is hereinafter the "Extended Maturity Date") upon satisfaction of the following terms and conditions of this Section 2.3.2(b):

-25-

D7732 - J52

(i)    In order to exercise the first Extension Option, Borrower shall deliver to Lender written notice of such extension not less than thirty (30) days nor more than sixty (60) days prior to the Initial Maturity Date and, upon giving of such notice of extension, and subject to the satisfaction of the conditions set forth below, the Maturity Date as theretofore in effect will be extended to August 9, 2008;

(ii)    In order to exercise the second Extension Option, Borrower shall deliver to Lender written notice of such extension not less than thirty (30) days nor more than sixty (60) days prior to the Maturity Date and, upon the giving of such notice of extension, and subject to the satisfaction of the conditions set forth below, the Maturity Date as theretofore in effect will be extended to February 9, 2009;

(iii)    no Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and on the date that the applicable extension term is commenced;

(iv)    Borrower shall enter into an Interest Rate Protection Agreement through the term of the applicable extension under the same terms and conditions of the initial Interest Rate Protection Agreement (including its LIBOR strike price) entered into in connection with the Loan and shall provide an Assignment of Protection Agreement with respect thereto in the form of Assignment of Protection Agreement, together with an opinion of counsel with respect thereto reasonably acceptable to Lender;

(v)    Borrower shall have made a payment to Lender of an extension fee equal to one quarter of one percent (.25%) of the unpaid principal balance of the Loan as of the Maturity Date;

(vi)    if the Debt Service Coverage Ratio for the Property shall be less than 1.00:1.00 as of the date an Extension Option is exercised, Borrower shall deposit an amount up to $625,000.00, as determined by Lender in its sole discretion, into the Debt Service Reserve Funds, which amount shall be added to the existing Debt Service Reserve Funds, if any, and held in accordance with Section 6.6.1 hereof;

(vii)    the Franchise Agreement shall be in full force and effect with no material defaults thereunder, shall not have a term that expires prior to the Extended Maturity Date, and the Loan (as extended) shall be permitted thereby; and

(viii)    in connection with each Extension Option, Borrower shall have delivered to Lender together with its notice pursuant to Section 2.3.2(b)(i) or Section 2.3.2(b)(ii), as applicable, and as of the commencement of the applicable Extension Option, an Officer's Certificate in form acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the date of such Officer's Certificate.

2.3.3    **Interest Rate and Payment after Default**.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led

-26-

D7732 - J53

to such an Event of Default without regard to any grace or cure periods contained herein. If all or any part of the principal amount of the Loan is prepaid upon acceleration of the Loan following the occurrence of an Event of Default, Borrower shall be required to pay (a) to Lender, in addition to all other amounts then payable hereunder (including, without limitation, (i) in the event that such prepayment is received on a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such prepayment is received on a date other than a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which the next Monthly Payment Date occurs), all Breakage Costs, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, together with a Spread Maintenance Premium calculated with respect to the amount of principal being repaid and (b) to Morgan Stanley, the Exit Fee.

2.3.4   **Late Payment Charge**.  If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Mortgage and the other Loan Documents.

2.3.5   **Method and Place of Payment**.  (a)  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the Business Day immediately preceding such day.

(c)    All payments required to be made by Borrower hereunder or under the /Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.4   Prepayments.**

2.4.1   **Voluntary Prepayments**.  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.

(a)    Borrower may, provided no Event of Default has occurred, at its option, prepay the Debt in whole or in part, provided, the following conditions are satisfied (provided, however, that in connection with any such prepayment to Lender, Borrower shall pay the Exit Fee to Morgan Stanley):

-27-

D7732 – J54

(i)    Borrower shall provide prior written notice to Lender specifying the Monthly Payment Date upon which the prepayment is to be made (the "Prepayment Date"), which notice shall be delivered to Lender not less than thirty (30) days prior to such Prepayment Date (or such shorter period of time as may be permitted by Lender in its sole discretion) and which notice shall be irrevocable;

(ii)    if the Prepayment Date occurs on or prior to the Monthly Payment Date occurring in August 2007, Borrower shall pay a Spread Maintenance Premium calculated with respect to which would have been due hereunder through and including the end of the Interest Period occurring in August 2007, on the portion of the outstanding principal balance of the Loan being prepaid;

(iii)    no prepayment shall be permitted on any date during the period commencing on the first calendar day immediately following a Monthly Payment Date to, but not including, the Determination Date in such calendar month, unless consented to by Lender in its sole discretion;

(iv)    if such prepayment is made on a Monthly Payment Date, then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date; and

(v)    if such prepayment is made on a day other than a Monthly Payment Date (subject to the lockout period set forth in clause (iii) above), then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date; provided, however, that if the Prepayment Date is a date on or after the Determination Date in such calendar month and prior to the first day of the Interest Period that commences in such calendar month, Borrower shall also pay to Lender in connection with such prepayment all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the next succeeding Interest Period.  Any prepayment received by Lender on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan and shall be applied to (A) the Debt on the next Monthly Payment Date and (B) any Breakage Costs due and payable pursuant to Section 2.2.3(g) hereof.

(b)    Borrower has a one time right to prepay the Debt in whole but not in part, if the Mezzanine Loan does not close on or prior to August 4, 2006, which failure to close is due solely to Lender's inability to consummate the transaction on such date which is not due to any fault of Borrower (including, without limitation, Borrower's satisfaction and delivery of all items

LEGAL02/7825791v12

D7732 - J55

required in connection with such Mezzanine Loan in accordance with Section 9.5 hereof), provided, the following conditions are satisfied:

(i)     no Event of Default has occurred;

(ii)     Borrower shall provide evidence reasonably satisfactory to Lender that (A) the failure to close the Mezzanine Loan set forth in Sections 9.5(a) and (b) herein resulted solely from Lender's inability to consummate the transaction in accordance with the provisions of Section 9.5 hereof, and (B) that Borrower had satisfied all of its obligations (including, without limitation, all of the requirements set forth in Section 9.5 of this Agreement) in connection with the closing of the Mezzanine Loan, delivered all documentation, organizational documents, opinions and other information to Lender in accordance with Section 9.5 hereof, which shall be satisfactory to Lender in all respects, and was prepared to close the Mezzanine Loan on or before August 4, 2006, notwithstanding Lender's inability to do so

(iii)     no prepayment shall be permitted on any date during the period commencing on the first calendar day immediately following a Monthly Payment Date to, but not including, the Determination Date in such calendar month, unless consented to by Lender in its sole discretion;

(iv)     Borrower shall provide written notice to Lender by no later than August 9, 2006 that it intends to prepay the Loan pursuant to this Section 2.4.1(b);

(v)     Borrower shall make the prepayment on or prior to November 9, 2006;

(vi)     if such prepayment is made on a Monthly Payment Date, then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the prepayment date;

(vii)     if such prepayment is made on a day other than a Monthly Payment Date (subject to the lock-out period set forth in clause (iii) above), then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the prepayment date; provided, however, that if the prepayment date is a date on or after the Determination Date in such calendar month and prior to the first day of the Interest Period that commences in such calendar month, Borrower shall also pay to Lender in connection with such prepayment all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the next succeeding Interest Period. Any prepayment received

-29-

D7732 - J56

by Lender on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan and shall be applied to (A) the Debt on the next Monthly Payment Date and (B) any Breakage Costs due and payable pursuant to Section 2.2.3(g) hereof; and

(viii)   no Exit Fee or Spread Maintenance Premium shall be due in connection with a prepayment made under this Section 2.4.1(b).

2.4.2    **Mandatory Prepayments**.  On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for a Restoration, Borrower shall, at Lender's option, prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds together with (i) in the event that such Net Proceeds are received on or before a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such Net Proceeds are received on a date after a Monthly Payment Date, interest accruing on such amount calculated through and including the end of Interest Period in which the next Monthly Payment Date occurs.  Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date.  Borrower shall also be responsible for any Breakage Costs incurred and the Exit Fee.

2.4.3    **Prepayments After Default**.  If after an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, or a purchaser at foreclosure or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay (i) to Lender, in addition to the outstanding principal balance, all accrued and unpaid interest (including, without limitation, (a) in the event that such prepayment is received on or before a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (b) in the event that such prepayment is received on a date after a Monthly Payment Date, interest accruing on such amount calculated through and including the end of Interest Period in which the next Monthly Payment Date occurs), and other amounts payable under the Loan Documents, Breakage Costs, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, together with a Spread Maintenance Premium calculated with respect to the amount of principal being repaid, and (ii) to Morgan Stanley, the Exit Fee.

2.4.4    **Exit Fee**.  Notwithstanding anything to the contrary herein, Borrower shall pay to Morgan Stanley, in addition to payment to Lender of all amounts then due and owing to Lender under the Note, the Mortgage and the other Loan Documents, the Exit Fee on the earlier of (i) the date of any principal prepayment pursuant to Sections 2.3.3, 2.4.1(a), 2.4.2 or 2.4.3 above or (ii) the Maturity Date.  Borrower acknowledges that such Exit Fee is bargained-for-consideration and not a penalty.  In the event the Loan is prepaid or repaid or refinanced with the proceeds of a fixed rate permanent loan secured by the Property which is funded by Morgan Stanley, the Exit Fee shall be waived.

-30-

D7732 – J57

## III.  REPRESENTATIONS AND WARRANTIES

### Section 3.1    Borrower Representations.

Borrower represents and warrants that:

**3.1.1  Organization.** (a)  Each of Borrower and each SPC Party is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder, and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

(b)  Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).  Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 1448184.  Borrower's federal tax identification number is 20-0822918.  Borrower is not subject to back-up withholding taxes.

**3.1.2  Proceedings.**  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**3.1.3  No Conflicts.**  The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents or any agreement or instrument to which Borrower is a party or by which it is bound, or any order or decree applicable to Borrower, or result in the creation or imposition of any lien on any of Borrower's assets or property (other than pursuant to the Loan Documents).

-31-

D7732 - J58

**3.1.4  Litigation.** There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower in any court or by or before any other Governmental Authority which would materially and adversely affect the ability of Borrower to carry out the transactions contemplated by this Agreement.

**3.1.5  Agreements.** Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.

**3.1.6  Consents.** No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

**3.1.7  Title.** Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. There are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage, except those covered by the Post Closing Agreement. None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage and this Loan Agreement, materially and adversely affect the value of the Property, impair the use or operations of the Property or impair Borrower's ability to pay its obligations in a timely manner.

**3.1.8  No Plan Assets.** As of the date hereof and throughout the term of the Loan (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans.

**3.1.9  Compliance.** Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and Prescribed Laws. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of

-32-

D7732 – J59

Borrower. Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

      **3.1.10 Financial Information.** All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of the financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

      **3.1.11 Condemnation.** No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

      **3.1.12 Utilities, Public Access and Parking.** The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. The Property has, or is served by, parking to the extent required to comply with all Legal Requirements.

      **3.1.13 Separate Lots.** The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

      **3.1.14 Assessments.** There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

      **3.1.15 Enforceability.** The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

      **3.1.16 Assignment of Leases.** The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property. No Person other than Lender

-33-

D7732 – J60

has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

      3.1.17 **Insurance**. Borrower has obtained and has delivered to Lender original or certified copies of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

      3.1.18 **Licenses**. All permits and approvals, including without limitation, certificates of occupancy required by any Governmental Authority for the use, occupancy and operation of the Property in the manner in which the Property is currently being used, occupied and operated have been obtained and are in full force and effect.

      3.1.19 **Flood Zone**. None of the Improvements on the Property is located in an area identified by the Federal Emergency Management Agency as a special flood hazard area or if any portion of the Improvements is located within such area, Borrower has obtained the insurance prescribed in Section 5.1.1(a)(i) hereof.

      3.1.20 **Physical Condition**. The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

      3.1.21 **Boundaries**. All of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance.

      3.1.22 **Leases**. Borrower represents to Lender that, as of the date hereof, there are no commercial Leases with any Tenants at the Property.

      3.1.23 **Filing and Recording Taxes**. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid or are being paid

LEGAL02/7825791v12

D7732 - J61

simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the title insurance policy to be issued in connection with the Mortgage.

3.1.24 **Single Purpose.**  Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(a)    Borrower has not owned and will not own any asset or property other than (i) the Property and (ii) incidental personal property necessary for the ownership or operation of the Property; provided, however, Borrower previously owned the Adjacent Properties. Borrower hereby warrants and represents that (1) ownership of the Adjacent Properties has been transferred to another entity and Borrower has no direct or indirect ownership interest in the Adjacent Properties and (2) except as otherwise set forth herein, Borrower has no contingent liabilities in connection with the Adjacent Properties.

(b)    Borrower has not and will not engage in any business other than the ownership, management and operation of the Property (other than the prior ownership of the Adjacent Properties) and Borrower has and will conduct and operate its business as presently conducted and operated.

(c)    Borrower has not and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d)    Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) that certain loan made on May 10, 2005 in the original principal amount of $23,700,000 made by Marshall Investments Corporation to Borrower secured by the Property (the "**Prior Hotel Loan**"), (C) that certain loan made on October 7, 2005 in the original principal amount of $2,212,000 made by Oak Hill Bank to Borrower secured by the Adjacent Properties (the "**Adjacent Properties Loan**"), (D) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and/or (E) Permitted Equipment Leases; provided however, the aggregate amount of the indebtedness described in (D) and (E) shall not exceed at any time three percent (3%) of the outstanding principal amount of the Debt, and except as otherwise may be permitted pursuant to and in accordance with the terms of the Post Closing Agreement.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property.  With respect to the Prior Hotel Loan, Borrower hereby represents, warrants and covenants that (1) the Prior Hotel Loan has been satisfied in full, and (2) neither Borrower nor Guarantor have any remaining liabilities or obligations in

-35-

D7732 — J62

connection with the Prior Hotel Loan (other than environmental and other limited and customary indemnity obligations).    With respect to the Adjacent Properties Loan, Borrower hereby represents, warrants and covenants that Borrower has been fully released from all liabilities and obligations in connection with the Adjacent Properties Loan.

(e)    Borrower has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates.

(f)    Borrower is and will remain solvent and Borrower has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; provided, that, in each such case, there exists sufficient cash flow from the Property to do so.

(g)    Borrower has done or caused to be done and will do or cause to be done all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any constituent party to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or such constituent party without the prior consent of Lender in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Lender's consent.

(h)    Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party.  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet.  Borrower has filed and will file its own tax returns (to the extent Borrower is required to file any such tax returns) and has not and will not file a consolidated federal income tax return with any other Person.  Borrower has maintained and will maintain its books, records, resolutions and agreements as official records.

(i)    Borrower has been and will be, and at all times has and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any constituent party of Borrower), has and shall correct any known misunderstanding regarding its status as a separate entity, has and shall conduct business in its own name, has not and shall not identify itself or any of its Affiliates as a division or part of the other and has and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)    Borrower has and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its

-36-



D7732 - J63

contemplated business operations (provided that there exists sufficient cash flow from the Property to do so).

(k)    Neither Borrower nor any constituent party has or will seek or effect the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of Borrower.

(l)    Borrower has not and will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and has and will hold all of its assets in its own name.

(m)    Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)    Borrower has not and will not guarantee or become obligated for the debts of any other Person and has not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)    If Borrower is a limited partnership or a limited liability company (other than an Acceptable Delaware LLC), each general partner or managing member (each, an "**SPC Party**") shall be a corporation (I) whose sole asset is its interest in Borrower, (II) which has not been and shall not be permitted to engage in any business or activity other than owning an interest in Borrower; (III) which has not been and shall not be permitted to incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (IV) which has and will at all times own at least a 0.5% direct equity ownership interest in Borrower. Each such SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 (to the extent applicable) as if such representation, warranty or covenant was made directly by such SPC Party. Upon the withdrawal or the disassociation of an SPC Party from Borrower, Borrower shall immediately appoint a new SPC Party whose articles of incorporation are substantially similar to those of such SPC Party.

(p)    Borrower shall at all times cause there to be at least one (1) duly appointed member of the board of directors or managers of SPC Party or Borrower (to the extent Borrower is a corporation or an Acceptable Delaware LLC) who is provided by a nationally-recognized company that provides professional independent directors (each, an "**Independent Director**") reasonably satisfactory to Lender who shall not have been at the time of such individual's appointment or at any time while serving as a director or manager of such SPC Party or Borrower (as applicable) and may not have been at any time during the preceding five years (i) a stockholder, director or manager (other than, in each case, as an Independent Director), officer, employee, partner, member, attorney or counsel of such SPC Party (if any), Borrower or any Affiliate of either of them, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such SPC Party (if any), Borrower or any Affiliate of either of them, (iii) a Person or other entity Controlling or under common Control with any such stockholder, director, manager, officer, employee, partner, member, attorney or counsel, customer, supplier or other Person, or (iv) a member of the immediate family of any such

LEGAL02/7025791v12

D7732 - J64

stockholder, director, manager, officer, employee, partner, member, attorney or counsel, customer, supplier or other Person.

(q) Borrower shall not (I) cause or permit the board of directors or managers of any SPC Party or Borrower (as applicable) to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock or under any organizational document of Borrower or SPC Party (as applicable), requires a vote of the board of directors or managers of Borrower or SPC Party (as applicable) unless at the time of such action there shall be at least one (1) member who is an Independent Director and (II) without the unanimous written consent of all of its partners or members, as applicable, and the written consent of 100% of the directors or managers of Borrower or each SPC Party (as applicable), including, without limitation, each Independent Director, (1) file or consent to the filling of any petition, either voluntary or involuntary, to take advantage of any state or federal; bankruptcy or insolvency laws, (2) seek or consent to the appointment of a receiver, liquidator or any similar official, (3) take any action that might cause such entity to become insolvent, or (4) make an assignment for the benefit of creditors.

(r) <u>Intentionally Omitted</u>.

(s) Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(t) Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(u) Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and has paid and shall pay from its own assets all obligations of any kind incurred.

**3.1.25** <u>Tax Filings</u>. To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower. Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26** <u>Solvency</u>. Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately

-38-

D7732 – J65

following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

3.1.27 **Federal Reserve Regulations.** No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

3.1.28 **Organizational Chart.** The organizational chart attached as Schedule 1 hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

3.1.29 **Bank Holding Company.** Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

3.1.30 **Investment Company Act.** Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.31 **No Bankruptcy Filing.** Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any knowledge of any Person contemplating the filing of any such petition against it.

3.1.32 **Full and Accurate Disclosure.** To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

LEGAL02/7825791v12

D7732 - J66

**3.1.33  Foreign Person.**  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

**3.1.34  No Change in Facts or Circumstances; Disclosure.**  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

**3.1.35  Management Agreement.**  All of the representations and warranties with respect to the Management Agreement set forth in Article VII of this Agreement are true and correct in all respects.

**3.1.36  Intentionally Omitted.**

**3.1.37  No Breach of Fiduciary Duty.**  No Person currently owning a direct or indirect equity ownership interest in Borrower (nor any past or current affiliate of such Person), has breached any fiduciary duty owed by such Person to any other Person now or previously owning a direct or indirect equity ownership interest in Borrower or in any other prior owner of the Property.

**3.1.38  Intentionally Omitted.**

**3.1.39  Intentionally Omitted.**

**3.1.40  Franchise Agreement.**  The Franchise Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.

**3.1.41  FF&E.**  Borrower owns all of the furnishings, fixtures and equipment necessary to maintain and operate the Property as a hotel, or to the extent any of such furnishings, fixtures and/or equipment are held by borrower pursuant to a lease, such lease is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.

**Section 3.2     Survival of Representations.**

The representations and warranties set forth in Section 3.1 shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

-40-

D7732 - J67

## IV.   BORROWER COVENANTS

### Section 4.1    Borrower Affirmative Covenants.

Borrower hereby covenants and agrees with Lender that:

**4.1.1   Existence; Compliance with Legal Requirements.** Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it and the Property, including, without limitation, Prescribed Laws.

**4.1.2   Taxes and Other Charges.** Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 6.2 hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent; provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 6.2 hereof. Borrower shall not permit or suffer and shall promptly discharge any lien or charge against the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) Borrower shall deposit with Lender cash, or other security as may be approved by Lender, in an amount equal to one hundred twenty-five percent (125%) of the contested amount, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

**4.1.3   Litigation.** Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which might materially adversely affect the Property or Borrower's ability to perform its obligations hereunder or under the other Loan Documents.

**4.1.4   Access to Property.** Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**4.1.5   Further Assurances; Supplemental Mortgage Affidavits.** Borrower shall, at Borrower's sole cost and expense:

-41-

D7732 – J68

(a)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(b)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, including, without limitation, the execution and delivery of all such writings necessary to transfer any liquor licenses with respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default.

### 4.1.6    Financial Reporting.

(a)    Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with the Approved Accounting Method, reflecting the financial affairs of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable notice to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.

(b)    Borrower shall furnish Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements reviewed by a "Big Four" accounting firm (excluding Arthur Andersen), REA and Associates, Inc. or other independent certified public accountant acceptable to Lender, certified by an officer of the Borrower, prepared in accordance with the Approved Accounting Method covering the Property, including statements of income and expense and cash flow for Borrower and the Property and a balance sheet for Borrower, provided that (i) after an Event of Default and upon request of Lender, or (ii) after a Securitization, such financial statements provided by Borrower shall be audited by a "Big Four" accounting firm (excluding Arthur Andersen) or other independent certified public accountant acceptable to Lender. Such statements shall set forth Underwritable Cash Flow, Gross Revenue, Operating Expenses and occupancy statistics for the Property. Borrower's annual financial statements shall be accompanied by a certificate executed by the chief financial or other senior officer of Borrower stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property. Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same. Additionally, Borrower shall furnish to Lender (i) on or before the ninth (9th) day after the end of each calendar month, an Officer's Certificate stating the amount of Gross Revenue for the immediately preceding calendar month and (ii) on or before thirty (30) days after the end of each calendar month, Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports in the form of <u>Schedule IV</u> hereto then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

LEGAL02/7825791v12

D7732 — J69

(c)    Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year), the following items, accompanied by certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with the Approved Accounting Method, as applicable:

(i)    after a Securitization, quarterly and year-to-date statements of income and expense and cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower;

(ii)    after a Securitization, a comparison of the budgeted income and expenses and the actual income and expenses for such quarter and year-to-date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year-to-date;

(iii)    a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter, for such quarter and the last four quarters;

(iv)    after a Securitization, a current rent roll for the Property; and

(v)    after a Securitization, a financial statement for each Guarantor, as applicable, certified by the applicable Guarantor, in form and substance acceptable to Lender, reflecting the Net Worth (as defined in the Guaranty) and the Liquidity (as defined in the Guaranty) for each Guarantor.

(d)    Borrower will furnish Lender on or before the thirty-fifth (35th) day after the end of each calendar month, the following items, accompanied by a certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in a manner consistent with the Approved Accounting Method, as applicable:

(i)    prior to a Securitization, monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property;

(ii)    prior to a Securitization, a comparison of the budgeted income and expenses and the actual income and expenses for such month and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year to date;

(iii)    prior to a Securitization, a current rent roll for the Property;

(iv)    any notice received from a Tenant threatening non-payment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject month; and

-43-

D7732 – J70

(v)  a financial statement for each Guarantor, as applicable, certified by the applicable Guarantor, in form and substance acceptable to Lender, reflecting the Net Worth (as defined in the Guaranty) and the Liquidity (as defined in the Guaranty) for each Guarantor.

(e)  Borrower shall submit the Annual Budget to Lender not later than sixty (60) days prior to the commencement of each Fiscal Year. Lender shall have the right to approve each Annual Budget covering any period of time after the Maturity Date. Any Annual Budget approved by Lender shall hereinafter be referred to as an "Approved Annual Budget". In the event that Borrower incurs an extraordinary operating expense or extraordinary capital expenditure not set forth in the Annual Budget (each an "Extraordinary Expense"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval.

(f)  Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender (including, without limitation, a tenant aging report in form reasonably acceptable to Lender).

(g)  Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 4.1.6 (each, a "Required Financial Item" and collectively, the "Required Financial Items"). In the event Borrower fails to deliver to Lender any of the Required Financial Items within the time frame specified herein (each such event, a "Reporting Failure"), in addition to constituting a default hereunder and without limiting Lender's other rights and remedies with respect to the occurrence of such a default, Borrower shall pay to Lender the sum of $1,000.00 per occurrence for each Reporting Failure; provided, however, that Borrower shall have received notice from Lender of such Reporting Failure and have failed to cure the same within five (5) days of receipt of such notice. Notwithstanding the foregoing, Lender shall not be required to deliver any such notice more than two (2) times during any calendar year. It shall constitute a further Event of Default hereunder if any such payment is not received by Lender within thirty (30) days of the date on which such payment is due, and Lender shall be entitled to the exercise of all of its rights and remedies provided hereunder.

4.1.7  **Title to the Property.**  Borrower will warrant and defend the validity and priority of the Liens of the Mortgage and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to Permitted Encumbrances.

4.1.8  **Estoppel Statement.**

(a)  After request by Lender, Borrower shall within five (5) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

-44-

D7732 - J71

(b)     After request by Borrower, Lender shall within ten (10) Business Days furnish Borrower with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid and (iv) whether or not Lender has sent any notice of default under the Loan Documents which remains uncured in the opinion of Lender.

(c)     Borrower shall deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease (provided that Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease); provided that such certificate may be in the form required under the Lease (as applicable); provided further that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year (other than in connection with an Event of Default or a Securitization).

(d)     <u>Intentionally Omitted.</u>

(e)     Borrower shall deliver to Lender, upon request, an estoppel certificate or comfort letter, in form and substance acceptable to Lender, from Franchisor; provided that Borrower shall not be required to deliver such certificates more than three (3) times during the term of the Loan and not more frequently than once per calendar year (other than in connection with an Event of Default, a Securitization or the execution of a Replacement Franchise Agreement).

**4.1.9** <u>Leases.</u>

(a)     All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) provide that such Lease is subordinate to the Mortgage and that the lessee will attorn to Lender and any purchaser at a foreclosure sale and (iv) not contain any terms which would materially adversely affect Lender's rights under the Loan Documents. All Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to Lender's prior approval, which approval shall not be unreasonably withheld or delayed.  Lender shall execute and deliver a Subordination Non-Disturbance and Attornment Agreement in the form annexed as <u>Schedule 11</u> to Tenants under future Major Leases approved by Lender promptly upon request with such commercially reasonable changes as may be requested by Tenants, from time to time, and which are reasonably acceptable to Lender.

(b)     Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner, provided, however, Borrower shall not terminate or accept a surrender of a Major Lease without Lender's prior approval; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Lease so as to

-45-

D7732 – J72

change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)     Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Borrower further agrees to provide Lender with written notice of a Tenant "going dark" under such Tenant's Lease within five (5) Business Days after such Tenant "goes dark" and Borrower's failure to provide such notice shall constitute an Event of Default.

(d)     Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any Lease; and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender).

(e)     Notwithstanding anything to the contrary contained herein, to the extent Lender's prior approval is required for any leasing matters set forth in this Section 4.1.9, Lender shall have ten (10) Business Days from receipt of written request and all required information and documentation relating thereto in which to approve or disapprove such matter, provided that such request to Lender is marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the request must be marked "PRIORITY". In the event that Lender fails to respond to the leasing matter in question within such time, Lender's approval shall be deemed given for all purposes. Borrower shall provide Lender with such information and documentation as may be reasonably required by Lender, including, without limitation, lease comparables and other market information as reasonably required by Lender.

4.1.10  **Alterations**.  Lender's prior approval shall be required in connection with any alterations to any Improvements (except tenant improvements under any Lease approved by Lender or under any Lease for which approval was not required by Lender under this Agreement) (a) that may have a material adverse effect on Borrower's financial condition, the value of the Property or the ongoing revenues and expenses of the Property, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval may be granted or withheld in Lender's sole discretion. If the total unpaid amounts incurred and to be

-46-

D7732  —  J73

incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) U.S. Obligations, (iii) other securities acceptable to Lender, (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond, (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same). Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold.

      **4.1.11 Interest Rate Cap.** At all times during the term of the Loan, Borrower shall maintain in effect an Interest Rate Protection Agreement having a term equal to the term of the Loan, with an initial notional amount equal to the amount of the Loan and with a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating. If Borrower obtains one (1) interest rate cap, the LIBOR strike rate under the Interest Rate Protection Agreement shall be equal to or less than the Capped LIBOR Rate, or if Borrower obtains more than one (1) interest rate cap, the blended LIBOR strike rate under the Interest Rate Protection Agreement, as determined by Lender, shall be equal to or less than the Capped LIBOR Rate. The Interest Rate Protection Agreement shall be in form and substance substantially similar to the Interest Rate Protection Agreement in effect as of the date hereof. In the event of any downgrade or withdrawal of the rating of such Counterparty by any Rating Agency below the Minimum Counterparty Rating, Borrower shall replace the Interest Rate Protection Agreement not later than thirty (30) Business Days following receipt of notice from Lender of such downgrade or withdrawal with an Interest Rate Protection Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 4.1.11) from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating; provided, however, that if Lender or its Affiliate is the Counterparty and any Rating Agency withdraws or downgrades the credit rating of Lender or its Affiliate below the Minimum Counterparty Rating, Borrower shall not be required to replace the Counterparty under the Interest Rate Protection Agreement provided that within thirty (30) Business Days following Lender's notice to Borrower of such downgrade or withdrawal Lender or its Affiliate posts additional collateral acceptable to the Rating Agencies securing its obligations under the Interest Rate Protection Agreement. Notwithstanding the foregoing, if S&P or Fitch withdraws or downgrades the credit rating of Lender or its Affiliate below "A+", or Moody's withdraws or downgrades the credit rating of Lender or its Affiliate below "A1", Borrower shall replace the Interest Rate Protection Agreement not later than fifteen (15) Business Days following receipt of notice from Lender of such downgrade or withdrawal with an Interest Rate Protection Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 4.1.11) from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating.

      **4.1.12 Material Agreements.** Borrower shall (a) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under each Material Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement of which it is aware and

LEGAL02/7825791v12

D7732 — J74

(c) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Material Agreement to which it is a party in a commercially reasonable manner.

**4.1.13** **Performance by Borrower**.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

**4.1.14** **Costs of Enforcement/Remedying Defaults**.  In the event (a) that the Mortgage is foreclosed in whole or in part or the Note or any other Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any Lien or mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or an assignment by Borrower or Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all costs incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes.

**4.1.15** **Business and Operations**.  Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and leasing of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership and leasing of the Property.  Borrower shall at all times cause the Property to be maintained as a hotel.

**4.1.16** **Loan Fees**.  Borrower shall pay all fees and costs (including, without limitation, all origination and commitment fees) required of Borrower pursuant to the terms of that certain application letter between Platinum Properties and Morgan Stanley Mortgage Capital Inc. dated April 14, 2006.

**Section 4.2    Borrower Negative Covenants.**

Borrower covenants and agrees with Lender that:

**4.2.1** **Due on Sale and Encumbrance; Transfers of Interests**.  Without the prior written consent of Lender, Borrower shall not cause or permit a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an equity ownership interest in any Restricted Party in violation of the covenants and conditions set forth in the Mortgage and this Agreement.

**4.2.2** **Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances.

-46-

LEGAL02/7825791v12

D7732 – J75

**4.2.3    Dissolution.** Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly *permitted by the Loan Documents*, or (iv) cause, permit or suffer any SPC Party to (A) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which such SPC Party would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation or bylaws of such SPC Party, in each case without obtaining the prior consent of Lender.

**4.2.4    Change in Business.** Borrower shall not enter into any line of business other than the ownership and operation of the Property.

**4.2.5    Debt Cancellation.** Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**4.2.6    Affiliate Transactions.** Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**4.2.7    Zoning.** Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**4.2.8    Assets.** Borrower shall not purchase or own any property other than the Property and any property necessary or incidental for the operation of the Property.

**4.2.9    No Joint Assessment.** Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**4.2.10    Principal Place of Business.** Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender thirty (30) days prior notice.

**4.2.11    ERISA.** (a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt

-49-

D7732 - J76

(under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

(b)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

4.2.12  **Material Agreements**. Borrower shall not, without Lender's prior written consent:  (a) enter into, surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party, except as provided therein or on an arms'-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect, except on an arms'-length basis and commercially reasonable terms.

## V.    INSURANCE, CASUALTY AND CONDEMNATION

### Section 5.1    Insurance.

5.1.1  **Insurance Policies**. (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)    comprehensive all risk insurance on the Improvements and the Personal Property at the Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and Personal

LEGAL02/7825791v12

D7732 – J77

Property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000) for all such insurance coverage; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. In addition, Borrower shall obtain: (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of the Note or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i).

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit, excluding umbrella coverage, of not less than One Million and No/100 Dollars ($1,000,000); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 9 of the Mortgage to the extent the same is available;

(iii)    business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected gross income from the Property for a period from the date of loss to a date (assuming total destruction) which is twelve (12) months from the date that the Property is repaired or replaced and operations are resumed. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period. All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

-51-



D7732 – J78

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)    workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least Five Hundred Thousand and No/100 Dollars ($500,000) per accident and per disease per employee, and Five Hundred Thousand and No/100 Dollars ($500,000) for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)    umbrella liability insurance in addition to primary coverage in an amount not less than Ten Million and No/100 Dollars ($10,000,000) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above and (viii) below;

(viii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000);

(ix)    so-called "dramshop" insurance or other liability insurance required in connection with the sale of alcoholic beverages;

(x)    insurance against employee dishonesty in an amount not less than one (1) month of gross revenue from the Property and with a deductible not greater than Ten Thousand and No/100 Dollars ($10,000);

(xi)    any insurance required to be obtained pursuant the Franchise Agreement; and

(xii)    upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in Section 5.1.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or in the singular, the "Policy") and, to the extent not specified above, shall be subject to the approval of Lender as to deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies

-52-

D7732 - J79

theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "Insurance Premiums"), shall be delivered by Borrower to Lender.

(c)    Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1.1(a).

(d)    All Policies of insurance provided for or contemplated by Section 5.1.1(a) shall be primary coverage and, except for the Policy referenced in Section 5.1.1(a)(v), shall name Borrower as the insured and Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood, earthquake and terrorism insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Lender or Borrower to collect any proceeds under any of the Policies.

(e)    All Policies of insurance provided for in Section 5.1.1(a), except for the Policies referenced in Section 5.1.1(a)(v) and (a)(viii) shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policy shall not be canceled without at least thirty (30) days' written notice to Lender and any other party named therein as an additional insured and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice;

(iii)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder; and

(iv)    such Policies do not exclude coverage for acts of terror or similar acts of sabotage.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage and shall bear interest at the Default Rate.

-53-

D7732 – J80

(g)    In the event of foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

5.1.2    **Insurance Company.**  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "AA" or better by S&P and Fitch and an insurance financial strength rating of "Aa2" by Moody's.  If a Securitization occurs, (i) the foregoing required insurance company rating by a Rating Agency not rating any Securities shall be disregarded and (ii) if the insurance company complies with the aforesaid S&P required rating (and S&P is rating the Securities) and the other Rating Agencies rating the Securities do not rate the insurance company, such insurance company shall be deemed acceptable with respect to such Rating Agency not rating such insurance company.  Notwithstanding the foregoing, Borrower shall be permitted to maintain the Policies with insurance companies which do not meet the foregoing requirements (an "**Otherwise Rated Insurer**"), provided Borrower obtains a "cut-through" endorsement (that is, an endorsement which permits recovery against the provider of such endorsement) with respect to any Otherwise Rated Insurer from an insurance company which meets the claims paying ability ratings required above.  Moreover, if Borrower desires to maintain insurance required hereunder from an insurance company which does not meet the claims paying ability ratings set forth herein but the parent of such insurance company, which owns at least fifty-one percent (51%) of such insurance company, maintains such ratings, Borrower may use such insurance companies if approved by the Rating Agencies (such approval may be conditioned on items required by the Rating Agencies including a requirement that the parent guarantee the obligations of such insurance company).  Notwithstanding the foregoing, Borrower may maintain the Policies with such insurance companies that maintain a claims paying ability rating of "A+X" or better by AM Best and "Aq" or better by Fitch; provided however that if required by the Lender in connection with a Securitization, Borrower shall obtain such insurance coverages and Policies with insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "A" or better by S&P.

**Section 5.2    Casualty and Condemnation.**

5.2.1    **Casualty.**  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "**Restoration**") and otherwise in accordance with Section 5.3, it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower. In the event of a Casualty where the loss does not exceed Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a

-54-

LEGAL02/7825791v12

D7732 – J81

commercially reasonable and timely manner. In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustments. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

    **5.2.2    Condemnation.** Borrower shall give Lender prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation; provided that the same is effected in a commercially reasonable and timely manner. In the event a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement. Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.3. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

### Section 5.3    Delivery of Net Proceeds.

    **5.3.1    Minor Casualty or Condemnation.** If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided the conditions set forth in Section 5.3.2(a)(i) through (x) below have been met, the Net Proceeds will be disbursed by Lender to Borrower. Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement. If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

LEGAL02/7825791v12

D7732 – K42

| | |
|---|---|
| Fixed Amount Payer Payment Date: | [Date Borrower pays Purchase Price for Cap] |
| Fixed Amount: | USD [Purchase Price for Cap] |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Cap Rate: | % |
| Floating Rate Payer Payment Dates: | The ninth (9th) calendar day of every calculation period, commencing on _____, ____, up to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| Floating Rate Option: | USD–LIBOR–BBA;provided, however, that, on any date of determination, if such rate does not appear on the Telerate Page 3750, the rate for that Reset Date will be determined as if the parties' specified USD-LIBOR-LIBO as the applicable Floating Rate Option.   Notwithstanding anything to the contrary contained in Section 7.1 of the Definitions, the Floating Rate Option shall be determined on the second London Banking Day prior to the fifteenth (15th) calendar day of each month of such Calculation Period. |
| Designated Maturity: | One month. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Floating Rate Reset Dates: | The fifteenth calendar day of each month. |
| Period End Dates: | The fifteenth (15th) calendar day of each month following the Floating Rate Reset Date, but not subject to adjustment for Business Days. |
| Business Days: | New York |

### 3. Account Details:

Payments to Party A:

Payments to Party B:                     **PLEASE PROVIDE**

### 4. Additional Provision:

(n)    No Set-Off.   Payments by Party A hereunder shall be made without Set-off or counterclaim.

D7732 – K43 

(o)    [Tax Reps]

(p)    Downgrade Event.  In the event that Party A's [Credit Support Provider's] long-term senior unsecured unenhanced rating (the "Party A Rating") is downgraded below AA Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), below Aa2 by Moody's Investors Services, Inc. ("Moody's") or below AA by Fitch, Inc. ("Fitch") (all such ratings, the "Required Ratings"), Party A shall transfer its obligations under this Confirmation to an entity with the Required Ratings.  After a Securitization, only the ratings of those Rating Agencies rating the Certificates at the request of the issuer thereof shall apply.  Failure to comply with this provision shall constitute an Additional Termination Event with Party A as the sole Affected Party.

(q)    Addresses for Notices:

a.    Party A:

b.    Party B:

(r)    No Default by Party B.  Notwithstanding anything in the Agreement to the contrary, if Party B has paid Party A the Fixed Amount when and where due, no Event of Default or Termination Events shall apply to Party B.  Upon payment of the Fixed Amount, Party A may not designate an Early Termination Date with respect to Party B.

(s)    Legal Opinion. Each of Party A and Party B shall deliver to the other Party a legal opinion with respect to its capacity and authority to enter into this Transaction and the enforceability of this Confirmation [and the Credit Support Document].  In the case of Party A, the opinion shall be addressed to Party B and Morgan Stanley Mortgage Capital, Inc. ("MSMC").  In the case of Party B the opinion shall be addressed to [Provider and its Credit Support Provider].

(t)    Credit Support Document:  [guarantee]

(u)    Credit Support Provider: :  [guarantor]

(v)    No Amendment.  This Confirmation shall not be amended without approval of MSDWMC (prior to a Securitization) or the Rating Agencies (after a Securitization).

(w)    Assignment.  Party A hereby consents to the assignment of this Confirmation by Party B (and any assignee thereof) in connection with an assignment of the related mortgage loan or a Securitization and agrees to execute any separate consent as may be reasonably requested by Party B (and any assignee thereof).

(x)    Representations.  Each party represents to the other party hereto that it is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. 1a), as amended by the Commodity Futures Modernization Act of 2000.

(y)    Governing Law:  New York.

(z)    Additional Definitions. Section [12][14] of the Agreement shall be amended to include the following additional definitions:

"Rating Agencies" shall mean Moody's, S&P and Fitch.

D7732 – K44

"Securitization" shall mean the assignment of this Confirmation to a real estate mortgage investment conduit in connection with the issuance of mortgage pass-through certificates ("Certificates").

-4-

D7732 - K45

Please confirm that the foregoing correctly sets forth the terms of our agreement Reference No. _____ by executing this Confirmation and returning it to us.

Best Regards,


[Provider]

BY: _____
    Name:
    Title:


Acknowledged and agreed as of the date first written above:

[Borrower]

BY:_____
    Name:
    Title:

D7732 - K46

## SCHEDULE 1

| FROM | TO (but excluding) | NOTIONAL AMOUNT |
|------|--------------------|------------------|

LEGAL02/7825791v12

D7732 - K47

**FORM OF SMITH TRAVEL RESEARCH REPORT**

D7732 - K48 

**SCHEDULE V**

**LEGAL DESCRIPTION OF ADJACENT PROPERTIES**

(A) LEGAL DESCRIPTION OF 1.691 ACRE TRACT

Situated in the State of Ohio, County of Franklin, City of Columbus, located in located in part of Section 21, T12N, R21W, Refugee Lands, and being part of an original 6.094 acre tract currently owned by Lionmark Development Properties, of record in Official Record 7793, Page J12, Franklin County Recorder's Office, and being more particularly described as follows:

Beginning, for reference, at a PK Nail found marking the intersection of the centerline of Hilton Lane (60 feet wide) and Cloverleaf Street East (80 feet wide);

Thence South 00° 22' 16" East 59.22 feet, along the centerline of Cloverleaf Street East, to a point;

Thence South 89° 37' 44" West 30.00 feet, to an iron pin found (3/4 inch) in the east line of Cloverleaf Street East, and being the _PRINCIPAL PLACE OF BEGINNING_ of the herein described tract;

thence South 00° 22' 16" East 182.11 feet, along the west line of Cloverleaf Street East, to an iron pin found (3/4 inch) marking the northeast corner of a 4.403 acre tract currently owned by Lionmark Development Partners, of record in Official Record 15246, Page A13; thence the following four (4) courses along the north line of said 4.403 acre tract:

North 89° 43' 46" West 348.74 feet, to an iron pin found (3/4 inch);

North 00° 16' 14" East 19.84 feet, to an iron pin found (3/4 inch);

along the arc of a curve to the left (Delta angle= 40° 00' 00", Radius = 44.00 feet, Arc length = 30.72 feet), with a long chord bearing of North 19° 43' 46" West, and a chord length of 30.10 feet, to an iron pin found (3/4 inch);

North 39° 43' 46" West 73.43 feet, to an iron pin found (3/4 inch) in the north line of Hilton Lane;

thence North 50° 16' 14" East 72.43 feet, along the north line of Hilton Lane, to an iron pin found (3/4 inch);

thence along the north line of Hilton Lane and the arc of a curve to the right (Delta angle= 40° 00' 00", Radius = 260.00 feet, Arc length = 181.51 feet), with a long chord bearing of North 70° 16' 14" East, and a chord length of 177.85 feet, to an iron pin found (3/4 inch);

thence South 89° 43' 46" East 151.59 feet, along the north line of Hilton Lane, to an iron pin found (3/4 inch);

thence along the arc of a curve to the right (Delta angle= 89° 21' 30", Radius = 30.00 feet, Arc length = 46.79 feet), with a long chord bearing of South 45° 03' 01" East, and a chord length of 42.19 feet, to the principal place of beginning, containing an area of 1.691 acres.

_Basis of bearings assumed, based on the centerline of Hilton Lane being South 89 ° 43' 46" East, as shown on Plat Book 65, Page 87. A survey was done by Bradley J. Patridge P.S. 7066, in September, 2005. All iron pins set are capped PATRIDGE SURVEYING._

LEGAL02/7825791v12

D7732 – K49



All referenced documents are on file at the Franklin County Recorder's Office, Columbus, Ohio.

(B) LEGAL DESCRIPTION OF 11.168 ACRE TRACT

Situated in the State of Ohio, County of Franklin, City of Columbus, located in located in part of Sections 21 & 22, T12N, R21W, Refugee Lands, and being part of Lot 2 of LIONMARK COROPRATE CENTER, as numbered and delineated in Plat Book 65, Page 87, Franklin County Recorder's Office, and being more particularly described as follows:

Beginning, for reference, at a PK Nail found marking the intersection of the centerline of Hilton Lane (60 feet wide) and Cloverleaf Street east (80 feet wide);

Thence South 89° 43' 46" East 162.80 feet, along the centerline of Hilton Lane, to a point;

Thence North 00° 16' 14" East 30.00 feet, to an iron pin found (3/4 inch) in the north line of Hilton Lane marking the southeast corner of a 16.592 acre tract currently owned by Platinum Lodging LLC, of record in Instrument Number 200410270248374, and being the *PRINCIPAL PLACE OF BEGINNING* of the herein described tract;

thence North 00° 22 '16" West 605.46 feet, along the east line of said 16.592 acre tract, to an iron pin found (3/4 inch) in the north line of Lot 2 and south line of Interstate 70, marking the northeast corner of said 16.592 acre tract;

thence North 85° 59' 00" East 16.99 feet, along the north line of Lot 2 and south line of Interstate 70, to an iron pin found (3/4 inch);

thence North 87° 13' 53" East 484.74 feet, along the north line of Lot 2 and south line of Interstate 70, to an iron pin found (3/4 inch);

thence South 82° 13' 10" East 369.07 feet, along the north line of Lot 2 and south line of Interstate 70, to an iron pin found (3/4 inch) marking the northwest corner of a 3.181 acre tract currently owned by Siam Properties IV LLC, of record in Instrument Number 199812310337707;

thence South 00° 16' 14" West 534.71 feet, along the west line of said 3.181 acre tract, to an iron pin found in the north line of Hilton Lane marking the southwest corner of said 3.181 acre tract;

thence the following five (5) courses along the south line of Lot 2 and north line of Hilton Lane:

North 89° 43' 46" West 257.20 feet, to an iron pin found (3/4 inch);

along the arc of a curve to the right (Delta angle= 72° 53' 43", Radius = 20.00', Arc length = 25.45 feet), with a long chord bearing of North 53° 16' 55" West, and a chord length of 23.76 feet, to an iron pin found (3/4 inch);

along the arc of a curve to the left (Delta angle= 145° 47' 26", Radius = 150.00', Arc length = 381.68 feet), with a long chord bearing of North 89° 43' 46" West, and a chord length of 286.73 feet, to an iron pin found (3/4 inch);

along the arc of a curve to the right (Delta angle= 72° 53' 43", Radius = 20.00', Arc length = 25.45 feet), with a long chord bearing of South 53° 49' 23" West, and a chord length of 23.76 feet, to an iron pin found (3/4 inch);
North 89° 43' 46" West 296.02 feet, to the principal place of beginning, containing an area of 11.168 acres.

LEGAL02/7825791v12



D7732 – K50

Basis of bearings assumed, based on the centerline of Hilton Lane being South 89 ° 43' 46" East, as shown on Plat Book 65, Page 87. A survey was done by Bradley J. Patridge P.S. 7068, in September, 2005. All iron pins set are capped PATRIDGE SURVEYING.

All referenced documents are on file at the Franklin County Recorder's Office, Columbus, Ohio.

D7732 - K51

**FORM OF FUTURE MEZZANINE INTERCREDITOR**

**(ATTACHED HERETO)**

D7732 – K52

# INTERCREDITOR AGREEMENT

by and between

[ _____ ]

as Senior Lender

and

[ _____ ]

as Mezzanine Lender

Dated as of _____, 20__

Premises: _____
_____

LEGAL02/7816945v1

D7732 – K53

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Agreement"), dated as of
_____, 20__ by and between _____, a _____,
having an office at _____ _____,
_____ ("Senior Lender"), and _____ a _____,
having an office at _____, ("Mezzanine Lender").

## RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that
certain Loan Agreement, dated as of _____, 20__, between _____, a ____
_____, ("Borrower") and Senior Lender (the "Senior Loan Agreement"), Senior
Lender has made or is about to make a loan to Borrower in the original principal amount of $ ___
_____ (the "Senior Loan"), which Senior Loan is evidenced by a certain Promissory
Note, dated as of _____, 20__, made by Borrower to Senior Lender in the amount of the
Senior Loan (the "Senior Note"), and secured by, among other things, [insert as applicable: a
Mortgage, Assignment of Leases and Rents and Security Agreement/Deed of Trust, Assignment
of Leases and Rents and Security Agreement], dated as of _____, 20__, made by
Borrower in favor of Senior Lender (the "Senior Mortgage"), which Senior Mortgage encumbers
the real property described on Exhibit A attached hereto and made a part hereof, and all
improvements thereon and appurtenances thereto (collectively, the "Premises"); and

WHEREAS, pursuant to the terms, provisions and conditions set forth in that
certain Mezzanine Loan Agreement, dated as of _____, 20__, between _____
_____, a _____ ("Mezzanine Borrower") and Mezzanine Lender
(the "Mezzanine Loan Agreement"), Mezzanine Lender is the owner and holder of a loan to
Mezzanine Borrower in the original principal amount of $ _____ (the
"Mezzanine Loan"), which Mezzanine Loan is evidenced by a certain Promissory Note, dated as
of _____, 20__, made by Mezzanine Borrower in favor of Mezzanine Lender in the
amount of the Mezzanine Loan (the "Mezzanine Note"), and secured by, among other things, a
Pledge and Security Agreement, dated as of _____, 20__, from Mezzanine Borrower
pursuant to which Mezzanine Lender is granted a first priority security interest in all of
Mezzanine Borrower's ownership interests in Borrower [and its general partner/managing
member] (the "Pledge Agreement"); and

WHEREAS, Senior Lender and Mezzanine Lender desire to enter into this
Agreement to provide for the relative priority of the Senior Loan Documents (as such term is
hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on
the terms and conditions hereinbelow set forth, and to evidence certain agreements with respect
to the relationship between the Senior Loan and the Mezzanine Loan Documents, on the one
hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other
good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
Senior Lender and Mezzanine Lender hereby agree as follows:



D7732 – K54

Section 1.   Certain Definitions; Rules of Construction.

(a)   As used in this Agreement, the following capitalized terms shall have the following meanings:

"Affiliate" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common control with the Person or Persons in question.

"Agreement" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"Award" has the meaning provided in Section 9(d) hereof.

"Borrower" has the meaning provided in the Recitals hereto.

"Borrower Group" has the meaning provided in Section 10(c) hereof.

"Business Day" means _____.

"CDO" has the meaning provided in the definition of the term "Qualified Transferee."

"CDO Asset Manager" with respect to any Securitization Vehicle which is a CDO, shall mean the entity which is responsible for managing or administering the Mezzanine Loan as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of the Mezzanine Loan).

"Certificates" means any securities (including all classes thereof) representing beneficial ownership interests in the Senior Loan or in a pool of mortgage loans including the Senior Loan issued in connection with a Securitization of the Senior Loan.

"Continuing Senior Loan Event of Default" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired.

"Control" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "controlling" and "under common control with" shall have the respective correlative meaning thereto.

"Directing Mezzanine Lender" has the meaning provided in Section 4(c) hereof.

- 3 -

D7732 — K55

"Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of [$600,000,000] [Note: for very large loans, a higher amount may be required] and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of [$250,000,000] [Note: for very large loans, a higher amount may be required] and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

"Enforcement Action" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or Borrower, including, without limitation, the taking of possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Premises.

"Equity Collateral" means the equity interests of Borrower [and its general partner/managing member] pledged pursuant to the Pledge Agreement.

"Equity Collateral Enforcement Action" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral.

"Event of Default" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred, is continuing (i.e., has not been cured by Borrower or by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower).

"Intervening Trust Vehicle" with respect to any Securitization Vehicle which is a CDO, shall mean a trust vehicle or entity which holds the Mezzanine Loan as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

"Loan Pledgee" has the meaning provided in Section 15 hereof.

"Loan Purchase Price" has the meaning provided in Section 13(a) hereof.

"Mezzanine Borrower" has the meaning provided in the Recitals hereto.

"Mezzanine Lender" has the meaning provided in the first paragraph of this Agreement.

"Mezzanine Loan" has the meaning provided in the Recitals hereto.



D7732 - K56

"Mezzanine Loan Agreement" has the meaning provided in the Recitals hereto.

"Mezzanine Loan Cash Management Agreement" means any cash management agreement executed in connection with, or the cash management provisions of, the Mezzanine Loan Documents.

"Mezzanine Loan Documents" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with all documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Mezzanine Loan Modification" has the meaning provided in Section 7(b) hereof.

"Mezzanine Note" has the meaning provided in the Recitals hereto.

"Monetary Cure Period" has the meaning provided in Section 11(a) hereof.

"Permitted Fund Manager" means any Person that on the date of determination is (i) an entity that is a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of the definition thereof, one of the entities listed on Exhibit D [to be reviewed on a case by case basis] or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"Person" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"Pledge" has the meaning provided in Section 15 hereof.

"Pledge Agreement" has the meaning provided in the Recitals hereto.

"Premises" has the meaning provided in the Recitals hereto.

"Proceeding" has the meaning provided in Section 10(c) hereof.

"Property Manager" means _____ or any successor thereto as property manager of the Premises.

"Protective Advances" means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, including, with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 11 hereof.

- 5 -

D7732 – K57

●                    ●

"Purchase Option Notice" has the meaning provided in Section 13(a) hereof.

"Qualified Manager" shall mean a property manager of the Premises which (i) is a reputable management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Premises and in the jurisdiction in which the Premises are located, (ii) has, for at least five (5) years prior to its engagement as property manager, managed at least (5) properties of the same property type as the Premises, (iii) at the time of its engagement as property manager has leasable square footage of the same property type as the Premises equal to the lesser of (A) 1,000,000 leasable square feet and (B) five (5) times the leasable square feet of the Premises and (iv) is not the subject of a bankruptcy or similar insolvency proceeding. [Note: for very large assets, the tests in clauses (ii) and (iii) may be required to be higher.] [Insert other appropriate criteria for type of asset. e.g. luxury hotels, convention centers, regional malls, etc.]

"Qualified Transferee" means (i) Mezzanine Lender, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C) above;

(E)    a Qualified Trustee (or in the case of a CDO, a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the Mezzanine Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("CDO") secured by, or (C) a financing through an "owner trust" of, a Mezzanine Loan (any of the foregoing, a "Securitization Vehicle", provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of a Mezzanine Loan to such Securitization Vehicle); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer

- 6 -

D7732 – K58

of such Securitization Vehicle has a Required Special Servicer Rating (such entity, an "Approved Servicer") and such Approved Servicer is required to service and administer such Mezzanine Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a Qualified Trustee, or a CDO Asset Manager which is a Qualified Transferee, are each a Qualified Transferee under clauses (ii)(A), (ii)(B), (ii)(C) or (ii)(D) of this definition; or

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition.

"Qualified Trustee" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

"Rating Agencies" shall mean, prior to a Securitization, each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Senior Lender and, after a Securitization, shall mean any of the foregoing that have rated any of the Certificates.

"Rating Agency Confirmation" means each of the Rating Agencies shall have confirmed in writing that the occurrence of the event with respect to which Rating Agency Confirmation is sought shall not result in a downgrade, qualification or withdrawal of the applicable rating or ratings ascribed by such Rating Agency to any of the Certificates then outstanding. In the event that no Certificates are outstanding or the Senior Loan is not part of a Securitization, any action that would otherwise require a Rating Agency Confirmation shall require the consent of the Senior Lender, which consent shall not be unreasonably withheld or delayed.

"Redirection Notice" has the meaning provided in Section 15 hereof.

"Required Special Servicer Rating" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Mortgage Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special



D7732 – K59

servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"S&P" means Standard & Poors Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Securitization" means the sale or securitization of the Senior Loan (or any portion thereof) in one or more transactions through the issuance of securities, which securities may be assigned ratings by the Rating Agencies.

"Senior Lender" has the meaning provided in the first paragraph of this Agreement.

"Senior Loan" has the meaning provided in the Recitals hereto.

"Senior Loan Agreement" has the meaning provided in the Recitals hereto.

"Senior Loan Cash Management Agreement" means any cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents.

"Senior Loan Default Notice" has the meaning provided in Section 11(a) hereof.

"Senior Loan Documents" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Senior Loan Liabilities" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"Senior Loan Modification" has the meaning provided in Section 7(a) hereof.

"Senior Mortgage" has the meaning provided in the Recitals hereto.

"Senior Note" has the meaning provided in the Recitals hereto.

"Separate Collateral" means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Cash Management Agreement, and (iii) any other collateral given as security for the Mezzanine Loan pursuant to

LEGAL02/7816945v1

D7732 - K60

the Mezzanine Loan Documents, in each case not directly constituting security for the Senior Loan.

["SPE Constituent Entity" means _____ [list any entity required to be a single purpose entity pursuant to the terms of the Senior Loan Documents]]

"Third Party Agreement" has the meaning provided in Section 5(a) hereof.

"Third Party Obligor" has the meaning provided in Section 5(a) hereof.

"Transfer" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    [terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;]

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)    the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

-9-

D7732 - K61 

(viii)   the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Section 2.   Approval of Loans and Loan Documents.

(a)   Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)   Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents.  Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.   Representations and Warranties.

(a)   Mezzanine Lender hereby represents and warrants as follows:

(i)   Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof.  To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

D7732 - K62

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee (as hereinafter defined) as contemplated by the provisions of Section 15 hereof.

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or

LEGAL02/7816945v1



D7732 - K63

other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan.  The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof.  To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)    Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or



D7732 — K64

declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)   None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)   The Senior Loan is not cross-defaulted with any other loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

Section 4.    Transfer of Mezzanine Loan or Senior Loan.

(a)   Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) a Rating Agency Confirmation has been given with respect to such Transfer, in which case the related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement, or (ii) such Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Lender.

(b)   At least five (5) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Lender and, if any Certificates are outstanding, to the Rating Agencies, a certification that such transfer will be made in accordance with this Section 4, such certification to include the name and contact information of the Qualified Transferee.

(c)   If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "Directing Mezzanine Lender") to

LEGAL02/7816945v1

- 13 -



D7732 - K65

act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated, the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)     Mezzanine Lender acknowledges that any Rating Agency Confirmation may be granted or denied by the Rating Agencies in their sole and absolute discretion and that such Rating Agencies may charge customary fees in connection with any such action.

(e)     Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.

Section 5.     <u>Foreclosure of Separate Collateral</u>.

(a)     Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreement and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) without a Rating Agency Confirmation unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, (ii) the Premises will be managed by a Qualified Manager promptly after the transfer of title to the Equity Collateral, and (iii) if not in place prior to the transfer of title to the Equity Collateral, hard cash management and adequate reserves for taxes, insurance, debt service, ground rents, capital repair and improvement expenses, tenant improvement expenses and leasing commissions and operating expenses will be implemented under the Senior Loan promptly after the transfer of title to the Equity Collateral; provided, that the implementation of such hard cash management and reserves would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b). Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to the Rating Agencies within ten (10) business days of the transfer of title to the Equity Collateral. The Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this <u>Section 5(a)</u> have been satisfied to Senior Lender and the Rating Agencies upon consummation of any transfer of the Equity Collateral pursuant to this <u>Section 5(a)</u>. Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the removal of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a "<u>Third Party Obligor</u>"), such transferee or an

- 14 -



D7732 - K66

Affiliate thereof reasonably satisfactory to the Senior Lender shall: (A) execute and deliver to Senior Lender a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a "Third Party Agreement"), in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant to which the Third Party Obligor shall undertake the obligations set forth therein, and (B) if there are Certificates then outstanding, deliver (or cause to be delivered) to Senior Lender and each Rating Agency, an opinion of counsel that the substitution of the original Third Party Obligor and the original Third Party Agreement with a substitute Third Party Obligor and a substitute Third Party Agreement, would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b).

(b)    Nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral.

(c)    In the event Mezzanine Lender or any purchaser at a UCC sale obtains title to the Separate Collateral, Senior Lender hereby acknowledges and agrees that [optional: any transfer or assumption fee in the Senior Loan Agreement shall be waived as a condition to such transfer and] any such transfer shall not constitute a breach or default under the Senior Loan Documents, provided the conditions in Section 5(a) are met. Senior Lender also acknowledges and agrees that it will not impose any unreasonable fees or delays in connection with such Transfer.

Section 6.    Notice of Rating Confirmation. Mezzanine Lender promptly shall notify Senior Lender of any intended action relating to the Mezzanine Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Senior Lender in obtaining such confirmation. Senior Lender promptly shall notify Mezzanine Lender of any intended action relating to the Senior Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Mezzanine Lender in obtaining such confirmation. Mezzanine Lender shall pay all fees and expenses of the Rating Agencies in connection with any request for any Rating Agency Confirmation pursuant to this Agreement.

Section 7.    Modifications, Amendments, Etc.

(a)    Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Senior Loan Modification") of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower, (v) amend or modify the provisions limiting transfers of interests in the Borrower or the Premises, (vi) modify or amend the terms and provisions of the Senior Loan Cash Management Agreement with respect to the manner, timing and method of the application

D7732 – K67

of payments under the Senior Loan Documents, (vii) cross default the Senior Loan with any other indebtedness, (viii) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Senior Loan, (ix) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), or (x) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge; provided, however, in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that under no conditions shall clause (i) (with respect to increase principal amount only), or clause (x) be modified without the written consent of Mezzanine Lender. In addition and notwithstanding the foregoing provisions of this Section 7, any amounts funded by the Senior Lender under the Senior Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Senior Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(a).

(b)    Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Mezzanine Loan Modification") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises or (vi) cross default the Mezzanine Loan with any other indebtedness. Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall clause (i), with respect to increases in principal amounts only, clause (ii), clause (iii) (with respect to shortening the maturity only), clause (iv) or clause (v) be modified without the written consent of the Senior Lender. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)    Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations,

LEGAL02/7816945v1

D7732 – K68

changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

    (d)    Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

    Section 8.    Subordination of Mezzanine Loan and Mezzanine Loan Documents.

    (a)    Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a). Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

    (b)    Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents.

    (c)    This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

    Section 9.    Payment Subordination.

    (a)    Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine

D7732 – K69

Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid. If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)     Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), provided that no Event of Default shall then exist under the Senior Loan Documents, Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts.

(c)     Mezzanine Lender may take any Equity Collateral Enforcement Action which is permitted under Section 5 hereof; provided, however, that (i) Mezzanine Lender shall, prior to commencing any Equity Collateral Enforcement Action, give the Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) Mezzanine Lender shall provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action.

(d)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "Award"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender

D7732 - K70

receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender.

       Section 10.    <u>Rights of Subrogation; Bankruptcy</u>.

       (a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

       (b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

       (c)    Subject to <u>Section 30</u> of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower [or any SPE Constituent Entity] under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "<u>Proceeding</u>"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause either the Borrower or any entity which controls Borrower (the "<u>Borrower Group</u>") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower [or any SPE Constituent Entity] adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower [or

LEGAL02/7816945v1

D7732 - K71

any SPE Constituent Entity]; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower [or any SPE Constituent Entity]; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower [or any SPE Constituent Entity], the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower [or any SPE Constituent Entity]; (vii) seek to consolidate the Premises or any other assets of the Borrower [or any SPE Constituent Entity] with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)    If Mezzanine Lender is deemed to be a creditor of Borrower or any SPE Constituent Entity in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower [or any SPE Constituent Entity] without the prior consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such filing shall not be as a creditor of the Borrower, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower [or any SPE Constituent Entity] in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; provided, however, that with respect to any proposed plan of reorganization in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender being "impaired" (as such term is defined in the United States Bankruptcy Code) and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

Section 11.    Rights of Cure.

(a)    Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents, Senior Lender shall provide written notice of the default which would permit the Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "Senior Loan Default Notice") and shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 11(a). If the default is a monetary default relating to a liquidated sum of money, Mezzanine Lender shall have until five (5) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration

LEGAL02/7816945v1

D7732 – K72

of Borrower's cure provision, if any, (a "Monetary Cure Period") to cure such monetary default; provided, however, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) defend and hold harmless Senior Lender for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior Lender on any required (pursuant to applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances. [Optional: Mezzanine Lender shall not be required, in order to effect a cure hereunder (other than the cure by Mezzanine Lender of a default in the payment of the Senior Loan in full on the maturity date thereof or the reimbursement of interest on advances for monthly payment of principal and/or interest and/or on any Protective Advances, as aforesaid), to pay any interest calculated at the default rate under the Senior Loan Documents to the extent the same is in excess of the rate of interest which would have been payable by Borrower in the absence of such default (and irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and no interest shall accrue at the default rate as against Mezzanine Lender for such period.] Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than [four] consecutive months unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Separate Collateral. If the default is of a non-monetary nature, Mezzanine Lender shall have the same period of time as the Borrower under the Loan Documents to cure such non-monetary default; provided, however, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default for so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed thirty (30) days, unless such non-monetary default is of a nature that can not be cured within such thirty (30) days, in which case, Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, (iii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of Borrower and (iv) during such non-monetary cure period, there is no material impairment to the value, use or operation of the Premises. Any additional cure period granted to the Mezzanine Lender hereunder shall automatically terminate upon the bankruptcy (or similar insolvency) of the Borrower.

(b)     To the extent that any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that (i) such Qualified Transferee shall have caused Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed and (ii) all defaults under the Senior Loan which remain

D7732 – K73    ●    ●

uncured as of the date of such acquisition have been cured by such Qualified Transferee or waived by Senior Lender except for defaults that are not susceptible of being cured by such Qualified Transferee; provided, that such defaults which are not susceptible of being cured do not materially impair the value, use or operation of the Premises. [Optional: Notwithstanding any contrary or inconsistent provision of this Agreement, the Senior Loan Documents or the Mezzanine Loan Documents, no acquisition or other fee or similar charge shall be due in connection with such Qualified Transferee's acquisition of any interest in Borrower or the Premises as the result of a Equity Collateral Enforcement Action or assignment in lieu of foreclosure or other negotiated settlement in lieu of any of the foregoing.]

(c)    So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Cash Management Agreement, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay outstanding principal balance of the Senior Loan.

Section 12.    No Actions; Restrictive Provisions.    Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager. In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager (including any asset manager) or leasing agent for the Premises, which replacement manager, asset manager and/or leasing agent shall either (a) be subject to Senior Lender's reasonable approval and, if any Certificates are then outstanding, be subject to a Rating Agency Confirmation or (b) be a Qualified Manager. Notwithstanding anything in this Section 12 to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender.

Section 13.    Right to Purchase Senior Loan.

(a)    If the Senior Loan has been accelerated, any Enforcement Action has been commenced and is continuing under the Senior Loan Documents or the Senior Loan is a "specially serviced mortgage loan" under the applicable pooling and servicing agreement (each of the foregoing, a "Purchase Option Event"), upon ten (10) Business Days prior written notice to Senior Lender (the "Purchase Notice"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the outstanding principal balance thereof, together with all accrued interest and other amounts due thereon (including, without limitation, any late charges, default interest, exit fees, advances and post-petition interest), any Protective Advances made by Senior Lender and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances), including all costs and expenses (including legal fees and expenses)

- 22 -

D7732 − K74

actually incurred by Senior Lender in enforcing the terms of the Loan Documents (the "Loan Purchase Price"). Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender, at the sole cost and expense of Mezzanine Lender to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan and as to Senior Lender's not having assigned or encumbered its rights in the Loan). The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) upon a transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure or (ii) if a Purchase Option Event ceases to exist.

(b)     Mezzanine Lender covenants not to enter any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee or yield maintenance charge in connection with a prepayment of the Senior Loan by the Borrower.

Section 14.     Additional Understandings. For as long as the Mezzanine Loan remains outstanding:

(a)     Notices of Transfer; Consent. Senior Lender promptly shall notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan or seeks or requests Senior Lender's consent to, or take any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan. In the event of a request by the Borrower for Senior Lender's consent to either (i) the sale or transfer of all or any material portion of the Premises or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, Senior Lender shall, if Senior Lender has the right to consent, obtain the prior written consent of Mezzanine Lender prior to Senior Lender's granting of its consent or agreement thereto.

(b)     Annual Budget. The Mezzanine Lender shall have the right to approve the annual operating budget of Borrower in accordance with the terms of the Mezzanine Loan Documents. In the event the Mezzanine Lender objects to any such proposed budget, the Mezzanine Lender shall advise the Senior Lender of such objections, along with its suggestions for changes, within ten (10) days after its receipt of such budget in accordance with the Mezzanine Loan Documents. Senior Lender agrees to consult with the Mezzanine Lender with respect to such objections and suggestions but such consultation shall not be binding on Senior Lender. The Mezzanine Lender shall consent to any changes in the budget reasonably requested by the Senior Lender.

[The following alternative is acceptable for Senior Loans with hard cash management and adequate reserves for taxes, insurance, debt service, ground rents, capital

- 23 -



D7732 — K75

repairs and improvement expenses, tenant improvement expenses and leasing commissions, and operating expenses:

    (b)    <u>Annual Budget</u>. The Mezzanine Lender shall have the right to approve the annual operating budget of Borrower in accordance with the terms of the Mezzanine Loan Documents. Notwithstanding anything contained herein, in the Senior Loan Documents or in the Mezzanine Loan Documents, the Mezzanine Lender may require Borrower to submit the annual budget to the Mezzanine Lender for approval prior to any submission to the Senior Lender. Upon Mezzanine Lender's approval, the Mezzanine Lender shall submit the approved budget to the Senior Lender for its approval. The Mezzanine Lender shall consent to any changes in the budget reasonably requested by the Senior Lender. In the event that the approval of the Mezzanine Lender is not obtained on a timely basis, the then current existing operating budget shall remain in effect with an increase in any non-discretionary expense item to either (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.]

    Section 15.    <u>Financing of Mezzanine Loan</u>. Notwithstanding any other provision hereof, Senior Lender consents to Mezzanine Lender's pledge (a "<u>Pledge</u>") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency (a "<u>Loan Pledgee</u>"), on the terms and conditions set forth in this <u>Section 15</u>; <u>provided</u> that a Loan Pledgee which is not a Qualified Transferee may not take title to the Equity Collateral without a Rating Agency Confirmation. Upon written notice by Mezzanine Lender to Senior Lender that the Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by Mezzanine Lender under this Agreement of which default Senior Lender has actual knowledge; (b) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; (d) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of <u>Section 11</u> of this Agreement as if such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a "<u>Redirection Notice</u>") to Senior Lender by Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Senior Lender shall remit to Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed by Senior Lender to have been delivered by

LEGAL02/7816945v1

D7732 – K76

Loan Pledgee. Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in the writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this Section 15 shall remain effective unless and until Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

Section 16.     Intentionally Omitted.

Section 17.     Obligations Hereunder Not Affected.

(a)     All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)     any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)     any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)     any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

(iv)     any change, restructuring or termination of the corporate structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower; or

(v)     any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or a Senior Lender subject to the terms hereof.

(b)     This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment had not been made.

Section 18.     Notices. All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by

LEGAL02/7816945v1

D7732 – K77    ●                    ●

facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 18. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To Mezzanine Lender:

_____
_____
_____
Attention: _____
Telecopy: (___) ____-____

With a copy to:

_____
_____
_____
Attention: _____
Telecopy: (___) ____-____

To Senior Lender:

_____
_____
Attention: _____
Telecopy: (___) ____-____

With a copy to:

_____
_____
Attention: _____
Telecopy: (___) ____-____

[To Loan Pledgee:

_____

D7732 — K78

Attention: _____
Telecopy: (___) ____-____

Section 19.    Estoppel.

    (a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

    (b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

    Section 20.    Further Assurances.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

    Section 21.    No Third Party Beneficiaries; No Modification.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person.  This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.  If any Certificates are outstanding, this Agreement shall not be amended unless a Rating Agency Confirmation has been obtained with respect to such amendment.

    Section 22.    Successors and Assigns.  This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender.

    Section 23.    Counterpart Originals.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

    Section 24.    Legal Construction.  In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of [New York] applicable to agreements intended to be wholly performed within the State of [New York].

- 27 -

LEGAL02/7816945v1

D7732 – K79   

Section 25.   No Waiver; Remedies.  No failure on the part of the Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.   No Joint Venture.  Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.   Captions.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28.   Conflicts.  In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29.   No Release.  Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents or to release Mezzanine Borrower from (x) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (y) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30.   Continuing Agreement.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or by deed-in-lieu of foreclosure, (c) transfer of title to the Mezzanine Lender of the Separate Collateral or (d) payment in full of the Mezzanine Loan; provided, however, that any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

Section 31.   Severability.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32.   Expenses.

(a)     To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including,

LEGAL02/7816945v1

D7732 - K80

without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by Mezzanine Borrower out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof.

Section 33.    Injunction.  Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other.  Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.    Mutual Disclaimer.

(a)    Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

LEGAL02/7816945v1

D7732 – K81

(b)    Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other.

[NO FURTHER TEXT ON THIS PAGE]

LEGAL02/7816945v1

D7732 - K82

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

_____

a _____

By: _____
Name:
Title:


MEZZANINE LENDER:

_____

a _____

By: _____
Name:
Title:

- 31 -

D7732 - K83

**EXHIBIT A**

[Attach Legal Description of Premises]

A-1

11368147.1.BUSINESS
LEGAL02/7816945v1

D7732 – K84

## EXHIBIT B

### Senior Loan Documents

B-1

D7732 – K85

**EXHIBIT C**

Mezzanine Loan Documents

11368147.1.BUSINESS
LEGAL02/7816945v1

D7732 - K86

**EXHIBIT D**

**Permitted Fund Managers**

**[To be reveiwed on a case by case basis]**

11368147.1.BUSINESS
LEGAL02/7816945v1



Embassy Suites Cleveland Rockside Monthly STAR Report

For the Month of: March 2006

STR # 4:429

Date Created April 22, 2006

SMITH TRAVEL RESEARCH

735 East Main Street
Hendersonville, TN 37075
tel. 615.824.8664
fax 615.824.3848
www.smithtravelresearch.com

D7732 — K88

# Tab 2 - Monthly Performance at a Glance - My Property vs. Competitive Set

Embassy Suites Cleveland Rockside   5800 Rockside Woods Blvd   Independence, OH 44131-2346   (216) 986-9900
STR # 42426   ChainID: 000022265   MgtCo: None   Owner: None
For the Month of: March 2006   Date Created: April 22, 2006   Monthly Competitive Set Data Excludes Subject Property

## March 2006

| | Occupancy (%) | | | ADR ($) | | | RevPAR ($) | | |
|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Index | My Prop | Comp Set | Index | My Prop | Comp Set | Index |
| Current Month | 69.4 | 61.4 | 113.0 | 109.20 | 89.74 | 121.7 | 75.79 | 55.10 | 137.5 |
| Year To Date | 63.2 | 54.5 | 116.0 | 108.83 | 86.21 | 126.2 | 68.78 | 46.98 | 146.4 |
| Running 3 Month | 63.2 | 54.5 | 116.0 | 108.83 | 86.21 | 126.2 | 68.78 | 46.98 | 146.4 |
| Running 12 Month | 62.1 | 56.2 | 110.4 | 105.93 | 85.09 | 124.5 | 65.77 | 47.86 | 137.4 |

## March 2006 vs. 2005 Percent Change (%)

| | Occupancy | | | ADR | | | RevPAR | | |
|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Index | My Prop | Comp Set | Index | My Prop | Comp Set | Index |
| Current Month | 22.2 | 17.9 | 3.6 | 5.8 | 8.5 | -2.6 | 29.2 | 28.0 | 1.0 |
| Year To Date | 8.3 | 10.7 | -2.2 | 6.1 | 6.2 | -0.1 | 14.9 | 17.5 | -2.2 |
| Running 3 Month | 8.3 | 10.7 | -2.2 | 6.1 | 6.2 | -0.1 | 14.9 | 17.5 | -2.2 |
| Running 12 Month | 4.2 | 2.6 | 1.5 | 3.4 | 6.1 | -2.5 | 7.8 | 8.9 | -1.0 |

SMITH TRAVEL RESEARCH

D7732 - K89

# Tab 3 - STAR Summary - My Property vs. Comp Set and Industry Segments

Embassy Suites Cleveland Rockside   5800 Rockside Woods Blvd   Independence, OH 44131-2346   (216) 986-9800
STR # 42438   ChainID: 00002286   MgtCo: None   Owner: None
For the Month of: March 2008   Data Created: April 22, 2008   Monthly Comparative Set Data Excludes Subject Property

## Occupancy

| | Current Month | % Chg | Year to Date | % Chg | Running 3 Month | % Chg | Running 12 Month | % Chg | Month % Chg | YTD % Chg | Run 3 Mon % Chg | Run 12 Mon % Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Embassy Suites Cleveland Rockside | 65.4 | 22.2 | 63.2 | 8.2 | 63.2 | 8.3 | 62.1 | 4.2 | 0.0 | 0.0 | 0.0 | 0.0 |
| Market: Cleveland, OH | 54.7 | -4.0 | 49.8 | 2.6 | 49.8 | 2.6 | 54.8 | -0.9 | -0.3 | -0.2 | -0.2 | -0.4 |
| Market Price: Luxury | 64.3 | 8.2 | 55.0 | 3.8 | 55.0 | 3.5 | 63.1 | 0.0 | 0.8 | 0.8 | 0.8 | -0.2 |
| Tract Cleveland CBD/Independence | 61.2 | 11.9 | 52.7 | 8.4 | 52.7 | 8.4 | 58.2 | -0.7 | 0.0 | 0.0 | 0.0 | 0.0 |
| Tract Scale: Upscale Chains | 63.5 | 9.0 | 54.8 | 4.6 | 54.8 | 4.6 | 60.7 | -3.8 | 0.0 | 0.0 | 0.0 | -3.8 |
| Competitive Set: Competition | 61.4 | 17.8 | 54.6 | 10.7 | 54.6 | 10.7 | 59.2 | 2.6 | 0.0 | 0.0 | 0.0 | 2.8 |

## Average Daily Rate

| | Current Month | % Chg | Year to Date | % Chg | Running 3 Month | % Chg | Running 12 Month | % Chg | Month % Chg | YTD % Chg | Run 3 Mon % Chg | Run 12 Mon % Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Embassy Suites Cleveland Rockside | 108.30 | 8.6 | 106.83 | 8.1 | 106.83 | 8.1 | 109.63 | 3.4 | 22.2 | 8.5 | 8.5 | 4.2 |
| Market: Cleveland, OH | 83.07 | 10.5 | 79.67 | 7.5 | 79.67 | 7.5 | 79.23 | 6.0 | -3.5 | 2.8 | 2.8 | -1.3 |
| Market Price: Luxury | 117.73 | 10.4 | 114.81 | 9.4 | 114.81 | 9.5 | 116.36 | 7.1 | 10.0 | 4.3 | 4.3 | -0.2 |
| Tract Cleveland CBD/Independence | 88.82 | 7.3 | 86.18 | 4.7 | 86.18 | 4.7 | 88.52 | 4.4 | 11.9 | 8.4 | 8.4 | -0.7 |
| Tract Scale: Upscale Chains | 114.41 | 8.4 | 110.45 | 6.4 | 110.45 | 6.4 | 111.78 | 6.3 | 9.0 | 4.8 | 4.8 | -3.8 |
| Competitive Set: Competition | 95.90 | 8.8 | 89.21 | 9.2 | 89.21 | 9.2 | 96.09 | 8.2 | 17.8 | 10.7 | 10.7 | 2.6 |

## RevPAR

| | Current Month | % Chg | Year to Date | % Chg | Running 3 Month | % Chg | Running 12 Month | % Chg | Month % Chg | YTD % Chg | Run 3 Mon % Chg | Run 12 Mon % Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Embassy Suites Cleveland Rockside | 70.79 | 29.2 | 66.70 | 14.9 | 66.70 | 14.9 | 65.77 | 7.8 | 29.2 | 14.9 | 14.9 | 7.8 |
| Market: Cleveland, OH | 45.49 | 14.7 | 38.76 | 10.3 | 38.76 | 10.3 | 45.04 | 4.0 | 14.0 | 10.0 | 10.0 | 3.8 |
| Market Price: Luxury | 76.67 | 20.6 | 64.90 | 12.7 | 64.90 | 12.7 | 72.21 | 7.1 | 21.4 | 13.5 | 13.5 | -5.9 |
| Tract Cleveland CBD/Independence | 54.50 | 20.1 | 45.19 | 13.5 | 45.19 | 13.5 | 52.16 | 3.3 | 20.1 | 13.5 | 13.5 | 3.3 |
| Tract Scale: Upscale Chains | 72.46 | 18.2 | 60.30 | 11.6 | 60.30 | 11.6 | 67.64 | 2.3 | 18.2 | 11.6 | 11.6 | 2.3 |
| Competitive Set: Competition | 55.90 | 29.0 | 48.58 | 17.6 | 48.58 | 17.6 | 47.86 | 8.0 | 28.0 | 17.6 | 17.6 | 5.0 |

## Current Comp Set Property Data - Month

| | Census | | Sample | | Sample % | |
|---|---|---|---|---|---|---|
| | Properties | Rooms | Properties | Rooms | Properties | Rooms |
| Market: Cleveland, OH | 195 | 21972 | 143 | 19888 | 84.8 | 90.6 |
| Market Price: Luxury | 29 | 6400 | 27 | 6328 | 96.7 | 98.7 |
| Tract Cleveland CBD/Independence | 50 | 6081 | 27 | 6652 | 91.3 |  |
| Tract Scale: Upscale Chains | 18 | 3756 | 16 | 3756 | 100.0 |  |
| Competitive Set: Competition | 4 | 680 | 3 | 711 | 75.9 |  |

## Planning

| | Under Construction | | Planning | |
|---|---|---|---|---|
| | Properties | Rooms | Properties | Rooms |
| Market: Cleveland, OH | 3 | 391 | 8 | 1592 |

See Help page for positive definition.

SMITH TRAVEL RESEARCH



D7732 - K90

RevPAR Percent Change - 2006

D7732 - K91

## Tab 5 - Response Report

Embassy Suites Cleveland Rockside    6800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 986-9900
STR # 43426    ChainID: 000002346    MgtCo: None    Owner: None
For the Month of: March 2006    Date Created: April 22, 2006

**This Year**

Mar 17th - St. Patrick's Day

**Last Year**

Mar 17th - St. Patrick's Day
Mar 25th - Good Friday
Mar 27th - Easter



March 2006 (This Year)

March 2005 (Last Year)

Data required:
O = Monthly Only
● = Monthly & Daily
+ = Monthly, Daily, & Segmentation

| STR# | Name | City, State | Zip | Phone | Rooms | Open Date |
|---|---|---|---|---|---|---|
| 43426 | Embassy Suites Cleveland Rockside | Independence, OH | 44131-2346 | (216) 986-9900 | 271 | 200110 |
| 891 | Holiday Inn Cleveland South Independence | Independence, OH | 44131-2209 | (216) 524-8050 | 364 | 197406 |
| 8970 | Doubletree Cleveland South | Independence, OH | 44131-2218 | (216) 447-1300 | 193 | 198012 |
| 11104 | Independence Inn & Conf Center | Independence, OH | 44131-5114 | (216) 524-0700 | 176 | 197409 |
| 30448 | Courtyard Cleveland Independence | Independence, OH | 44131-3166 | (216) 901-9988 | 154 | 199905 |
| | | | | | 1181 | |

SMITH TRAVEL RESEARCH

D7732 - K92



Tab 6 - Daily Data for the Month

Embassy Suites Cleveland Rockside    5800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 985-9900
STR # 42426    ChainID: C00022266    MgtCo: None    Owner: None
For the Month of: March 2006    Date Created: April 27, 2006    Daily Competitive Set Data Excludes Subject Property

Daily Indexes for the Month of March

→ Occupancy Index → ADR Index → RevPAR Index

SMITH TRAVEL RESEARCH

D7732 - K93

Tab 7 - Day of Week and Weekday/Weekend Report

SMITH TRAVEL RESEARCH

D7732 - K94

# Tab 8 - Segmentation Summary - My Property vs. Competitive Set

Embassy Suites Cleveland Rockside   5800 Rockside Woods Blvd   Independence, OH 44131-2346   (216) 986-9900
STR # 42426   ChainID: 000022268   MgtCtr: None   Owner: None
For the Month of: March 2006   Date Created: April 22, 2006   Monthly Competitive Set Data Excludes Subject Property

## March 2006

| | Transient | % Chg | Group | % Chg | Contract | % Chg | Total | % Chg |
|---|---|---|---|---|---|---|---|---|
| **Occupancy (%)** | | | | | | | | |
| My Property | 47.9 | | 21.5 | | 0.0 | | 69.4 | 22.2 |
| Comp set | | | | | | | 61.4 | 17.9 |
| Index | | | | | | | 113.0 | 3.8 |
| **ADR ($)** | | | | | | | | |
| My Property | 111.50 | | 104.08 | | 0.00 | | 109.20 | 5.8 |
| Comp set | | | | | | | 89.74 | 8.5 |
| Index | | | | | | | 121.7 | -2.6 |
| **RevPAR ($)** | | | | | | | | |
| My Property | 53.45 | | 22.35 | | 0.00 | | 75.79 | 28.2 |
| Comp set | | | | | | | 55.10 | 28.0 |
| Index | | | | | | | 137.5 | 1.0 |

## Year to Date

| | Transient | % Chg | Group | % Chg | Contract | % Chg | Total | % Chg |
|---|---|---|---|---|---|---|---|---|
| **Occupancy (%)** | | | | | | | | |
| My Property | 47.8 | | 15.3 | | 0.0 | | 53.2 | 8.3 |
| Comp set | | | | | | | 54.5 | 10.7 |
| Index | | | | | | | 116.0 | -2.2 |
| **ADR ($)** | | | | | | | | |
| My Property | 110.72 | | 102.92 | | 0.00 | | 108.83 | 6.1 |
| Comp set | | | | | | | 86.21 | 6.2 |
| Index | | | | | | | 126.2 | -0.1 |
| **RevPAR ($)** | | | | | | | | |
| My Property | 52.98 | | 15.78 | | 0.00 | | 68.78 | 14.9 |
| Comp set | | | | | | | 46.86 | 17.5 |
| Index | | | | | | | 146.4 | -2.2 |

SMITH TRAVEL RESEARCH

D7732 - K95

# Tab 9 - Segmentation Occupancy Analysis

Embassy Suites Cleveland Rocksides    5800 Rockside Woods Blvd    Independence, OH 44131-2348    (216) 986-9900
STR # 43728    Chain#: 0000022363    MgtCo: None    Owner: None    Market Scale: Cleveland, OH Upper Upscale Chains
For the Month of: March 2006    Date Created: April 22, 2006    Monthly Competitive Set Data Excludes Subject Property

SMITH TRAVEL RESEARCH

D7732 - K96

# Tab 10 - Segmentation ADR Analysis

Embassy Suites Cleveland Rockside    3800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 986-9900
STR # 04436    Chain ID: 900022368    MgtCo: None    Owner: None    Market Scale: Cleveland, OH Upper Upscale Chains
For the Month of: March 2008    Date Created: April 22, 2008    Monthly Competitive Set Data Excludes Subject Property

| Current Month | Transient | | | Group | | | Contract | | | Total | | | Transient | | | Group | | | Contract | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | | |
| 2004 Oct | | | 118.88 | | | 110.77 | | 38.53 | | | 109.22 | 92.22 | 110.47 | | 7.1 | | | -1.2 | | | 38.8 | | -1.3 | -4.2 | 3.7 |
| Nov | | | 109.48 | | | 111.00 | | 43.37 | | | 100.59 | 79.82 | 108.60 | | 7.0 | | | 8.8 | | | 12.0 | | 1.8 | 5.1 | 6.1 |
| Dec | | | 105.55 | | | 97.61 | | 43.18 | | | 103.70 | 76.33 | 99.60 | | 8.1 | | | 15.5 | | | 10.4 | | 8.4 | 6.1 | 7.4 |
| 2005 Jan | | | 106.98 | | | 90.95 | | 42.37 | | | 102.18 | 80.55 | 99.83 | | 8.1 | | | -0.3 | | | 25.1 | | 5.6 | 6.2 | 8.1 |
| Feb | | | 110.57 | | | 98.40 | | 43.08 | | | 102.34 | 80.35 | 104.31 | | 4.9 | | | 4.1 | | | 16.8 | | 3.5 | 3.8 | 6.1 |
| Mar | | | 108.85 | | | 98.87 | | 42.49 | | | 103.25 | 82.68 | 104.85 | | 2.9 | | | -2.6 | | | 9.0 | | 1.2 | 4.0 | 3.0 |
| Apr | | | 113.88 | | | 103.66 | | 42.26 | | | 102.88 | 82.66 | 106.83 | | 6.0 | | | 1.4 | | | 0.3 | | -0.2 | 3.3 | 6.3 |
| May | | | 115.15 | | | 105.49 | | 41.70 | | | 103.14 | 84.06 | 106.06 | | 7.7 | | | 0.0 | | | 4.1 | | 2.5 | 5.2 | 6.9 |
| Jun | | | 117.38 | | | 106.73 | | 41.82 | | | 105.87 | 88.17 | 113.74 | | 7.8 | | | -1.8 | | | 0.3 | | 2.3 | 9.5 | 0.3 |
| Jul | | | 112.91 | | | 103.02 | | 41.84 | | | 101.90 | 83.13 | 107.66 | | 2.2 | | | 1.1 | | | 0.0 | | -1.7 | 3.8 | 3.8 |
| Aug | | | 115.40 | | | 106.25 | | 40.74 | | | 105.01 | 85.89 | 112.12 | | 7.6 | | | 8.5 | | | 0.9 | | 3.0 | 6.2 | 8.1 |
| Sep | | | 118.94 | | | 113.89 | | 39.57 | | | 108.08 | 88.83 | 114.69 | | 7.1 | | | 14.0 | | | -1.3 | | 4.8 | 6.3 | 11.3 |
| Oct | | | 112.08 | | | 112.08 | | 43.71 | | | 107.33 | 87.72 | 114.89 | | 1.6 | | | 1.2 | | | 13.3 | | 5.8 | 8.7 | 4.1 |
| Nov | 104.83 | | 118.69 | 110.33 | | 100.57 | | 45.09 | | | 108.58 | 84.37 | 110.98 | 8.0 | | | -4.9 | | | 8.5 | | 4.8 | 8.6 | 3.8 |
| Dec | 106.74 | | 113.72 | 96.33 | | 98.70 | 0.00 | 43.38 | | | 107.00 | 79.89 | 107.68 | 6.1 | | | 1.1 | | | 6.1 | | 3.7 | 9.3 | 8.3 |
| 2006 Jan | 110.70 | | 114.40 | 96.07 | | 98.10 | 0.00 | 49.10 | | | 108.47 | 82.85 | 110.60 | 5.9 | | | 8.2 | | | 19.1 | | 8.2 | 2.9 | 8.1 |
| Feb | 108.51 | | 110.19 | 104.82 | | 103.80 | 0.00 | 50.50 | | | 108.75 | 85.18 | 112.19 | 5.1 | | | 5.8 | | | 17.5 | | 8.4 | 7.1 | 7.5 |
| Mar | 111.80 | | 122.46 | 104.08 | | 106.17 | 0.00 | 57.98 | | | 109.22 | 89.74 | 118.06 | 11.4 | | | 13.4 | | | 38.8 | | 5.8 | 6.1 | 11.7 |

| Year To Date | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | | | 105.77 | | | 94.93 | | 35.97 | | | 89.67 | 77.82 | 88.94 | | 7.1 | | | | | | 5.8 | | 0.4 | 2.8 | 0.9 |
| 2005 | | | 110.14 | | | 96.91 | | 42.82 | | | 102.54 | 81.19 | 103.01 | | 4.1 | | | -0.8 | | | 18.3 | | 2.8 | 5.1 | 4.4 |
| 2006 | 110.72 | | 118.94 | 102.52 | | 104.98 | 0.00 | 53.22 | | | 108.83 | 86.21 | 113.86 | 7.8 | | | 9.6 | | | 28.9 | | 6.1 | 5.2 | 10.4 |

| Running 3 Month | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | | | 105.77 | | | 94.93 | | 35.97 | | | 89.67 | 77.82 | 88.94 | | 7.1 | | | | | | 5.8 | | 0.4 | 2.8 | 0.9 |
| 2005 | | | 110.14 | | | 95.91 | | 42.82 | | | 105.54 | 81.19 | 103.01 | | 4.1 | | | -0.8 | | | 18.5 | | 2.9 | 4.2 | 4.4 |
| 2006 | 110.72 | | 118.54 | 102.52 | | 104.98 | 0.00 | 53.22 | | | 108.85 | 86.31 | 113.80 | 7.8 | | | 9.6 | | | 28.9 | | 6.1 | 8.2 | 10.4 |

| Running 12 Month | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | | | 108.32 | | | 105.08 | | 40.71 | | | 103.71 | 79.43 | 103.15 | | | | | | | | | | 5.0 | -1.4 | -7.0 |
| 2005 | | | 109.81 | | | 103.87 | | 40.44 | | | 102.40 | 83.17 | 104.40 | | 3.1 | | | -4.1 | | | -0.7 | | -1.3 | 2.2 | 1.2 |
| 2006 | | | 116.56 | | | 105.92 | | 43.39 | | | 105.95 | 85.09 | 111.61 | | 6.1 | | | 3.1 | | | 7.3 | | 2.4 | 6.1 | 7.1 |

SMITH TRAVEL RESEARCH

D7732 – K97

# Tab 11 - Segmentation RevPAR Analysis

Embassy Suites Cleveland Rockside    8800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 986-9900
STR # 40429    Chain ID: 0000022298    MgtCo: None    Owner: None    Market Scale: Cleveland, OH Upper Upscale Chains
For the Month of March 2006    Data Consist: April 22, 2006    Monthly Competitive Set Data Excludes Subject Property

| Current Month | Transient | | | | Group | | | | Contract | | | | Total | | | | Transient | | | | Group | | | | Contract | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | My Prop | Comp Set | Market Index | | | | |

SMITH TRAVEL RESEARCH

D7732 – K90

# Tab 12 - Segmentation Index Analysis

Embassy Suites Cleveland Rockside    3800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 986-9900
STR # 40428    ChainID: 0000022366    MgmtCo: None    Owner: None
For the Month at: March 2006    Date Created: April 22, 2006    Monthly Competitive Set Data Excludes Subject Property

SMITH TRAVEL RESEARCH

D7732 - 129

# Tab 13 - Other Revenue Analysis

Embassy Suites Cleveland Rockside     5800 Rockside Woods Blvd     Independence, OH 44131-2348     (216) 895-9000
STR # 42428     Chain ID: 000022208     MgtDir: None     Market Scale: Cleveland, OH Upper Upscale Chains
For the Month of: March 2006     Data Created: April 22, 2006     Monthly Competitive Set Data Evaluates Subject Property

| Current Month | Revenue Per Room Sold ($) | | | | | | | | | | | | | | | | Percent of Total Revenue (%) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Room | | | F&B | | | Other | | | Total | | | Room | | | F&B | | | Other | | | | | | | |
| | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | My Prop | Comp Set | Market Scale | | | | | | |
| 2004 Oct | 103.22 | 82.22 | 110.47 | | | 55.54 | | | 21.22 | | | 187.23 | | | 59.0 | | | 33.2 | | | 10.8 | | | | | | |
| Nov | 100.83 | 79.62 | 105.90 | | | 63.42 | | | 8.85 | | | 179.69 | | | 58.8 | | | 35.4 | | | 4.9 | | | | | | |
| Dec | 103.70 | 78.33 | 99.60 | | | 61.08 | | | 27.55 | | | 203.23 | | | 47.8 | | | 38.9 | | | 13.2 | | | | | | |
| 2005 Jan | 103.12 | 80.35 | 90.88 | | | 63.81 | | | 14.76 | | | 178.48 | | | 56.0 | | | 35.8 | | | 8.3 | | | | | | |
| Feb | 103.24 | 80.33 | 104.31 | | | 62.71 | | | 15.65 | | | 182.08 | | | 57.1 | | | 34.3 | | | 8.6 | | | | | | |
| Mar | 103.25 | 80.86 | 104.68 | | | 56.82 | | | 12.06 | | | 172.99 | | | 60.6 | | | 32.4 | | | 7.0 | | | | | | |
| Apr | 102.98 | 82.98 | 108.83 | | | 67.80 | | | 8.87 | | | 185.30 | | | 58.8 | | | 36.6 | | | 4.8 | | | | | | |
| May | 103.14 | 84.06 | 109.95 | | | 65.32 | | | 3.71 | | | 180.68 | | | 60.8 | | | 36.1 | | | 3.2 | | | | | | |
| Jun | 106.67 | 85.17 | 112.74 | | | 56.03 | | | 6.09 | | | 176.85 | | | 63.7 | | | 32.6 | | | 3.4 | | | | | | |
| Jul | 101.90 | 83.13 | 107.59 | | | 48.77 | | | 6.51 | | | 172.77 | | | 65.2 | | | 30.0 | | | 3.9 | | | | | | |
| Aug | 103.01 | 85.99 | 112.12 | | | 53.72 | | | 5.08 | | | 171.53 | | | 65.4 | | | 31.3 | | | 3.3 | | | | | | |
| Sep | 106.05 | 85.53 | 114.96 | | | 55.54 | | | 7.56 | | | 191.38 | | | 60.1 | | | 35.5 | | | 4.1 | | | | | | |
| Oct | 107.23 | 87.72 | 114.98 | | | 78.79 | | | 18.48 | | | 208.22 | | | 55.2 | | | 36.9 | | | 7.9 | | | | | | |
| Nov | 105.88 | 84.87 | 110.06 | | 82.70 | 64.47 | 0.00 | | 13.32 | 138.56 | | 183.45 | 76.4 | | 56.7 | 23.0 | | 34.2 | 0.0 | | 7.1 | | | | | | |
| Dec | 107.59 | 78.59 | 107.88 | | 82.18 | 74.65 | 0.00 | | 8.10 | 160.66 | | 190.63 | 63.4 | | 55.8 | 39.6 | | 39.2 | 0.0 | | 4.2 | | | | | | |
| 2006 Jan | 104.47 | 82.65 | 110.08 | | 45.86 | 66.98 | 4.86 | | 13.97 | 158.68 | | 190.97 | 64.3 | | 61.3 | 28.7 | | 31.0 | 3.1 | | 7.7 | | | | | | |
| Feb | 104.75 | 86.10 | 112.48 | | 47.08 | 62.94 | 5.94 | | 14.50 | 191.57 | | 189.20 | 67.4 | | 59.3 | 29.2 | | 33.3 | 3.4 | | 7.5 | | | | | | |
| Mar | 100.35 | 83.74 | 118.69 | | 49.68 | 62.89 | 5.48 | | 10.59 | 190.74 | | 190.37 | 67.8 | | 61.4 | 29.7 | | 53.0 | 3.4 | | 6.8 | | | | | | |

| Year To Date | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2004 | 99.87 | 77.62 | 98.84 | | | 57.29 | | | 17.03 | | | 172.98 | | | 57.0 | | | 33.1 | | | 9.8 | | | | | | |
| 2005 | 102.34 | 81.10 | 103.01 | | | 60.53 | | | 14.04 | | | 177.58 | | | 58.0 | | | 34.1 | | | 7.9 | | | | | | |
| 2006 | 103.83 | 86.21 | 113.99 | | 46.22 | 60.89 | 5.30 | | 12.95 | 160.35 | | 187.23 | 67.8 | | 60.7 | 28.8 | | 32.5 | 3.3 | | 6.8 | | | | | | |

| Running 12 Month | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2004 | 99.67 | 77.62 | 98.84 | | | 57.29 | | | 17.03 | | | 172.96 | | | 57.0 | | | 33.1 | | | 9.6 | | | | | | |
| 2005 | 102.34 | 81.10 | 103.01 | | | 60.53 | | | 14.04 | | | 177.58 | | | 58.0 | | | 34.1 | | | 7.9 | | | | | | |
| 2006 | 105.83 | 86.21 | 113.69 | | 46.22 | 60.89 | 5.30 | | 12.95 | 160.35 | | 187.23 | 67.8 | | 63.7 | 28.8 | | 32.5 | 3.3 | | 6.8 | | | | | | |

| Running 36 Month | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2004 | 103.75 | 76.42 | 103.15 | | | 54.16 | | | 20.09 | | | 177.38 | | | 58.2 | | | 30.5 | | | 11.3 | | | | | | |
| 2005 | 102.60 | 80.17 | 104.40 | | | 60.60 | | | 14.10 | | | 178.00 | | | 58.7 | | | 33.4 | | | 7.9 | | | | | | |
| 2006 | 105.93 | 85.69 | 111.81 | | | 63.04 | | | 9.57 | | | 184.42 | | | 60.6 | | | 34.2 | | | 5.2 | | | | | | |

SMITH TRAVEL RESEARCH

D7932 - L1

# Tab 14 - Monthly Performance at a Glance - My Property vs. Competitive Set - Comp Set 2

Embassy Suites Cleveland Rockside    5800 Rockside Woods Blvd    Independence, OH 44131-2346    (216) 986-9900
STR # 42428    ChainID: 000022268    MgtCo: None    Owner: None
For the Month of: March 2006    Data Created: April 22, 2006    Monthly Competitive Set Data Excludes Subject Property

### March 2006

| | Occupancy (%) | | | ADR ($) | | | RevPAR ($) | | |
|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Index | My Prop | Comp Set | Index | My Prop | Comp Set | Index |
| Current Month | 69.4 | 63.9 | 108.5 | 109.20 | 123.05 | 88.7 | 75.79 | 78.69 | 96.3 |
| Year To Date | 63.2 | 53.7 | 117.6 | 108.83 | 119.31 | 91.2 | 68.78 | 64.11 | 107.3 |
| Running 3 Month | 63.2 | 53.7 | 117.6 | 108.83 | 119.31 | 91.2 | 68.78 | 64.11 | 107.3 |
| Running 12 Month | 62.1 | 62.6 | 99.2 | 105.93 | 118.62 | 89.3 | 65.77 | 74.23 | 88.6 |

### March 2006 vs. 2005 Percent Change (%)

| | Occupancy | | | ADR | | | RevPAR | | |
|---|---|---|---|---|---|---|---|---|---|
| | My Prop | Comp Set | Index | My Prop | Comp Set | Index | My Prop | Comp Set | Index |
| Current Month | 22.2 | 9.6 | 11.5 | 5.8 | 10.1 | -4.0 | 29.2 | 20.7 | 7.1 |
| Year To Date | 8.3 | 3.8 | 4.5 | 6.1 | 7.7 | -1.4 | 14.9 | 11.6 | 3.0 |
| Running 3 Month | 8.3 | 3.8 | 4.5 | 6.1 | 7.7 | -1.4 | 14.9 | 11.6 | 3.0 |
| Running 12 Month | 4.2 | -1.8 | 6.1 | 3.4 | 5.2 | -1.6 | 7.8 | 3.3 | 4.3 |

SMITH TRAVEL RESEARCH

D7732 – L2

## Tab 15 - STAR Summary – My Property vs. Comp Set and Industry Segments - Comp Set 2

Embassy Suites Cleveland Rockside    5800 Rockside Woods Blvd    Independence, OH 44131-2348    (216) 986-9900
STR # 43431    Chain ID: 000022918    Mgt. Or: None    Owner: None
For the Month of March 2006    Date Created: April 22, 2006    Monthly Competitive Set Data Excludes Subject Property

SMITH TRAVEL RESEARCH

See Help page for pipeline definitions.



Tab 16 - Trend Report - Comp Set 2

D7732 - L4

# Tab 17 - Response Report - Comp Set 2

Embassy Suites Cleveland Rockside   5800 Rockside Woods Blvd   Independence, OH 44131-2348   (216) 986-9900
STR # 43426   ChainID: 00/0022289   MgtCo: None   Owner: None
For the Month of: March 2008   Date Created: April 22, 2008

**This Year**
Mar 17th - St. Patrick's Day

**Last Year**
Mar 17th - St. Patrick's Day
Mar 26th - Good Friday
Mar 27th - Easter



| STR# | Name | City, State | Zip | Phone | Rooms | Open Date |
|---|---|---|---|---|---|---|
| 43426 | Embassy Suites Cleveland Rockside | Independence, OH | 44131-2348 | (216) 986-9900 | 271 | 2001/12 |
| 5551 | Hilton Cleveland East Beachwood | Beachwood, OH | 44122-4216 | (216) 464-5950 | 404 | 1977/11 |
| 10193 | Marriott Cleveland Downtown @ Key Ctr | Cleveland, OH | 44114-1306 | (216) 696-9200 | 400 | 1991/10 |
| 16024 | Renaissance Cleveland Hotel | Cleveland, OH | 44113-2223 | (216) 696-5600 | 491 | 1918/12 |
| 13146 | Embassy Suites Cleveland Downtown | Cleveland, OH | 44114-2507 | (216) 523-8000 | 268 | 1990/07 |
| 13335 | Embassy Suites Cleveland Beachwood | Beachwood, OH | 44122-2507 | (216) 765-8066 | 216 | 1998/10 |
| 42943 | Hyatt Regency Cleveland @ The Arcade | Cleveland, OH | 44114-1259 | (216) 575-1234 | 293 | 2001/09 |
| | | | | | 2343 | |

Data received:
O = Monthly Only
● = Hourly & Daily
+ = Monthly, Daily, & Segmentation

SMITH TRAVEL RESEARCH

D7732 - L5

# Tab 18 - Help

**Definitions**

- ADR (Average Daily Rate) - Room revenue divided by rooms sold
- Competitive (Comp) Set - A peer group of competitive hotels selected by hotel management to benchmark the subject property's performance
- Closed - Rooms unavailable from bookings sold at rates stipulated by contract, including online travel agent and permanent guests.
- Food & Beverage Revenue (F&B) - Revenue derived from food and beverage sales.
- Open - Rooms unavailable from bookings sold simultaneously at blocks of ten (10) or more.
- Index (Occupancy, ADR, RevPar) - Property performance divided by competitive set performance multiplied by 100
- Market Scale - Hotels located in the subject property's market and classified in the subject property's STR chain scale segment. There are seven (7) scale groups; Luxury, Upper Upscale, Upscale, Midscale with F&B, Midscale without F&B, Economy and Independent.
- Market Scale (Upscale) - Hotels located in the subject property's market and classified in the subject property's STR chain scale segment. There are four (4) market scale groups; Upscale (includes Luxury, Upper Upscale, Upscale, Midscale, Midscale pertaining to) ... with F&B,
- Midscale without F&B, Economy and Independent.
- MTD (Month to Date) - If a month ends during the current week, the MTD number would represent the month that ended.
- Occupancy - Rooms sold divided by rooms available multiplied by 100
- Other Revenue - All hotel revenue other than room and food and beverage revenue.
- Percent Change (% Chg) - Amount of growth - up, down or flat - this period versus same period last year (day, week, running 28 days, running calendar, month) ... Calculated as ((TY-LY)/LY)*100.
- Percent Change Scale (Occupancy, ADR, RevPar) - The percent change for the property is compared to the percent change of each hotel in the comp set
- Rate (Occupancy, ADR, RevPar) - Property performance minus comp set in the comparative set (Is it a "1" or "0" of ADR range) means the subject hotel's absolute ADR is the highest of the competition.
- RevPAR (Revenue per Available Room) - Room revenue divided by rooms available
- Room Revenue - Revenue derived from guestroom rental.
- Segmented Data - Rooms sold and revenue data broken down by Transient, Group, and Contract
- Track Data - Hotels located in the subject property's track and classified in the subject property's STR chain scale segment. There are four (4) track scale groups; Upscale (includes Luxury, Upper Upscale, Upscale, Midscale pertaining to) with F&B,
- Midscale without F&B, Economy and Independent.
- Transient - Rooms roomrevenue from guests with reservations at Rack, Corporate, Corporate Negotiated, Package, Government or foreign transient rates.
- Pipeline - The project will go out for bids, construction will start within x months, or an estimated number has been selected for the project and plans are underway.
- Under Construction - Ground has been broken or we expect to finalizing this on the press (period) correct.

**FAQ**

- How is my hotel performing versus competition?
  The ranking STAR report provides ...
- Is my hotel included in the competitive numbers?
  Your hotel is not included in the industry numbers.
- How are percentage changes calculated?
  Hotel and competitive performance changes are measured against same period prior year.
- Why do my percentage change numbers here such a large range?
  The data for this year vs. the same period last year vary greatly. December if you sold 2294 rooms this year vs. 143 last year, the percent change would be 200 TR ((2294+143)/143)*100.
- What is an index?
  An index is an easy way to measure your hotel's performance versus competitors. An index of 100 or higher means your hotel's absolute performance is the same or better than competition.
- What does the "Rank" column mean?
  The rank column is the ranked against one other competitor in your competitive set. If your hotel's RevPAR rank is "1 of 4", that means your hotel's absolute RevPAR is the second highest of the five hotels in your competitive set
- What does "running 28 day" mean?
  The most recent 28 days historical performance. The running 28 day numbers are based on the most current 28-day period, ending with the last day included in the weekly report
- What does "run MTD" mean?
  Running month-to-date. The MTD numbers are based on a calendar month and include all days of the same month, through the most recent calendar day included in the report. If the most recent week's reporting includes data in two calendar months, the MTD numbers only include data from the recently ended month.
- What if there are blanks in my competitive set numbers?
  A minimum of three (3) hotels evaluating the subject property must report data in order for STR to provide comparative set performance.
- What if there are blanks in my competitive set numbers?
  Your competitive set did not include all hotels' data for reporting prior year data.
- What is "Explain" on the Summary Tab?
  Pipeline data is generated based on the STR/TWR/Dodge Construction Supply Pipeline contains and details hotels that are being planned but not yet open. Every month STR receives data feeds here to hotel clients and Dodge Construction to create the database for hotels in planning, pre-planning or under construction. The data is widely used by investment banks, development groups and hotel owners to evaluate future investments supply growth and track supply changes in key market.

# Exhibit 2

MSMCI Loan No. 06-26034

# MEZZANINE LOAN AGREEMENT

Dated as of August 3, 2006

Between

## PLATINUM LODGING MEZZ, LLC,
as Borrower

and

## MORGAN STANLEY MORTGAGE CAPITAL INC.,
as Lender

LEGAL02/30016305v7

TABLE OF CONTENTS

Page

I.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions. ...................................................................................2
Section 1.2    Principles of Construction. ...............................................................23

II.  THE LOAN

Section 2.1    The Loan....................................................................................23
Section 2.2    Interest Rate...............................................................................24
Section 2.3    Loan Payments. ...........................................................................27
Section 2.4    Prepayments................................................................................32

III. REPRESENTATIONS AND WARRANTIES

Section 3.1    Borrower Representations. ...............................................................34
Section 3.2    Survival of Representations................................................................44

IV.  BORROWER COVENANTS

Section 4.1    Borrower Affirmative Covenants. .......................................................44
Section 4.2    Borrower Negative Covenants............................................................54

V.   INSURANCE, CASUALTY AND CONDEMNATION

Section 5.1    Insurance....................................................................................57
Section 5.2    Casualty and Condemnation. .............................................................58

VI.  RESERVE FUNDS

Section 6.1    Reserve Funds.  Borrower shall cause Mortgage Borrower to comply
               with all of its obligations under Article 6 of the Mortgage Loan
               Agreement.  Notwithstanding anything to the contrary contained in this
               Agreement, if at any time and for any reason, Mortgage Borrower is no
               longer maintaining any of the Mortgage Reserve Accounts in accordance
               with the terms of the Mortgage Loan Documents (or any mortgage loan
               agreement in effect with respect to a refinancing consented to by Lender
               under this Agreement), to the extent permitted to do so pursuant to the
               Mortgage Loan Documents, (i) Borrower shall promptly establish and
               maintain with Lender and for the benefit of Lender reserves in
               replacement and substitution thereof, which substitute reserves shall be
               subject to all of the same terms and conditions applicable under the

Mortgage Loan Documents with respect to the Mortgage Reserve Accounts being replaced (including, but not limited to those contained in the Mortgage Cash Management Agreement, and Borrower shall, and shall cause Mortgage Borrower to, acknowledge and agree to the amendments to this Agreement relating to such substitution to cash management provided such amendments are substantially similar to those contained in the Mortgage Cash Management Agreement), and (ii) to the extent not prohibited by Mortgage Lender under the Mortgage Loan Documents, Borrower shall or shall cause Mortgage Lender to remit to Lender any funds from Mortgage Reserve Accounts that were remaining in such reserves at the time of the termination of such reserves for the purpose of funding the equivalent substitute reserves. ............59

6.2 Cash Management.  (a) Borrower and Lender acknowledge and agree that all Rent and other income from the Property will be deposited and disbursed in accordance with the Mortgage Cash Management Agreement. Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason (including, without limitation, the satisfaction of the Mortgage Loan), Mortgage Borrower is no longer maintaining the accounts established pursuant to the Mortgage Cash Management Agreement or if the cash management arrangement referred to in the Mortgage Loan Agreement and Mortgage Cash Management Agreement is no longer in full force and effect, to the extent not prohibited under the Mortgage Loan Documents, Borrower shall promptly enter into a substitute cash management agreement and related lockbox agreement with Bank (as defined in the Mortgage Cash Management Agreement) (or such other depository institution selected by Borrower and reasonably acceptable to Lender) on substantially the same terms as the agreements entered into as of the date hereof in connection with the related Mortgage Loan. ......................................................59

(b) Borrower acknowledges and agrees that it shall cause all amounts payable under any Interest Rate Protection Agreement to be deposited into the Deposit Account (as defined in the Mortgage Cash Management Agreement]. If, notwithstanding the provisions of this Section 6.2, Borrower or Manager receives any amounts payable under any Interest Rate Protection Agreement, then (i) such amounts shall be deemed to be collateral for the Loan, as applicable, and shall be held in trust for the benefit, and as the property, of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts in the Deposit Account within one (1) Business Day of receipt....................................................................59

## VII.   PROPERTY MANAGEMENT

Section 7.1     The Management Agreement and the Franchise Agreement. ............................60
Section 7.2     Prohibition Against Termination or Modification..............................................60
Section 7.3     Replacement of Manager...............................................................................61

Section 7.4       Matters Concerning the Franchisor. ...................................................61

VIII.    PERMITTED TRANSFERS

Section 8.1       Intentionally Omitted.........................................................................61
Section 8.2       Permitted Transfers of Equity Interests.............................................61
Section 8.3       Future Junior Mezzanine Option.......................................................62
Notwithstanding the foregoing provisions of this Article 8, one or more constituent
                  parties of Borrower (collectively, the "Future Junior Mezzanine
                  Borrower"), other than any SPC Party, shall have the one-time right to
                  incur junior mezzanine financing (the "Future Junior Mezzanine Loan")
                  secured by the direct and/or indirect equity interests in Borrower owned
                  by Future Junior Mezzanine Borrower (the "Future Junior Mezzanine
                  Option"); provided, that, the following terms and conditions are each
                  satisfied;...................................................................................................62

IX.      SALE AND SECURITIZATION OF MORTGAGE

Section 9.1       Sale of Loan and Securitization.........................................................64
Section 9.2       Securitization Indemnification. .........................................................67
Section 9.3       Rating Agency Costs. ........................................................................69
Section 9.4       Reserves / Escrows............................................................................69
In the event that Securities are issued in connection with the Loan, all funds held by
                  Lender in escrow or pursuant to reserves in accordance with this
                  Agreement, the Mortgage, the Note and the other Loan Documents shall
                  be held in "eligible accounts" at "eligible institutions" and, if invested,
                  invested in "permitted investments" as then defined and required by the
                  Rating Agencies...............................................................................................69
Section 9.5       Mortgage Loan Securitization.  Borrower also agrees to cooperate with
                  Mortgage Lender in connection with the Securitization of the Mortgage
                  Loan as set forth in Section 9.1 of the Mortgage Loan Agreement and, to
                  the extent set forth therein, at Borrower's expense. .........................................69
Section 9.6       Conversion to Registered Form.........................................................69
At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer
                  agent (the "Registrar") reasonably acceptable to Lender which shall
                  maintain, subject to such reasonable regulations as it shall provide, such
                  books and records as are necessary for the registration and transfer of the
                  Note in a manner that shall cause the Note to be considered to be in
                  registered form for purposes of Section 163(f) of the Code.  The option
                  to convert the Note into registered form once exercised may not be
                  revoked.  Any agreement setting out the rights and obligation of the
                  Registrar shall be subject to the reasonable approval of Lender.
                  Borrower may revoke the appointment of any particular person as
                  Registrar, effective upon the effectiveness of the appointment of a
                  replacement Registrar.  The Registrar shall not be entitled to any fee

from Borrower or Lender or any other lender in respect of transfers of
the Note and other Loan Documents. ................................................................70

X.    DEFAULTS

Section 10.1    Event of Default.................................................................................70
Section 10.2    Remedies. ..........................................................................................73
Section 10.3    Right to Cure Defaults........................................................................74
Section 10.4    Remedies Cumulative.........................................................................74
Section 10.5    Power of Attorney. .............................................................................75

XI.    MISCELLANEOUS

Section 11.1    Successors and Assigns. .....................................................................75
Section 11.2    Lender's Discretion. ...........................................................................75
Section 11.3    Governing Law. ..................................................................................75
Section 11.4    Modification, Waiver in Writing. .......................................................77
Section 11.5    Delay Not a Waiver. ...........................................................................77
Section 11.6    Notices. ..............................................................................................77
Section 11.7    Trial by Jury.......................................................................................78
Section 11.8    Headings. ...........................................................................................79
Section 11.9    Severability.........................................................................................79
Section 11.10   Preferences.........................................................................................79
Section 11.11   Waiver of Notice. ...............................................................................79
Section 11.12   Remedies of Borrower........................................................................79
Section 11.13   Expenses; Indemnity..........................................................................80
Section 11.14   Schedules Incorporated.......................................................................81
Section 11.15   Offsets, Counterclaims and Defenses..................................................81
Section 11.16   No Joint Venture or Partnership; No Third Party Beneficiaries............81
Section 11.17   Publicity .............................................................................................81
Section 11.18   Waiver of Marshalling of Assets.........................................................82
Section 11.19   Waiver of Offsets/Defenses/Counterclaims. .......................................82
Section 11.20   Conflict; Construction of Documents; Reliance....................................82
Section 11.21   Brokers and Financial Advisors. ........................................................82
Section 11.22   Recourse. ...........................................................................................83
Section 11.23   Prior Agreements................................................................................84
Section 11.24   Servicer...............................................................................................85
Section 11.25   Joint and Several Liability..................................................................85
Section 11.26   Creation of Security Interest...............................................................85
Section 11.27   Assignments and Participations...........................................................85
Section 11.28   Set-Off. ..............................................................................................86
Section 11.29   Component Notes. ..............................................................................86
Section 11.30   Tax Disclosure....................................................................................87
Section 11.31   Reinstatement. ...................................................................................87
Section 11.32   Certain Additional Rights of Lender (VCOC). ...................................87
SCHEDULES

| Schedule I | - | Organizational Chart |
|---|---|---|
| Schedule II(a) | - | Form of Interest Rate Cap Confirmation – Lender or its Affiliate |
| Schedule II(b) | - | Form of Interest Rate Cap Confirmation – Third Party |
| Schedule III | - | Form of Smith Travel Research Report |
| Schedule IV | - | Legal Description of Adjacent Properties |

## MEZZANINE LOAN AGREEMENT

THIS MEZZANINE LOAN AGREEMENT, dated as of August 3, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **PLATINUM LODGING MEZZ, LLC**, an Ohio limited liability company ("**Borrower**"), whose principal place of business is 8330 Strasbourg Court, Dublin, Ohio 43017, and **MORGAN STANLEY MORTGAGE CAPITAL INC.**, a New York corporation, having an address at 1221 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "**Lender**").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H :

WHEREAS, Morgan Stanley Mortgage Capital Inc., a New York corporation, as mortgage lender ("**Mortgage Lender**"), has made a loan in the original principal amount of TWENTY EIGHT MILLION FIVE HUNDRED THOUSAND and NO/100 Dollars ($28,500,000) (the "**Mortgage Loan**") to PLATINUM LODGING, LLC, an Ohio limited liability company (together with its successors and/or assigns, "**Mortgage Borrower**") pursuant to a certain Loan Agreement, dated as of July 18, 2006, between Mortgage Borrower and Mortgage Lender, which is concurrently herewith being amended by that certain First Amendment to Loan Agreement, dated as of the date hereof, by and between Mortgage Borrower and Mortgage Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**");

WHEREAS, the Mortgage Loan is evidenced by that certain Promissory Note, dated as of July 18, 2006, made by Mortgage Borrower to Mortgage Lender as amended, restated, replaced, consolidated or otherwise modified from time to time (the "**Mortgage Note**"), and secured by, among other things, that certain Mortgage and Security Agreement, dated as of July 18, 2006, granted by Mortgage Borrower in favor of Mortgage Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Mortgage**"), pursuant to which Mortgage Borrower has granted to Mortgage Lender a first priority mortgage on, among other things, the real property and other collateral as more fully described in the Mortgage (collectively, the "**Property**");

WHEREAS, simultaneously with the execution of this Agreement, Mortgage Borrower is (A) entering into that certain (i) First Amendment to Loan Agreement, by and between Mortgage Borrower and Mortgage Lender, (ii) Cash Management Agreement, by and between Mortgage Borrower, Mortgage Lender and Manager (defined herein) (the "**Mortgage Cash Management Agreement**") and (iii) Restricted Account Agreement, by and between Mortgage Borrower, Mortgage Lender and Lockbox Bank (defined herein) (the "**Restricted Account Agreement**") and (B) making a principal paydown of the Mortgage Loan in the amount of $4,000,000.00 and thereby reducing the principal amount of the Mortgage Loan to $24,500,000;

LEGAL02/30016305v7

WHEREAS, Borrower is the legal and beneficial owner of (i) 99.5% of the membership interests in Mortgage Borrower and (ii) 100% of the shareholder interests in Water Park Management Company Inc., an Ohio corporation (the "**Mortgage SPE Component Entity**"), the managing member of and holder of 0.5% of the membership interests in Mortgage Borrower (the "**Pledged Company Interests**");

WHEREAS, Borrower has requested Lender to make a loan to it in the original principal amount of **TEN MILLION FIVE HUNDRED THOUSAND and NO/100 Dollars ($10,500,000.00)** (the "**Loan**");

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into that certain Pledge Agreement and Security Agreement, dated as of the date hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral (as defined in the Pledge Agreement) as collateral security for the Debt (as defined below); and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### Section 1.1    Definitions.

For all purposes of this Agreement, except as otherwise expressly provided:

"**Acceptable Delaware LLC**" shall mean a limited liability company formed under Delaware law which (i) has at least one springing member, which, upon the dissolution of all of the members or the withdrawal or the disassociation of all of the members from such limited liability company, shall immediately become the sole member of such limited liability company, and (ii) otherwise meets the Rating Agency criteria then applicable to such entities.

"**Acquired Property Statements**" shall have the meaning set forth in Section 9.1(c).

"**Adjacent Properties**" shall mean those certain parcels of real property adjacent to the Property, each of which are more particularly described on Schedule IV attached hereto and made a part hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than forty percent (40%) of, is in Control of, is Controlled by or is under common ownership or Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

LEGAL02/30016305v7

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Guarantor, any SPC Party (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**Aggregate Debt Service**" shall mean, with respect to any particular period of time, the sum of scheduled principal and interest payments under the Note and the Mortgage Note, and the Future Junior Mezzanine Loan, if any.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean $700,000.

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth Borrower's good faith estimate of Gross Revenue, Operating Expenses, and FF&E Expenditures for the applicable Fiscal Year.

"**Applicable Interest Rate**" shall mean 9.15625% per annum for the initial Interest Period and thereafter either (i) the LIBOR Interest Rate plus the Spread with respect to any period when the Loan is a LIBOR Loan or (ii) the Substitute Rate plus the Substitute Spread with respect to any period when the Loan is a Substitute Rate Loan provided, however, that in no event shall the Applicable Interest Rate ever be less than 7.00% per annum.

"**Approved Accounting Method**" shall mean the (i) the Uniform System of Accounts reconciled in accordance with GAAP or (ii) such other method of accounting as may be reasonably acceptable to Lender, consistently applied.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(e).

"**Assignment of Management Agreement**" shall mean that certain Mezzanine Subordination of Management Agreement dated the date hereof among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Protection Agreement**" shall mean that certain Mezzanine Assignment of Interest Rate Protection Agreement, dated as of the date hereof, between Borrower and Lender and acknowledged by IXIS FINANCIAL PRODUCTS INC. and any other Assignment of Interest Rate Protection Agreement hereafter delivered.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Basic Carrying Costs**" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the first paragraph hereof.

"**Borrower Operating Agreement**" shall mean the limited liability company agreement for Borrower.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"**Capital Expenditures**" shall mean for any period the amount expended for items capitalized under the Approved Accounting Method (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Capped LIBOR Rate**" shall mean 5.50%.

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Closing Date**" shall mean the date of funding the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall have the meaning set forth in the Recitals.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contractual Obligation**" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"**Counterparty**" shall mean (a) the counterparty under the Interest Rate Protection Agreement or (b) a Person that guarantees such counterparty's obligations under the Interest Rate Protection Agreement or otherwise provides to such counterparty credit support acceptable to Lender or, after a Securitization, the Rating Agencies, provided, however, that such guarantor shall be deemed the "Counterparty" for so long as the long-term credit rating issued by the Rating Agencies to such guarantor is better than the long-term credit rating of the actual counterparty under the Interest Rate Protection Agreement.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Debt**" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon (including, without limitation, any interest that would accrue on the outstanding principal amount of the Loan through and including the end of any applicable Interest Period, even if such Interest Period extends beyond any applicable Monthly Payment Date, Prepayment Date or the Maturity Date) and all other sums (including, without limitation, the Spread Maintenance Premium and any Breakage Costs) due to Lender in respect of the Loan under the Note, this Agreement, the Pledge Agreement, the Environmental Indemnity or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and/or interest payments under the Note.

"**Debt Service Coverage Ratio**" shall mean the ratio calculated by Lender on a quarterly basis of (i) Underwritable Cash Flow for the twelve (12) calendar month period immediately preceding the date of calculation to (ii) the projected Aggregate Debt Service that would be due for the twelve (12) calendar month period immediately following such calculation (assuming a mortgage and mezzanine loan constant of 11.33% (or such other mortgage and mezzanine loan constant as may be expressly and specifically set forth herein)).

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate.

"**Determination Date**" shall mean, with respect to each Interest Period, the date that is two (2) London Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Period commences; provided, however, that Lender shall have the right to change the Determination Date to any other day upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"**Disclosure Document**" shall have the meaning set forth in Section 9.2(a).

"**Eligible Account**" shall mean an identifiable account which is separate from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or

examination by federal and state authority.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a federal or state chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

"**Environmental Indemnity**" shall mean that certain Mezzanine Environmental Indemnity Agreement dated as of the date hereof executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender.

"**Equity Collateral**" shall have the meaning set forth in Section 9.5.

"**ERISA**" shall have the meaning set forth in Section 4.2.11.

"**Event of Default**" shall have the meaning set forth in Section 10.1.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a).

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1(c)(vi).

"**Exculpated Parties**" shall have the meaning set forth in Section 11.22 hereof.

"**Excusable Delay**" shall mean a delay due to acts of God, governmental restrictions, stays, judgments, orders, decrees, enemy actions, civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other causes beyond the reasonable control of Borrower and/or Guarantor (or any of their respective constituent owners), but lack of funds in and of itself shall not be deemed a cause beyond the control of Borrower and/or Guarantor (or any of their respective constituent owners).

"**Exit Fee**" shall mean an amount equal to two and fifty hundredths percent (2.50%) of the original principal amount of the Note.

"**Extension Option**" shall have the meaning set forth in Section 2.3.2(b) hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.3.2(b) hereof.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(e).

"**FF&E**" shall mean repair and/or replacement of the furnishings, fixtures, equipment and other items to the extent the same are properly capitalized in accordance with the Approved Accounting Method.

"**Fiscal Year**" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Franchise Agreement**" shall mean that certain License Agreement, dated as of April 9, 2004, between Platinum Lodging, LLC, an Ohio limited liability company and Franchisor, and as the same may be amended or modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, the Replacement Franchise Agreement executed in accordance with the terms and provisions of this Agreement.

"**Franchisor**" shall mean Holiday Hospitality Franchising Inc., a Delaware corporation, or, if the context requires, a Qualified Franchisor.

"**Future Junior Mezzanine Borrower**" shall have the meaning set forth in Section 8.3 hereof.

"**Future Junior Mezzanine Loan**" shall have the meaning set forth in Section 8.3 hereof.

"**Future Junior Mezzanine Option**" shall have the meaning set forth in Section 8.3 hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Revenue**" shall mean all revenue, derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Mortgage Borrower to any Governmental Authority, non-recurring revenues as determined by Lender, payments received by Borrower under the Interest Rate Protection Agreement (and payments received by the Mortgage Borrower under the Interest Rate Protection Agreement executed by Mortgage Borrower in connection with the Mortgage Loan_, proceeds from the sale or refinancing of the Property, security deposits (except to the extent determined by Lender to be properly utilized to offset a loss of Rent), refunds and uncollectible accounts, proceeds of casualty insurance and Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), and any disbursements to Mortgage Borrower from the Mortgage Reserve Funds or any other fund established by the Mortgage Loan Documents. Without limiting the generality of the foregoing, Gross Revenue shall also include all sustainable income and proceeds (whether in cash or on

credit, and computed on an accrual basis) received by Mortgage Borrower or Manager for the use, occupancy or enjoyment of the Property, or any part thereof, or received by Mortgage Borrower or Manager for the sale of any goods, services or other items sold on or provided from the Property in the ordinary course of the Property operation, including without limitation: (a) all income and proceeds received from rental of rooms, Leases and commercial space, meeting, conference and/or banquet space within the Property including net parking revenue; (b) all income and proceeds received from food and beverage operations and from catering services conducted from the Property even though rendered outside of the Property; (c) all income and proceeds from business interruption, rental interruption and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); (d) all Awards for temporary use (after deducting therefrom all costs incurred in the adjustment or collection thereof and in Restoration of the Property); (e) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Gross Revenue" if received in the ordinary course of the Property operation (after deducting therefrom all necessary costs and expenses incurred in the adjustment or collection thereof); and (f) interest on credit accounts, rent concessions or credits, and other required pass-throughs and interest on Mortgage Reserve Funds; but excluding, (1) gross receipts received by lessees, licensees or concessionaires of the Property; (2) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Mortgage Borrower or Manager; (3) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (4) federal, state and municipal excise, sales and use taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes; (5) Awards (except to the extent provided in clause (d) above); (6) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (7) gratuities collected by the Property employees; (8) the proceeds of any financing; (9) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; and (10) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.

"**Guarantor**" shall mean Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively, as the context may require.

"**Guaranty**" shall mean that certain Mezzanine Guaranty of Payment and Guaranty of Recourse Obligations of even date herewith from Guarantor for the benefit of Lender.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such

LEGAL02/30016305v7

Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b).

"**Independent Director**" shall have the meaning set forth in Section 3.1.24(p)(i).

"**Initial Maturity Date**" shall mean February 9, 2008.

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement dated as of the date hereof among Lender and the Mortgage Lender.

"**Interest Period**" shall mean (a) for the first interest period hereunder, (i) if the Closing Date occurs on or before the fourteenth (14th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the fourteenth (14th) day of the calendar month in which the Closing Date occurs, and (ii) if the Closing Date occurs on or after the fifteenth (15th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the fourteenth (14th) day of the following calendar month and (b) for each interest period thereafter commencing September 15, 2006, the period commencing on the fifteenth (15th) day of each calendar month and ending on (and including) the fourteenth (14th) day of the following calendar month. Each Interest Period as set forth in clause (b) above shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"**Interest Rate Protection Agreement**" shall mean one or more interest rate caps (together with the schedules relating thereto) in form and substance reasonably satisfactory to Lender, with a confirmation from Lender or its Affiliate in the form attached hereto as Schedule II(a) and/or a confirmation from any other Counterparty in the form attached hereto as Schedule II(b), between Borrower and, subject to Section 4.1.11, a Counterparty reasonably acceptable to Lender with a Minimum Counterparty Rating, and all amendments, restatements, replacements, supplements and modifications thereto.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

-9-

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, Mortgage Borrower, the Collateral or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or Mortgage Borrower, at any time in force affecting Borrower, Mortgage Borrower, the Collateral or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the first paragraph hereof.

"**Lender Indemnitees**" shall have the meaning set forth in Section 11.13(b).

"**Lender's Mezzanine Option**" shall have the meaning set forth in Section 9.5.

"**Lender's Notice**" shall have the meaning set forth in Section 2.2.3(b).

"**Liabilities**" shall have the meaning set forth in Section 9.2(b).

"**LIBOR**" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/1000 of 1%) for deposits in U.S. dollars, for a one-month period, that appears on Telerate Page 3750 (or the successor thereto) as of 11:00 a.m., London time, on the related Determination Date. If such rate does not appear on Telerate Page 3750 as of 11:00 a.m., London time, on such Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, if at least two such offered rates so appear. If fewer than two such offered rates appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the principal London Office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the then outstanding principal amount of the Loan. If at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the then outstanding principal amount of the Loan. If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. LIBOR shall be determined by Lender or its agent and at Borrower's request, Lender shall provide Borrower with the basis for its determination.

"**LIBOR Interest Rate**" shall mean with respect to each Interest Period the quotient of (i) LIBOR applicable to the Interest Period divided by (ii) a percentage equal to 100% minus the Reserve Requirement applicable to the Interest Period.

"**LIBOR Loan**" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at LIBOR Interest Rate plus the Spread in accordance with the provisions of Article II hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, Mortgage Borrower, the Collateral or the Property or any portion thereof, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of TEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($10,500,000.00) made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Environmental Indemnity, the Guaranty, the Assignment of Protection Agreement, the Assignment of Management Agreement and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan.

"**Lockbox Bank**" shall mean JPMorgan Chase Bank, N.A., a national banking association.

"**London Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England or New York, New York are not open for business.

"**LTV**" shall mean a percentage, calculated by taking a fraction, the numerator of which is the aggregate outstanding principal balance of each of the Loan and the Mortgage Loan and, if any, the Future Junior Mezzanine Loan (each as reasonably adjusted by Lender, to the extent applicable, to add to the principal amount thereof any future advance, negative amortization or other similar features that may increase the principal amount thereof) and the denominator of which is the value of the Property based on a current appraisal acceptable to Lender thereof, multiplied by one hundred (100) percent.

"**Major Lease**" shall mean (i) any commercial or retail Lease that demises 1,000 square feet or more of the Property's gross leasable area, (ii) any Lease which contains any option, offer, right of first refusal or other similar entitlement to acquire all or any portion of the Property (which such rights shall be deemed to be exclusive of any rights under any Lease to

-11-

extend the term thereof or to lease additional space at the Property), or (iii) any instrument guaranteeing or providing credit support for any Lease meeting the requirements of (ii) above.

"**Management Agreement**" shall mean the management agreement entered into by and between Mortgage Borrower and the Manager, pursuant to which the Manager is to provide management and other services with respect to the Property.

"**Manager**" shall mean Focus Lodging Group, LLC, an Ohio limited liability company or any other manager approved in accordance with the terms and conditions of the Loan Documents.

"**Manager Termination Ratio**" shall have the meaning set forth in Section 7.3.

"**Material Agreements**" means each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, under which there is an obligation of Mortgage Borrower to pay more than $25,000 per annum.

"**Maturity Date**" shall mean the Initial Maturity Date or, if applicable, the Extended Maturity Date, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Minimum Counterparty Rating**" shall mean a credit rating from S&P and Fitch of at least "AA" and from Moody's of at least "Aa2"; provided, however, that if Lender or its Affiliate is the Counterparty, the Minimum Counterparty Rating shall mean a credit rating from S&P and Fitch of at least "AA-" and from Moody's of at least "Aa3".

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

"**Monthly Payment Date**" shall mean the ninth (9th) calendar day of every calendar month occurring during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately preceding such day, commencing on September 9, 2006 and continuing to and including the Maturity Date.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Morgan Stanley**" shall have the meaning set forth in Section 9.2(b).

"**Morgan Stanley Group**" shall have the meaning set forth in Section 9.2(b).

"**Mortgage**" shall have the meaning set forth in the Recitals.

"**Mortgage Borrower**" shall have the meaning set forth in the Recitals.

"**Mortgage Borrower Operating Agreement**" shall mean the limited liability company agreement of Mortgage Borrower.

"**Mortgage Cash Management Agreement**" shall have the meaning set forth in the Recitals.

"**Mortgage Lender**" shall have the meaning set forth in the Recitals.

"**Mortgage Loan**" shall have the meaning set forth in the Recitals.

"**Mortgage Loan Agreement**" shall have the meaning set forth in the Recitals.

"**Mortgage Loan Default**" shall mean a "Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Documents**" shall mean, collectively, the Mortgage Loan Agreement, the Mortgage Note, the Mortgage, the Mortgage Cash Management Agreement and any and all other documents defined as the "Loan Documents" in the Mortgage Loan Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Mortgage Loan Event of Default**" shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Post Closing Agreement**" shall mean that certain Post Closing Obligations Agreement, dated as of July 18, 2006, executed by Mortgage Borrower in favor of Mortgage Lender and delivered in connection with the Mortgage Loan.

"**Mortgage Note**" shall have the meaning set forth in the Recitals.

"**Mortgage Reserve Accounts**" shall mean the accounts into which Mortgage Borrower shall deposit the Mortgage Reserve Funds pursuant to the terms of the Mortgage Loan Documents.

"**Mortgage Reserve Funds**" shall mean the "Reserve Funds" as defined in the Mortgage Loan Agreement.

"**Mortgage SPE Component Entity**" shall have the meaning set forth in the Recitals.

"**Net Liquidation Proceeds After Debt Service**" shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) Lender's and/or Mortgage Lender's reasonable costs incurred in connection with the recovery thereof, (ii) the costs incurred by

Mortgage Borrower in connection with a restoration of the Property made in accordance with the Mortgage Loan Documents, (iii) amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the case of a foreclosure sale, disposition or Transfer of the Property in connection with realization thereon following a Mortgage Loan Event of Default, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (v) in the case of a foreclosure sale, such costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents and (vi) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including attorneys' fees) of such refinancing as shall be reasonably approved by Lender.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"**Note**" shall have the meaning set forth in Section 2.1.3.

"**Notice**" shall have the meaning set forth in Section 11.6.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Expenses**" shall mean all costs and expenses relating to the operation, maintenance and management of the Property, including, without limitation, utilities, repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes, equipment lease payments, a management fee equal to the greater of 4% of annual rents or the actual management fee, but excluding actual Capital Expenditures, depreciation, amortization, Extraordinary Expenses and deposits required to be made to the Mortgage Reserve Funds; provided, however such costs and expenses shall be subject to adjustment by Lender to normalize such costs and expenses.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively, (i) the Liens and security interests created by the Mortgage Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy (as defined in the Mortgage Loan Agreement), (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Equipment and/or the Personal Property provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Equipment and/or Person Property which is (A) used in connection with the operation and maintenance of the Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the Mortgage.

"**Pledge Agreement**" shall have the meaning set forth in the Recitals.

"**Pledged Company Interests**" shall have the meaning set forth in the Recitals.

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Property**" shall have the meaning set forth in the Recitals.

"**Qualified Equityholder**" shall mean any one of the following Persons:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

-15-

(D)  any entity Controlled by any of the entities described in <u>clause (i)</u> or clauses <u>(ii)(A)</u> or <u>(ii)(C)</u> above;

(E)  a Qualified Trustee (or in the case of a CDO, a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the Future Junior Mezzanine Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("<u>CDO</u>") secured by, or (C) a financing through an "owner trust" of, a Future Junior Mezzanine Loan (any of the foregoing, a "<u>Securitization Vehicle</u>", provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of a Future Junior Mezzanine Loan to such Securitization Vehicle); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer of such Securitization Vehicle has a Required Special Servicer Rating (such entity, an "<u>Approved Servicer</u>") and such Approved Servicer is required to service and administer such Future Junior Mezzanine Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a Qualified Trustee, or a CDO Asset Manager which is a Qualified Equityholder, are each a Qualified Equityholder under clauses (ii)(A), (ii)(B), (ii)(C) or (ii)(D) of this definition; or

(F)  an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Equityholders under <u>clauses (ii)(A)</u>, <u>(B)</u>, <u>(C)</u> or <u>(D)</u> of this definition.

Notwithstanding the foregoing, no person or entity shall be deemed to be a Qualified Equityholder if (y) such person or entity (or any other person or entity owned or Controlled by such person or entity or affiliated with such person or entity) has been, within the last ten (10) years, (I) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institutional lender or (II) the subject of any action or proceeding under applicable Bankruptcy Code; or (z) any of the principals or entities which Control such person or entity or own a material direct or indirect equity interest in such person or entity have ever been convicted of a felony.

As used in the above definition of "**Qualified Equityholder**", the following terms shall have the following meanings:

(i)  "<u>CDO Asset Manager</u>" with respect to any Securitization Vehicle which is a CDO, shall mean the entity which is responsible for managing or administering the Future Junior Mezzanine Loan as an underlying asset of such Securitization Vehicle or, if applicable, as

LEGAL02/30016305v7

an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of the Future Junior Mezzanine Loan).

(ii)    "Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

(iii)    "Intervening Trust Vehicle" with respect to any Securitization Vehicle which is a CDO, shall mean a trust vehicle or entity which holds the Future Junior Mezzanine Loan as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

(iv)    "Permitted Fund Manager" means any Person that on the date of determination is (i) an entity that is a Qualified Equityholder under clauses (ii)(A), (B), (C) or (D) of the definition thereof or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to any case, proceeding or other action against Borrower, Future Junior Mezzanine Borrower or any SPC Party under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors.

(v)    "Qualified Trustee" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

(vi)    "Required Special Servicer Rating" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Mortgage Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"Qualified Franchisor" shall mean either (a) Franchisor; or (b) in the reasonable judgment of Lender, a reputable and experienced franchisor possessing experience in flagging hotel properties similar in size, scope, use and value as the Property, provided, that at Lender's option, Mortgage Borrower's delivery to Lender of a Rating Agency Confirmation with regard to such franchisor shall be a prerequisite to Lender's approval of such franchisor hereunder.

"**Rating Agencies**" shall mean, prior to the final Securitization of the Loan, each of S&P, Moody's and Fitch, or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"**Rating Surveillance Charge**" shall have the meaning set forth in Section 9.3.

"**Registrar**" shall have the meaning set forth in Section 9.6 hereof.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b).

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect, including any successor or other Regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"**Regulatory Change**" shall mean any change after the date of this Agreement in federal, state or foreign laws or regulations or the adoption or the making, after such date, of any interpretations, directives or requests applying to Lender or a class of banks or companies controlling banks, including Lender, of or under any federal, state or foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Mortgage Note.

"**Rents**" shall mean all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income or insurance, including, without limitation, all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of

any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Franchise Agreement**" shall mean either (a) a franchise, trademark and license agreement with a Qualified Franchisor substantially in the same form and substance as the Franchise Agreement, or (b) a franchise, trademark and license agreement with a Qualified Franchisor, which franchise, trademark and license agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (b), Lender, at its option, may require that Mortgage Borrower shall have obtained a Rating Agency Confirmation with regard to such franchise, trademark and license agreement.

"**Replacement Guarantor**" shall mean a new guarantor or guarantors of the Loan that replaces one or more of Guarantor, such replacement to occur upon satisfaction of the following conditions: (a) such Person shall (i) be satisfactory to Lender based solely on a thorough credit investigation (including review of such Replacement Guarantor's credit reports, judgment and lien searches and such other credit information as Lender reasonably requests), (ii) have the same net worth and liquidity as that of the Guarantor being replaced, as of the date hereof, (iii) assume the obligations of Guarantor under the Loan Documents and, in connection therewith, shall execute, without any cost or expense to Lender, such documents and agreements as Lender shall require to evidence and effectuate said assumption and (iv) own, directly or indirectly, an interest in the Borrower in an amount no less than interest of the Guarantor that such Person replaces; (b) Lender shall have received (i) if required by Lender, (1) a Rating Agency Confirmation and (ii) an opinion in form and substance (and from counsel) acceptable to Lender and the Rating Agencies stating that the consummation of the substitution of the original Guarantor would not constitute a "significant modification" of the Loan under Section 1001 of the IRS Code or otherwise cause a tax to be imposed on a "prohibited transaction" by any REMIC Trust (a "**REMIC Opinion**"), provided that a Rating Agency Confirmation and REMIC Opinion shall only be required in the event a Securitization has occurred; and (c) no Event of Default shall have occurred and be continuing. Notwithstanding the foregoing, no Person shall be deemed to be an acceptable Replacement Guarantor if (a) such Person (or any other Person owned or Controlled by such Person or affiliated with such Person) has been, within the last ten (10) years (i) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institution lender or (ii) the subject of any action or proceeding under the applicable Bankruptcy Code, or (b) any of the principals or entities which Control such Person or own a material direct or indirect equity interest in such Person have ever been convicted of a felony.

"**Replacement Interest Rate Cap Agreement**" means an interest rate cap agreement from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating, with terms identical to the Interest Rate Protection Agreement except that the same shall be effective in connection with replacement of the Interest Rate Protection Agreement following a downgrade, withdrawal or qualification of the long-term unsecured debt rating of the Counterparty; provided that to the extent any such interest rate cap agreement does not meet the foregoing requirements, a "Replacement Interest Rate Cap Agreement" shall be

such interest rate cap agreement approved in writing by each of the Rating Agencies with respect thereto.

"**Reporting Failure**" shall have the meaning set forth in Section 4.1.6.

"**Required Financial Item**" shall have the meaning set forth in Section 4.1.6.

"**Reserve Requirements**" means with respect to any Interest Period, the maximum rate of all reserve requirements (including, without limitation, all basic, marginal, emergency, supplemental, special or other reserves and taking into account any transitional adjustments or other schedule changes in reserve requirements during the Interest Period) which are imposed under Regulation D on eurocurrency liabilities (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against any category of extensions of credit or other assets which includes loans by a non-United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits) during the Interest Period and which are applicable to member banks of the Federal Reserve System with deposits exceeding one billion dollars, but without benefit or credit of proration, exemptions or offsets that might otherwise be available from time to time under Regulation D.  The determination of the Reserve Requirements shall be based on the assumption that Lender funded 100% of the Loan in the interbank eurodollar market.  In the event of any change in the rate of such Reserve Requirements under Regulation D during the Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including, without limitation, the imposition of Reserve Requirements, or differing Reserve Requirements, on one or more but not all of the holders of the Loan or any participation therein, Lender may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining the rate of such Reserve Requirements which shall be used in the computation of the Reserve Requirements. Lender's computation of same shall be final absent manifest error.

"**Restoration**" shall have the meaning set forth in Section 5.2.1 of the Mortgage Loan Agreement.

"**Restoration Threshold**" shall mean $700,000.

"**Restricted Account Agreement**" shall have the meaning set forth in the Recitals.

"**Restricted Party**" shall mean Borrower, Mortgage Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Mortgage Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager or any non-member manager.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"**Sale**" shall have the meaning set forth in Article 8 hereof.

-20-

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1(a).

"**Securities**" shall have the meaning set forth in Section 9.1(a).

"**Securities Act**" shall have the meaning set forth in Section 9.2(a).

"**Securitization**" shall have the meaning set forth in Section 9.1(a).

"**Servicer**" shall have the meaning set forth in Section 11.24.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(c).

"**Significant Party**" shall mean each of Borrower and Mortgage Borrower.

"**SPC Party**" shall have the meaning set forth in Section 3.1.24(o).

"**Spread**" shall mean 375 basis points.

"**Spread Maintenance Premium**" shall mean, in connection with a prepayment of all or any portion of the outstanding principal balance of the Loan pursuant to Section 2.3.3, Section 2.4.1(a) (as modified therein) or Section 2.4.3 hereof, an amount equal to the present value, discounted at LIBOR on the most recent Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, discounted at an interest rate that Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available), of all future installments of interest which would have been due hereunder through and including the end of the Interest Period in which the Maturity Date occurs, on the portion of the outstanding principal balance of the Loan being prepaid as if interest accrued on such portion of the principal balance being prepaid at an interest rate per annum equal to greater of (a) the Spread or (b) the Spread plus the difference between (i) 7.00% and (ii) LIBOR on such Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, an interest rate that Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available). The Spread Maintenance Premium shall be calculated by Lender and shall be final absent manifest error.

"**Standard Statement**" shall have the meaning set forth in Section 9.1(c).

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Subsidiary**" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than ten (10%) of the equity classes issued by such entity.

"**Substitute Rate**" shall have the meaning set forth in Section 2.2.3(b).

"**Substitute Rate Loan**" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at the Substitute Rate plus the Substitute Spread in accordance with the provisions of Article II hereof.

"**Substitute Spread**" shall have the meaning set forth in Section 2.2.3(b).

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Trustee**" shall mean any trustee holding the Loan in a Securitization.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Underwritable Cash Flow**" shall mean the excess of Gross Revenue over Operating Expenses. Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Gross Revenue or Operating Expenses) shall be calculated by Lender based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall have the meaning set forth in Section 9.2(b).

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"**Updated Information**" shall have the meaning set forth in Section 9.1(b)(i).

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

### Section 1.2    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

Notwithstanding anything stated herein to the contrary, any provisions in this Agreement cross-referencing provisions of the Mortgage Loan Agreement shall (x) mean the Mortgage Loan Agreement in effect as of the date hereof and Lender shall not be bound by any modifications of the Mortgage Loan Agreement with respect to such referenced provisions herein unless Lender has consented to such modification of the Mortgage Loan Agreement (or no such consent is required pursuant to the Intercreditor Agreement), and (y) be effective notwithstanding the termination of the Mortgage Loan Agreement by payment in full of the Mortgage Loan or otherwise.

## II.    THE LOAN

### Section 2.1    The Loan.

2.1.1    **Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

2.1.2    **Single Disbursement to Borrower.**  Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3    **The Note.**  The Loan shall be evidenced by that certain Mezzanine Promissory Note dated as of the date hereof, in the stated principal amount of TEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($10,500,000.00) executed by Borrower and payable to the order of Lender in evidence of the Loan (as the same may hereafter be amended, supplemented, restated, increased, extended or consolidated from time to time, the "Note") and shall be repaid in accordance with the terms of this Agreement and the Note.

2.1.4    **Use of Proceeds.**  Borrower shall use proceeds of the Loan to make capital contributions to the Mortgage Borrower to (i) pay and discharge any existing loans relating to the Property, (ii) pay all past-due Basic Carrying Costs, if any, in respect of the Property, (iii) deposit the Reserve Funds, (iv) pay costs and expenses incurred in connection with the closing of the Loan and the Mortgage Loan, as approved by Mortgage Lender and Lender, (v) fund any working capital requirements of the Property, as approved by Lender and (vi) retain the balance, if any.

-23-

### Section 2.2    Interest Rate.

**2.2.1    Applicable Interest Rate.** Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to and including the Maturity Date (including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through the end of the Interest Period during which the Maturity Date occurs (even if such period extends beyond the Maturity Date)) at the Applicable Interest Rate. Interest on the outstanding principal balance of the Loan existing on the commencement of an Interest Period shall accrue for the entire Interest Period and shall be owed by Borrower for the entire Interest Period regardless of whether any principal portion of the Loan is repaid prior to the expiration of such Interest Period.

**2.2.2    Interest Calculation.** Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.

**2.2.3    Determination of Interest Rate.**

(a)    Any change in the rate of interest hereunder due to a change in the Applicable Interest Rate shall become effective as of the first day on which such change in the Applicable Interest Rate shall become effective. Each determination by Lender of the Applicable Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(b)    In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall, by notice to Borrower ("Lender's Notice"), which notice shall set forth in reasonable detail such circumstances, establish the Applicable Interest Rate at Lender's then customary spread (the "Substitute Spread"), taking into account the size of the Loan and the creditworthiness of Borrower, above a published index used for variable rate loans as reasonably determined by Lender (the "Substitute Rate").

(c)    If, pursuant to the terms of this Agreement, the Loan has been converted to a Substitute Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower, and the Substitute Rate Loan shall automatically convert to a LIBOR Loan on the effective date set forth in such notice. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to convert a LIBOR Loan to a Substitute Rate Loan.

(d)    With respect to a LIBOR Loan, all payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed,

enacted or become effective after the date hereof (such non-excluded taxes being referred to collectively as "Foreign Taxes"), excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (including Puerto Rico). If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(e)     If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR Loan as contemplated hereunder, (i) the obligation of Lender hereunder to make a LIBOR Loan shall be cancelled forthwith and (ii) Lender may give Borrower a Lender's Notice, establishing the Applicable Interest Rate at the Substitute Rate plus the Substitute Spread, in which case the Applicable Interest Rate shall be a rate equal to the Substitute Rate in effect from time to time plus the Substitute Spread. In the event the condition necessitating the cancellation of Lender's obligation to make a LIBOR Loan hereunder shall cease, Lender shall promptly notify Borrower of such cessation and the Loan shall resume its characteristics as a LIBOR Loan in accordance with the terms herein from and after the first day of the Interest Period next following such cessation. Borrower hereby agrees promptly to pay Lender, upon demand, any additional amounts necessary to compensate Lender for any out-of-pocket costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be set forth in reasonable detail and Lender's calculation shall be conclusive absent manifest error.

(f)     In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)     shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(ii)     shall hereafter impose, modify, increase or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the rate hereunder; or

-25-

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Borrower shall not be required to pay same unless they are the result of requirements imposed generally on lenders similar to Lender and not the result of some specific reserve or similar requirement imposed on Lender as a result of Lender's special circumstances.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Lender shall provide Borrower with not less than thirty (30) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence, executed by an authorized signatory of Lender and submitted by Lender to Borrower shall be conclusive in the absence of manifest error.  This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(g)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense (other than consequential and punitive damages) which Lender sustains or incurs as a consequence of (i) any default by Borrower in payment of the principal of or interest on a LIBOR Loan, including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder, (ii) any prepayment (whether voluntary or mandatory) of the LIBOR Loan on a day that (A) is not a Monthly Payment Date or (B) is a Monthly Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Loan hereunder and (iii) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate to the Substitute Rate plus the Substitute Spread with respect to any portion of the outstanding principal amount of the Loan then bearing interest at a rate other than the Substitute Rate plus the Substitute Spread on a date other than the first day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder (the amounts referred to in clauses (i), (ii) and (iii) are herein referred to collectively as the "Breakage Costs").  Whenever in this Section 2.2.3 the term "interest or fees payable by Lender to lenders of funds obtained by it" is used and no such funds were actually obtained from such lenders, it shall include interest or fees which would have been payable by Lender if it had obtained funds from lenders in order to maintain a LIBOR Loan hereunder.  Lender will provide to Borrower a statement detailing such Breakage Costs and the calculation thereof.

(h)    The provisions of this Section 2.2.3 shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

LEGAL02/30016305v7

**2.2.4    Usury Savings.**  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.3    Loan Payments.

**2.3.1    Payment Before Maturity Date.**  Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period.  On the Monthly Payment Date occurring in September, 2006 and on each Monthly Payment Date thereafter to and including the Maturity Date, Borrower shall make a payment to Lender of interest accruing hereunder during the entire Interest Period in which such Monthly Payment Date occurs, calculated in the manner set forth herein.

**2.3.2    Payment on Maturity Date; Extension of Maturity Date.**  (a) Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents, including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through and including the end of the Interest Period in which the Maturity Date occurs (even if such Interest Period extends beyond the Maturity Date).

(b)    Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for two (2) successive terms (each, an **"Extension Option"**) for consecutive six (6) month periods (the Initial Maturity Date following the exercise of each such option is hereinafter the **"Extended Maturity Date"**) upon satisfaction of the following terms and conditions of this Section 2.3.2(b), and provided further Mortgage Borrower has satisfied the corresponding terms pursuant to Section 2.3.2(b) of the Mortgage Loan Agreement with respect to the Mortgage Loan:

(i)    In order to exercise the first Extension Option, Borrower shall deliver to Lender written notice of such extension not less than thirty (30) days nor more than sixty (60) days prior to the Initial Maturity Date and, upon giving of such notice of extension, and subject to the satisfaction of the conditions set forth below, the Maturity Date as theretofore in effect will be extended to August 9, 2008;

LEGAL02/30016305v7

(ii)     In order to exercise the second Extension Option, Borrower shall deliver to Lender written notice of such extension not less than thirty (30) days nor more than sixty (60) days prior to the Maturity Date and, upon the giving of such notice of extension, and subject to the satisfaction of the conditions set forth below, the Maturity Date as theretofore in effect will be extended to February 9, 2009;

(iii)     no Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and on the date that the applicable extension term is commenced;

(iv)     Borrower shall enter into an Interest Rate Protection Agreement through the term of the applicable extension under the same terms and conditions of the initial Interest Rate Protection Agreement (including its LIBOR strike price) entered into in connection with the Loan and shall provide an Assignment of Protection Agreement with respect thereto in the form of Assignment of Protection Agreement, together with an opinion of counsel with respect thereto reasonably acceptable to Lender;

(v)     Borrower shall have made a payment to Lender of an extension fee equal to one quarter of one percent (.25%) of the unpaid principal balance of the Loan as of the Maturity Date;

(vi)     if the Debt Service Coverage Ratio for the Property shall be less than 1.00:1.00 as of the date an Extension Option is exercised, Borrower shall deposit an amount up to $625,000.00, as determined by Lender in its sole discretion, into the Debt Service Reserve Funds, which amount shall be added to the existing Debt Service Reserve Funds, if any, and held in accordance with Section 6.6.1 hereof;

(vii)     the Franchise Agreement shall be in full force and effect with no material defaults thereunder, shall not have a term that expires prior to the Extended Maturity Date, and the Loan (as extended) shall be permitted thereby; and

(viii)     in connection with each Extension Option, Borrower shall have delivered to Lender together with its notice pursuant to Section 2.3.2(b)(i) or Section 2.3.2(b)(ii), as applicable, and as of the commencement of the applicable Extension Option, an Officer's Certificate in form acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the date of such Officer's Certificate.

2.3.3     **Interest Rate and Payment after Default.**  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such an Event of Default without regard to any grace or cure periods contained herein.  If all or any part of the principal amount of the Loan is prepaid upon acceleration of the Loan following the occurrence of an Event of Default, Borrower shall be required to pay (a) to Lender, in addition to all other amounts then payable hereunder (including, without limitation, (i) in the event that such prepayment is received on a Monthly Payment Date, interest accruing on such

LEGAL02/30016305v7

amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such prepayment is received on a date other than a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which the next Monthly Payment Date occurs), all Breakage Costs, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, together with a Spread Maintenance Premium calculated with respect to the amount of principal being repaid and (b) to Morgan Stanley, the Exit Fee.

2.3.4 **Late Payment Charge.** If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents.

2.3.5 **Method and Place of Payment.** (a) Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b) Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the Business Day immediately preceding such day.

(c) All payments required to be made by Borrower hereunder or under the /Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

2.3.6 **Regulatory Change.**

(a) If, at any time, as a result of any Regulatory Change: (i) the basis of taxation of payments to Lender of the principal of or interest on the Loan is changed or Lender or the Person controlling Lender shall be subject to any tax, duty, charge or withholding of any kind with respect to this Agreement (excluding federal taxation of the overall net income of Lender); or (ii) any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with or other liabilities of Lender is imposed, modified or deemed applicable to Lender; or (iii) any other condition affecting the Loan is imposed on Lender; and Lender or any Person controlling Lender reasonably determines that, by reason thereof, the cost to Lender or any Person controlling Lender of maintaining or extending the Loan is increased, or any amount receivable by Lender or any Person controlling Lender hereunder in respect of any portion of the Loan is reduced, in each case by an amount deemed by Lender, in its sole discretion, to be material (such increases in cost and reductions in amounts receivable being herein called "Increased Costs") and where Lender requires the same of all similarly situated

-29-

Borrowers, then Borrower shall pay to Lender such additional amount or amounts as will compensate Lender or any Person controlling Lender for such Increased Costs to the extent Lender reasonably determines that such Increased Costs are allocable to the Loan. Lender will notify Borrower of any event occurring after the date hereof which will entitle Lender to compensation pursuant to this subsection (f) as promptly as practicable after it obtains knowledge thereof and determines to request such compensation; provided, however, that, if Lender fails to deliver a notice within 180 days after the date on which an officer of Lender responsible for overseeing this Agreement knows or has reason to know of its right to additional compensation under this Section 2.3.6(a), Lender shall only be entitled to additional compensation for any such Increased Costs incurred from and after Borrower received such notice. If Lender requests compensation under this Section 2.3.6(a), Borrower may, by notice to Lender, require that Lender furnish to Borrower a reasonably detailed statement setting forth the basis for requesting such compensation and the method for determining the amount thereof. Notwithstanding the foregoing, in the event any Regulatory Change is caused by a change in Lender's organizational structure, Borrower shall not be required to pay any Increased Costs in connection therewith.

(b)    (i) At all times, Borrower shall make all payments hereunder free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, or any liabilities with respect thereto, including those arising after the date hereof as a result of the adoption of or any change in law, treaty, rule, regulation, guideline or determination of a Governmental Authority or any change in the interpretation or application thereof by a Governmental Authority but excluding, in the case of the Lender, such taxes (including income taxes, franchise taxes and branch profit taxes) as are imposed on or measured by Lender's net income by the United States of America or any Governmental Authority of the jurisdiction under the laws of which Lender is organized or maintains a lending office (all such non-excluded taxes, levies, imposts, deduction, charges, withholdings and liabilities with respect thereto which Lender determines to be applicable to this Agreement, the other Loan Documents and the Loan being hereinafter referred to as "U.S. Taxes"). If Borrower shall be required by law to deduct any U.S. Taxes from or in respect of any sum payable hereunder or under any other Loan Document to Lender, (A) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.3.6(b)) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (B) Borrower shall make such deductions, and (C) Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law. If a withholding tax of the United States of America or any other Governmental Authority shall be or become applicable after the date of this Agreement, to such payments by Borrower made to the lending office or any other office, Lender shall use reasonable efforts to make, fund and maintain its Loan through another lending office of Lender in another jurisdiction so as to reduce Borrower's liability hereunder, if the making, funding or maintenance of such Loan through Lender's such other lending office does not, in the judgment of Lender, otherwise adversely affect the Loan.

(ii)    In addition, for all periods, Borrower agrees to pay any present or future stamp or documentary taxes or other excise or property taxes, charges, or similar levies which arise from any payment made hereunder, or from the execution, delivery or registration of,

-30-

or otherwise with respect to, this Agreement, the other Loan Documents, or the Loan (hereinafter referred to as "Other Taxes").

        (iii)     Borrower shall indemnify Lender for all periods for the full amount of U.S. Taxes and Other Taxes (including any U.S. Taxes or Other Taxes imposed by any Governmental Authority on amounts payable under this Section 2.3.6(b)) paid by Lender and any liability (including penalties, interest, and expenses) arising therefrom or with respect thereto, whether or not such U.S. Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days after the date Lender makes written demand therefor.

        (iv)     Without prejudice to the survival of any other agreement of Borrower and Lender hereunder, the agreements and obligations of Borrower contained in Section 2.3.6(a) and this Section 2.3.6(b)) shall survive the payment in full of principal and interest hereunder, and the termination of this Agreement.

        (v)     If Lender or any of its successors or assigns is a foreign person (i.e., a person other than a United States person for United States federal income tax purposes), Lender shall:

        (1)     not later than the Closing Date (or, in the case of a successor or assign of Lender, the date such successor or assign becomes a successor or assign) deliver to Borrower one accurate and complete signed original of Internal Revenue Service Form W-8 ECI or any successor form ("Form W-8 ECI"), one accurate and complete signed original of Internal Revenue Service Form W-8 BEN or any successor form ("Form W-8BEN"), or one accurate and complete signed original of Internal Revenue Service Form W-8 EXP or any successor form ("Form W-8 EXP") as appropriate, in each case indicating that Lender (or such successor or assign, as applicable) is on the date of delivery thereof entitled to receive payments of principal, interest and fees under this Agreement free from withholding of United States federal income tax;

        (2)     if at any time it makes any changes necessitating a new Form W-8 ECI, Form W-8 BEN or Form W-8 EXP with reasonable promptness deliver to Borrower in replacement for, or in addition to, the forms previously delivered by it hereunder, one accurate and complete signed original of Form W-8 ECI, Form W-8 BEN, or Form W-8 EXP as appropriate, in each case indicating that it is on the date of delivery thereof entitled to receive payments of principal, interest and fees under this Agreement free from withholding of United States federal income tax; provided, that, Lender shall not be required to deliver such Form W-8 ECI, Form W-8 BEN or Form W-8 EXP if a Regulatory Change has occurred and Lender is unable to deliver such Form W-8 ECI, Form W-8 BEN or Form W-8 EXP; and

(3)    promptly upon Borrower's reasonable request to that effect, deliver to Borrower such other forms or similar documentation as may be required from time to time by applicable law, treaty, rule or regulation in order to establish its tax status for withholding purposes.

(vi)    Borrower will not be required to pay any additional amounts in respect of United States federal income tax pursuant to this Section 2.3.6(b) to Lender if the obligation to pay such additional amounts would not have arisen but for a failure by Lender to comply with its obligations under Section 2.3.6(b)(v) and the last sentence of Section 2.3.6(b)(i) above.

### Section 2.4    Prepayments.

**2.4.1    Voluntary Prepayments.**    Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.

(a)    Borrower may, provided no Event of Default has occurred, at its option, prepay the Debt in whole or in part, provided, the following conditions are satisfied (provided, however, that in connection with any such prepayment to Lender, Borrower shall pay the Exit Fee to Morgan Stanley):

(i)    Borrower shall provide prior written notice to Lender specifying the Monthly Payment Date upon which the prepayment is to be made (the "Prepayment Date"), which notice shall be delivered to Lender not less than thirty (30) days prior to such Prepayment Date (or such shorter period of time as may be permitted by Lender in its sole discretion) and which notice shall be irrevocable;

(ii)    if the Prepayment Date occurs on or prior to the Monthly Payment Date occurring in August 2007, Borrower shall pay a Spread Maintenance Premium calculated with respect to which would have been due hereunder through and including the end of the Interest Period occurring in August 2007, on the portion of the outstanding principal balance of the Loan being prepaid;

(iii)    no prepayment shall be permitted on any date during the period commencing on the first calendar day immediately following a Monthly Payment Date to, but not including, the Determination Date in such calendar month, unless consented to by Lender in its sole discretion;

(iv)    if such prepayment is made on a Monthly Payment Date, then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date; and

(v)    if such prepayment is made on a day other than a Monthly Payment Date (subject to the lockout period set forth in clause (iii) above), then in connection with such prepayment Borrower shall pay to Lender, simultaneously

with such prepayment, all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date; provided, however, that if the Prepayment Date is a date on or after the Determination Date in such calendar month and prior to the first day of the Interest Period that commences in such calendar month, Borrower shall also pay to Lender in connection with such prepayment all interest on the principal balance of the Loan then being prepaid which would have accrued through the end of the next succeeding Interest Period. Any prepayment received by Lender on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan and shall be applied to (A) the Debt on the next Monthly Payment Date and (B) any Breakage Costs due and payable pursuant to Section 2.2.3(g) hereof.

(b)    Intentionally Omitted.

2.4.2    **Liquidation Events.** (a) In the event of (i) any Casualty to the Property or any material portion thereof, (ii) any Condemnation of the Property or any material portion thereof, (iii) a Transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, including without limitation a foreclosure sale, or (iv) any refinancing of the Property or the Mortgage Loan (each, a "Liquidation Event"), Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be deposited directly into the Mezzanine Debt Service Account. On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, Borrower shall prepay the outstanding principal balance of the Mezzanine Note in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with (i) in the event that such Net Proceeds are received on or before a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such Net Proceeds are received on a date after a Monthly Payment Date, interest accruing on such amount calculated through and including the end of Interest Period in which the next Monthly Payment Date occurs. Any amounts of Net Liquidation Proceeds After Debt Service in excess of the Mezzanine Debt shall be paid to Borrower. Any prepayment received by Lender pursuant to this Section 2.4.2(a) on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date.

(b)    Borrower shall notify Lender of any Liquidation Event not later than one Business Day following the first date on which Borrower has knowledge of such event. Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of the Property, on the date on which a commitment for such refinancing has been entered into. The provisions of this Section 2.4.2 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement and the other Loan Documents.

-33-

LEGAL02/30016305v7

**2.4.3    Prepayments After Default.**  If after an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay (i) to Lender, in addition to the outstanding principal balance, all accrued and unpaid interest (including, without limitation, (a) in the event that such prepayment is received on or before a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (b) in the event that such prepayment is received on a date after a Monthly Payment Date, interest accruing on such amount calculated through and including the end of Interest Period in which the next Monthly Payment Date occurs), and other amounts payable under the Loan Documents, Breakage Costs, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, together with a Spread Maintenance Premium calculated with respect to the amount of principal being repaid, and (ii) to Morgan Stanley, the Exit Fee.

**2.4.4    Exit Fee.**  Notwithstanding anything to the contrary herein, Borrower shall pay to Morgan Stanley, in addition to payment to Lender of all amounts then due and owing to Lender under the Note, the Mortgage and the other Loan Documents, the Exit Fee on the earlier of (i) the date of any principal prepayment pursuant to Sections 2.3.3, 2.4.1(a), 2.4.2 or 2.4.3 above or (ii) the Maturity Date.  Borrower acknowledges that such Exit Fee is bargained-for-consideration and not a penalty.  In the event the Loan is prepaid or repaid or refinanced with the proceeds of a fixed rate permanent loan secured by the Property which is funded by Morgan Stanley, the Exit Fee shall be waived.

## III.    REPRESENTATIONS AND WARRANTIES

### Section 3.1    Borrower Representations.

Borrower represents and warrants that:

**3.1.1    Organization.**  (a)    Each Significant Party and each SPC Party is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder, and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

(b)    Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4)

months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 1637614. Borrower's federal tax identification number is 84-1714533. Borrower is not subject to back-up withholding taxes.

(c)    Borrower has the power and authority and the requisite ownership interests to control the actions of Mortgage Borrower and upon the realization of the Collateral under the Pledge Agreement, Lender or any other party succeeding to the Borrower's interest in the Collateral described in the Pledge Agreement would have such control. Without limiting the foregoing, Borrower has sufficient control over Mortgage Borrower to cause Mortgage Borrower to (i) take any action on Mortgage Borrower's part required by the Loan Documents and (ii) refrain from taking any action prohibited by the Loan Documents.

3.1.2  **Proceedings.**  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.1.3  **No Conflicts.**  The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which any Significant Party is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any Significant Party's organizational documents or any agreement or instrument to which such Significant Party, is a party or by which it is bound, or any order or decree applicable to such Significant Party, or result in the creation or imposition of any lien on any of such Significant Party's assets or property (other than pursuant to the Loan Documents).

3.1.4  **Litigation.**  There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against any Significant Party in any court or by or before any other Governmental Authority which would materially and adversely affect the ability of Borrower to carry out the transactions contemplated by this Agreement.

3.1.5  **Agreements.**  Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.

3.1.6  **Consents.**  No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of,

-35-

or compliance by Borrower with, this Agreement or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

   **3.1.7**  **Title.**  Borrower is the record and beneficial owner of, and has good and marketable title to, the Collateral, free and clear of all Liens whatsoever. The Pledge Agreement, together with the Uniform Commercial Code financing statements required to be filed in connection therewith, will create valid, perfected first priority security interests in and to the Collateral, all in accordance with the terms thereof.

   **3.1.8**  **No Plan Assets.**  As of the date hereof and throughout the term of the Loan (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans.

   **3.1.9**  **Compliance.**  Borrower, Mortgage Borrower, the Collateral and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and Prescribed Laws. Neither Borrower nor Mortgage Borrower is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower or Mortgage Borrower. Neither Borrower nor Mortgage Borrower has committed any act which may give any Governmental Authority the right to cause Mortgage Borrower or Borrower to forfeit the Property or the Collateral, or any part thereof, as applicable, or any monies paid in performance of Borrower's or Mortgage Borrower's obligations under any of the Loan Documents or Mortgage Loan Documents, as applicable.

   **3.1.10**  **Financial Information.**  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, Mortgage Borrower or the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, Mortgage Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Neither Borrower nor Mortgage Borrower has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower or Mortgage Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of the financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower, Mortgage Borrower or the Property from that set forth in said financial statements.

   **3.1.11**  **Mortgage Loan Representations.**  All of the representations and warranties contained in the Mortgage Loan Documents are hereby incorporated into this Agreement and deemed made hereunder as and when made thereunder and shall remain

incorporated without regard to any waiver, amendment or other modification thereof by the Mortgage Lender or to whether the related Mortgage Loan Document has been repaid, defeased or otherwise terminated, unless otherwise consented to in writing by Lender.

**3.1.12 Intentionally Omitted.**

**3.1.13 Intentionally Omitted.**

**3.1.14 Intentionally Omitted.**

**3.1.15 Enforceability.** The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**3.1.16 Intentionally Omitted.**

**3.1.17 Intentionally Omitted.**

**3.1.18 Intentionally Omitted.**

**3.1.19 Intentionally Omitted.**

**3.1.20 Intentionally Omitted.**

**3.1.21 Intentionally Omitted.**

**3.1.22 Intentionally Omitted.**

**3.1.23 Intentionally Omitted.**

**3.1.24 Single Purpose.** Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(a)    Borrower has not owned and will not own any asset or property other than (i) the related Pledged Company Interests and (ii) incidental personal property necessary for the ownership of such interests.

(b)    Borrower has not and will not engage in any business other than the ownership of the related Pledged Company Interests, and Borrower has and will conduct and operate its business as presently conducted and operated.

(c)    Neither Borrower nor Mortgage Borrower has entered into or will enter into any contract or agreement with any Affiliate of Borrower, Mortgage Borrower, any

-37-

constituent party of Borrower or Mortgage Borrower, any Affiliate of any constituent party, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

     (d)    Neither Borrower nor Mortgage Borrower has incurred nor will incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) in the case of Borrower, the Debt, and (ii) in the case of Mortgage Borrower, (A) the Mortgage Loan, (B) that certain loan made on May 10, 2005 in the original principal amount of $23,700,000 made by Marshall Investments Corporation to Mortgage Borrower secured by the Property (the "**Prior Hotel Loan**"), (C) that certain loan made on October 7, 2005 in the original principal amount of $2,212,000 made by Oak Hill Bank to Mortgage Borrower secured by the Adjacent Properties (the "**Adjacent Properties Loan**"), (D) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and/or (E) Permitted Equipment Leases; provided however, the aggregate amount of the indebtedness described in subsections (ii)(D) and (ii)(E) shall not exceed at any time three percent (3%) of the outstanding principal amount of the Mortgage Loan and except the indebtedness set forth in the Mortgage Loan Post Closing Agreement which Borrower represents is being paid-in-full and satisfied out of the proceeds of the Loan and that there are no remaining liability or obligations in connection with such indebtedness.  With respect to the Prior Hotel Loan, Borrower hereby represents, warrants and covenants that (1) the Prior Hotel Loan has been satisfied in full, and (2) neither Borrower, Mortgage Borrower nor Guarantor have any remaining liabilities or obligations in connection with the Prior Hotel Loan (other than environmental and other limited and customary indemnity obligations).   With respect to the Adjacent Properties Loan, Borrower hereby represents, warrants and covenants that Mortgage Borrower has been fully released from all liabilities and obligations in connection with the Adjacent Properties Loan.

     (e)    Neither Mortgage Borrower nor Borrower has made, and neither Mortgage Borrower nor Borrower will make, any loans or advances to any third party (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates.

     (f)    Each Significant Party is and will remain solvent and each Significant Party has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; provided, that, in each such case, there exists sufficient cash flow from the Property to do so.

     (g)    Each Significant Party has done or caused to be done and will do all things necessary to observe organizational requirements and formalities and preserve its existence, and no Significant Party will, nor will any Significant Party permit any constituent party of any Significant Party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such Significant Party or such constituent party without the prior consent of the Lender in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by

its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Lender's consent.

(h)     Each Significant Party has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party. No Significant Party's assets have or will be listed as assets on the financial statement of any other Person; provided, however, that each Significant Party's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Significant Party and such Affiliates and to indicate that such Significant Party's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on such Significant Party's own separate balance sheet. Each Significant Party has filed and will file its own tax returns (to the extent such Significant Party is required to file any such tax returns) and has not and will not file a consolidated federal income tax return with any other Person. Each Significant Party has maintained and will maintain its books, records, resolutions and agreements as official records.

(i)     Each Significant Party has been and will be, and at all times has and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Significant Party or any constituent party of such Significant Party), has and shall correct any known misunderstanding regarding its status as a separate entity, has and shall conduct business in its own name, has not and shall not identify itself or any of its Affiliates as a division or part of the other and has and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Each Significant Party has and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided that there exists sufficient cash flow from the Property to do so).

(k)     No Significant Party nor any constituent party has or will seek or effect the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of any Significant Party.

(l)     No Significant Party has nor will commingle the funds and other assets of such Significant Party with those of any Affiliate or constituent party or any other Person, and has and will hold all of its assets in its own name.

(m)     Each Significant Party has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     No Significant Party has nor will not guarantee or become obligated for the debts of any other Person and has not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)     If any Significant Party is a limited partnership or a limited liability company (other than an Acceptable Delaware LLC), each general partner or managing member

-39-

(each, an "**SPC Party**") shall be a corporation (I) whose sole asset is its interest in such Significant Party, (II) which has not been and shall not be permitted to engage in any business or activity other than owning an interest in such Significant Party; (III) which has not been and shall not be permitted to incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (IV) which has and will at all times own at least a 0.5% direct equity ownership interest in such Significant Party.  Each such SPC Party will at all times comply, and will cause such Significant Party to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 (to the extent applicable) as if such representation, warranty or covenant was made directly by such SPC Party.  Upon the withdrawal or the disassociation of an SPC Party from such Significant Party, such Significant Party shall immediately appoint a new SPC Party whose articles of incorporation are substantially similar to those of such SPC Party.

(p)    Each Significant Party shall at all times cause there to be at least one (1) duly appointed member of the board of directors or managers of SPC Party or such Significant Party (to the extent such Significant Party is a corporation or an Acceptable Delaware LLC) who is provided by a nationally-recognized company that provides professional independent directors (each, an "**Independent Director**") reasonably satisfactory to Lender who shall not have been at the time of such individual's appointment or at any time while serving as a director or manager of such SPC Party or such Significant Party (as applicable) and may not have been at any time during the preceding five years (i) a stockholder, director or manager (other than, in each case, as an Independent Director), officer, employee, partner, member, attorney or counsel of such SPC Party (if any), any Significant Party or any Affiliate of either of them, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such SPC Party (if any), any Significant Party or any Affiliate of either of them, (iii) a Person or other entity Controlling or under common Control with any such stockholder, director, manager, officer, employee, partner, member, attorney or counsel, customer, supplier or other Person, or (iv) a member of the immediate family of any such stockholder, director, manager, officer, employee, partner, member, attorney or counsel, customer, supplier or other Person.

(q)    No Significant Party shall (I) cause or permit the board of directors or managers of any SPC Party or such Significant Party (as applicable) to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock or under any organizational document of such Significant Party or SPC Party (as applicable), requires a vote of the board of directors or managers of such Significant Party or SPC Party (as applicable) unless at the time of such action there shall be at least one (1) member who is an Independent Director and (II) without the unanimous written consent of all of its partners or members, as applicable, and the written consent of 100% of the directors or managers of such Significant Party or each SPC Party (as applicable), including, without limitation, each Independent Director, (1) file or consent to the filling of any petition, either voluntary or involuntary, to take advantage of any state or federal; bankruptcy or insolvency laws, (2) seek or consent to the appointment of a receiver, liquidator or any similar official, (3) take any action that might cause such entity to become insolvent, or (4) make an assignment for the benefit of creditors.

(r)    Intentionally Omitted.

(s)     Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(t)     Each Significant Party has paid and shall pay the salaries of its own employees (if any) from its own funds and such Significant Party has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(u)     Each Significant Party has compensated and shall compensate each of its consultants and agents from its funds for services provided to it, and such Significant Party has paid and shall pay from its own assets all obligations of any kind incurred.

**3.1.25 <u>Tax Filings</u>.** To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower. Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26 <u>Solvency</u>.** Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**3.1.27 <u>Federal Reserve Regulations</u>.** No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**3.1.28 <u>Organizational Chart</u>.** The organizational chart attached as <u>Schedule I</u> hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

-41-

**3.1.29  Bank Holding Company.**  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**3.1.30  Investment Company Act.**  Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**3.1.31  No Bankruptcy Filing.**  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any knowledge of any Person contemplating the filing of any such petition against it.

**3.1.32  Full and Accurate Disclosure.**  To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

**3.1.33  Foreign Person.**  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

**3.1.34  No Change in Facts or Circumstances; Disclosure.**  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

**3.1.35  Management Agreement.**  All of the representations and warranties with respect to the Management Agreement set forth in Article VII of this Agreement are true and correct in all respects.

**3.1.36  Fraudulent Transfer.**  Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. The assets of Borrower do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as

-42-

conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts reasonably expected to be payable on or in respect of its obligations).

3.1.37 **No Breach of Fiduciary Duty.** No Person currently owning a direct or indirect equity ownership interest in Borrower (nor any past or current affiliate of such Person), has breached any fiduciary duty owed by such Person to any other Person now or previously owning a direct or indirect equity ownership interest in Borrower or in any other prior owner of the Property.

3.1.38 **Condemnation**. No condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

3.1.39 **No Contractual Obligations**. Other than the Loan Documents, the Borrower Operating Agreement and Mortgage Borrower Operating Agreement, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which it or its assets are bound, or has incurred any Indebtedness, and prior to the date of this Agreement neither Borrower nor any of its Subsidiaries has entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any Indebtedness.

3.1.40 **Franchise Agreement**. The Franchise Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or giving of notice, would constitute a default thereunder.

3.1.41 **Subsidiaries**. Borrower does not have any Subsidiaries except Mortgage Borrower and Mortgage SPE Component Entity.

3.1.42 **Pledged Company Interests**. There are no Liens on the Pledged Company Interests (other than the Liens created by the Loan Documents).

3.1.43 **Warranty of Title**.    (a)  Borrower is the record and beneficial owner of, and has good title to, the Collateral, free and clear of all Liens whatsoever. The Pledge Agreement, together with the UCC Financing Statements relating to the Collateral when properly filed in the appropriate records, will create a valid, perfected first priority security interests in and to the Collateral, all in accordance with the terms thereof for which a Lien can be perfected by filing a UCC Financing Statement. For so long as the Lien of the Pledge Agreement is outstanding, Borrower shall forever warrant, defend and preserve such title and the validity and priority of the Lien of the Pledge Agreement and shall forever warrant and defend such title, validity and priority to Lender against the claims of all persons whomsoever.

(b)    Mortgage Borrower has good title to the Property and Mortgage Borrower possesses a fee simple absolute estate in the Property and it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for the Permitted Encumbrances. The Permitted Encumbrances do not and will not materially adversely affect or interfere with the value, or materially adversely affect or interfere with the current use or operation, of the Property

or the ability of Borrower to repay the Note or any other amount owing under the Note, the Pledge Agreement, the Loan Agreement, or the other Loan Documents or to perform its obligations thereunder in accordance with the terms of the Loan Agreement, the Note, the Pledge Agreement or the other Loan Documents. Other than Mortgage Lender, no Person other than Mortgage Borrower owns any interest in any payments due under such Leases. Borrower shall cause Mortgage Borrower to forever warrant, defend and preserve the title to the Property and to forever warrant and defend the same to Lender against the claims of all persons whomsoever.

   **3.1.44  No Default**. As of the date hereof, no Default exists and no event that with the giving of notice and/or the lapse of time would constitute a Default exists.

   **3.1.45  Mortgage Reserve Accounts**. Mortgage Borrower has established the Mortgage Reserve Accounts as required under the Mortgage Loan Agreement.

   **Section 3.2 Survival of Representations.**

   The representations and warranties set forth in Section 3.1 shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## IV. BORROWER COVENANTS

   **Section 4.1 Borrower Affirmative Covenants.**

   Borrower hereby covenants and agrees with Lender that:

   **4.1.1  Existence; Compliance with Legal Requirements.** Borrower and Mortgage Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it, Mortgage Borrower and the Property, including, without limitation, Prescribed Laws.

   **4.1.2  Taxes and Other Charges.** Borrower shall cause Mortgage Borrower to pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to cause Mortgage Borrower to directly pay Taxes shall be suspended for so long as Mortgage Borrower complies with the terms and provisions of Section 6.2 of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent; provided, however, that Mortgage Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 6.2 of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to not permit or suffer and shall promptly cause Mortgage Borrower to discharge any lien or charge against the Property. After prior notice to Lender, Borrower may permit Mortgage Borrower, at its own expense, to contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be

-44-

permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof cause Mortgage Borrower to pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) Mortgage Borrower shall have deposited with Mortgage Lender security, as provided in the Mortgage Loan Agreement to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.

**4.1.3   Litigation.**  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which might materially adversely affect the Property or Borrower's ability to perform its obligations hereunder or under the other Loan Documents.

**4.1.4   Access to Property.**  Borrower shall cause Mortgage Borrower to permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**4.1.5   Further Assurances; Supplemental Mortgage Affidavits.**  Borrower shall, at Borrower's sole cost and expense:

(a)     execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(b)     do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, including, without limitation, the execution and delivery of all such writings necessary to transfer any liquor licenses with respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default.

**4.1.6   Financial Reporting.**

(a)     Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with the Approved Accounting Method, reflecting the financial affairs of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.

(b)     Borrower shall furnish Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's and Mortgage Borrower's annual financial statements reviewed by a "Big Four" accounting firm (excluding Arthur Andersen), REA and Associates, Inc. or other independent certified public accountant acceptable to Lender, certified by an officer of the Borrower, prepared in accordance with the Approved Accounting

-45-

Method covering the Property, including statements of income and expense and cash flow for Mortgage Borrower and the Property and a balance sheet for Mortgage Borrower, provided that (i) after an Event of Default and upon request of Lender, or (ii) after a Securitization, such financial statements provided by Mortgage Borrower shall be audited by a "Big Four" accounting firm (excluding Arthur Andersen) or other independent certified public accountant acceptable to Lender. Such statements shall set forth Underwritable Cash Flow, Gross Revenue, Operating Expenses and occupancy statistics for the Property. All annual financial statements shall be accompanied by a certificate executed by the chief financial or other senior officer of Borrower and Mortgage Borrower, as applicable, stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and Mortgage Borrower, as applicable. Together with such annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it -has existed and the action then being taken to remedy the same. Additionally, Borrower shall furnish to Lender (i) on or before the ninth (9th) day after the end of each calendar month, an Officer's Certificate stating the amount of Gross Revenue for the immediately preceding calendar month and (ii) on or before thirty (30) days after the end of each calendar month, Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports in the form of <u>Schedule IV</u> hereto then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(c)    Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year), the following items, accompanied by certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower and the Property in accordance with the Approved Accounting Method, as applicable:

(i)    after a Securitization, quarterly and year-to-date statements of income and expense and cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower and Mortgage Borrower;

(ii)    after a Securitization, a comparison of the budgeted income and expenses and the actual income and expenses for such quarter and year-to-date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year-to-date;

(iii)    a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter, for such quarter and the last four quarters;

(iv)    after a Securitization, a current rent roll for the Property; and

(v)    after a Securitization, a financial statement for each Guarantor, as applicable, certified by the applicable Guarantor, in form and substance acceptable to

Lender, reflecting the Net Worth (as defined in the Guaranty) and the Liquidity (as defined in the Guaranty) for each Guarantor.

(d)     Borrower will furnish Lender on or before the thirty-fifth (35th) day after the end of each calendar month, the following items, accompanied by a certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower and the Property in a manner consistent with the Approved Accounting Method, as applicable:

(i)     prior to a Securitization, monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property;

(ii)     prior to a Securitization, a comparison of the budgeted income and expenses and the actual income and expenses for such month and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year to date;

(iii)     prior to a Securitization, a current rent roll for the Property;

(iv)     any notice received from a Tenant threatening non-payment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Mortgage Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Mortgage Borrower from Tenants during the subject month; and

(v)     a financial statement for each Guarantor, as applicable, certified by the applicable Guarantor, in form and substance acceptable to Lender, reflecting the Net Worth (as defined in the Guaranty) and the Liquidity (as defined in the Guaranty) for each Guarantor.

(e)     Borrower shall submit, or cause Mortgage Borrower to submit, the Annual Budget to Lender not later than sixty (60) days prior to the commencement of each Fiscal Year. Lender shall have the right to approve each Annual Budget covering any period of time after the Maturity Date. Any Annual Budget approved by Lender shall hereinafter be referred to as an "Approved Annual Budget".   In the event that Borrower incurs an extraordinary operating expense or extraordinary capital expenditure not set forth in the Annual Budget (each an "Extraordinary Expense"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval. Without the prior written consent of the Lender, Borrower shall not approve or consent to Mortgage Borrower entering into any contracts or other agreements nor expending any funds not provided for in the Approved Annual Budget, other than (i) expenditures required to be made by reason of the occurrence of any emergency (i.e., an unexpected event which threatens imminent harm to persons or property at the Property) and with respect to which it would be impracticable, under the circumstances, to obtain Lender's prior consent thereto or (ii) certain variances in the line items shown on the Approved Annual Budget to the extent permitted under the Mortgage Cash

-47-

Management Agreement. Borrower shall notify Lender as promptly as practicable with respect to any such emergency expenditures made with respect to the Property. At the request of Lender, Borrower agrees to cause Mortgage Borrower to deliver evidence in a form satisfactory to Lender that amounts allocated to budgeted expenses have been paid in accordance with the Approved Annual Budget.

(f)    At Lender's sole cost and expense, Lender shall have the right as necessary to consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings shall be held via teleconference, with Lender having the right to call special meetings upon good cause shown via teleconference at any reasonable time with reasonable notice. Notwithstanding the foregoing, all decisions regarding the management and operations of Borrower shall be made by the management of Borrower in their sole discretion, subject to the terms of this Agreement. Lender's role shall be limited to that of an advisor or consultant.

(g)    Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender (including, without limitation, a tenant aging report in form reasonably acceptable to Lender).

(h)    Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 4.1.6 (each, a "Required Financial Item" and collectively, the "Required Financial Items"). In the event Borrower fails to deliver to Lender any of the Required Financial Items within the time frame specified herein (each such event, a "Reporting Failure"), in addition to constituting a default hereunder and without limiting Lender's other rights and remedies with respect to the occurrence of such a default, Borrower shall pay to Lender the sum of $1,000.00 per occurrence for each Reporting Failure; provided, however, that Borrower shall have received notice from Lender of such Reporting Failure and have failed to cure the same within five (5) days of receipt of such notice. Notwithstanding the foregoing, Lender shall not be required to deliver any such notice more than two (2) times during any calendar year. It shall constitute a further Event of Default hereunder if any such payment is not received by Lender within thirty (30) days of the date on which such payment is due, and Lender shall be entitled to the exercise of all of its rights and remedies provided hereunder.

(i)    Borrower shall furnish, or cause to be furnished, to Lender, copies of all financial statements, reports, budgets and summaries required to be delivered to Mortgage Lender under the Mortgage Loan Documents, as well as all Mortgage Borrower disbursement requests and other notices related to the Mortgage Loan or the Loan, at the same time as each such document is furnished to the Mortgage Lender.

**4.1.7    Title to the Collateral**. Borrower will warrant and defend the validity and priority of Lender's security interest in the Collateral.

### 4.1.8  Estoppel Statement.

(a)    After request by Lender, Borrower shall within five (5) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

(b)    After request by Borrower, Lender shall within ten (10) Business Days furnish Borrower with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid and (iv) whether or not Lender has sent any notice of default under the Loan Documents which remains uncured in the opinion of Lender.  After request by Lender (or its servicer), Borrower shall cause Mortgage Borrower to within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Mortgage Note, (ii) the rate of interest on the Mortgage Note, (iii) the unpaid principal amount of the Mortgage Note, (iv) the date installments of interest and/or principal were last paid, on the Mortgage Note, (v) any offsets or defenses to the payment of the Mortgage Loan, if any, and (vi) that the Mortgage Note, the Mortgage Loan Agreement, the Mortgage and the other Mortgage Loan Documents are valid, legal and binding obligations and (vii) that the Mortgage Loan Documents have not been modified or, if modified, giving particulars of such modification.

(c)    Borrower shall cause Mortgage Borrower to deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease (provided that Borrower shall only be required to cause Mortgage Borrower to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease); provided that such certificate may be in the form required under the Lease (as applicable); provided further that Borrower shall only be required to cause Mortgage Borrower to deliver such certificates no more frequently than two (2) times in any calendar year (other than in connection with an Event of Default or a Securitization).

(d)    **Intentionally Omitted.**

(e)    Borrower shall cause Mortgage Borrower to deliver to Lender, upon request, an estoppel certificate or comfort letter, in form and substance acceptable to Lender, from Franchisor; provided that Borrower shall only be required to cause Mortgage Borrower to deliver such certificates no more than three (3) times during the term of the Loan and not more frequently than once per calendar year (other than in connection with an Event of Default, a Securitization or the execution of a Replacement Franchise Agreement).

### 4.1.9  Leases.

(a)    Borrower shall cause Mortgage Borrower to cause all Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) provide that such Lease is subordinate to the Mortgage and that the lessee will attorn to

-49-

Lender and any purchaser at a foreclosure sale and (iv) not contain any terms which would materially adversely affect Lender's rights under the Loan Documents. All Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to Lender's prior approval, which approval shall not be unreasonably withheld or delayed.

(b)    Borrower (i) shall cause Mortgage Borrower to observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall cause Mortgage Borrower to enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner, provided, however, Borrower shall not permit Mortgage Borrower to terminate or accept a surrender of a Major Lease without Lender's prior approval; (iii) shall not permit Mortgage Borrower to collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not permit Mortgage Borrower to execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Mortgage Loan Documents); (v) shall not permit Mortgage Borrower to alter, modify or change any Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor; and (vi) shall cause Mortgage Borrower to hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)    Notwithstanding anything contained herein to the contrary, Borrower shall not cause Mortgage Borrower to willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Borrower further agrees to cause Mortgage Borrower to provide Lender with written notice of a Tenant "going dark" under such Tenant's Lease within five (5) Business Days after such Tenant "goes dark" and Borrower's failure to cause Mortgage Borrower to provide such notice shall constitute an Event of Default.

(d)    <u>Intentionally Omitted</u>.

(e)    Notwithstanding anything to the contrary contained herein, to the extent Lender's prior approval is required for any leasing matters set forth in this Section 4.1.9, Lender shall have ten (10) Business Days from receipt of written request and all required information and documentation relating thereto in which to approve or disapprove such matter, provided that such request to Lender is marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the request must be marked "PRIORITY". In the event that Lender fails to respond to the leasing matter in question within such time, Lender's approval shall be deemed given for all purposes. Borrower shall provide Lender with such information and documentation as may be reasonably required by Lender, including, without limitation, lease comparables and other market information as reasonably required by Lender.

LEGAL02/30016305v7

**4.1.10  Alterations.**  Lender's prior approval shall be required in connection with any alterations to any Improvements (except tenant improvements under any Lease approved by Lender or under any Lease for which approval was not required by Lender under this Agreement) (a) that may have a material adverse effect on Borrower's or Mortgage Borrower's financial condition, the value of the Property or the ongoing revenues and expenses of the Property, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval may be granted or withheld in Lender's sole discretion.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) U.S. Obligations, (iii) other securities acceptable to Lender, or (iv) a completion bond acceptable to Lender.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, less (x) amounts to be paid or reimbursed by Tenants under the Leases and (y) amounts actually deposited with the Mortgage Lender by the Mortgage Borrower as security with respect to such alterations.

**4.1.11  Interest Rate Cap.**  At all times during the term of the Loan, Borrower shall maintain in effect an Interest Rate Protection Agreement having a term equal to the term of the Loan, with an initial notional amount equal to the amount of the Loan and with a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating.  If Borrower obtains one (1) interest rate cap, the LIBOR strike rate under the Interest Rate Protection Agreement shall be equal to or less than the Capped LIBOR Rate, or if Borrower obtains more than one (1) interest rate cap, the blended LIBOR strike rate under the Interest Rate Protection Agreement, as determined by Lender, shall be equal to or less than the Capped LIBOR Rate.  The Interest Rate Protection Agreement shall be in form and substance substantially similar to the Interest Rate Protection Agreement in effect as of the date hereof.  In the event of any downgrade or withdrawal of the rating of such Counterparty by any Rating Agency below the Minimum Counterparty Rating, Borrower shall replace the Interest Rate Protection Agreement not later than thirty (30) Business Days following receipt of notice from Lender of such downgrade or withdrawal with an Interest Rate Protection Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 4.1.11) from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating; provided, however, that if Lender or its Affiliate is the Counterparty and any Rating Agency withdraws or downgrades the credit rating of Lender or its Affiliate below the Minimum Counterparty Rating, Borrower shall not be required to replace the Counterparty under the Interest Rate Protection Agreement provided that within thirty (30) Business Days following Lender's notice to Borrower of such downgrade or withdrawal Lender or its Affiliate posts additional collateral acceptable to the Rating Agencies securing its obligations under the Interest Rate Protection Agreement.  Notwithstanding the foregoing, if S&P or Fitch withdraws or downgrades the credit rating of Lender or its Affiliate below "A+", or Moody's withdraws or downgrades the credit rating of Lender or its Affiliate below "A1", Borrower shall replace the Interest Rate Protection Agreement not later than fifteen (15) Business Days following receipt of notice from Lender of such downgrade or withdrawal with an Interest Rate Protection Agreement in form and substance reasonably satisfactory to Lender (and meeting the

requirements set forth in this Section 4.1.11) from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating.

4.1.12 **Material Agreements**. (a) Borrower shall cause Mortgage Borrower to (a) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under each Material Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Material Agreement to which it is a party in a commercially reasonable manner.

(b) Borrower shall cause Mortgage Borrower to observe, perform and fulfill in a timely manner each and every covenant, term and provision to be observed and performed by Mortgage Borrower under the Mortgage Loan Agreement and the other Mortgage Loan Documents and any other agreement or instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto so as not to cause a Mortgage Loan Event of Default.

4.1.13 **Performance by Borrower**. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

4.1.14 **Costs of Enforcement/Remedying Defaults**. In the event (a) that the Note or any other Loan Document is put into the hands of an attorney for collection, suit or action, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, Mortgage Borrower or Guarantor or an assignment by Borrower, Mortgage Borrower or Guarantor for the benefit of its creditors, or (c) Lender shall remedy or attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all costs incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes.

4.1.15 **Business and Operations**. Borrower will cause Mortgage Borrower to continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and leasing of the Property. Borrower will, shall cause Mortgage Borrower to, qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership and leasing of the Property. Borrower shall at all times cause the Property to be maintained as a hotel.

**4.1.16 Loan Fees.** Borrower shall pay all fees and costs (including, without limitation, all origination and commitment fees) required of Borrower pursuant to the terms of that certain term sheet between Mortgage Borrower and Morgan Stanley Mortgage Capital Inc. dated July 13, 2006 ("**Mezz Term Sheet**").

**4.1.17 Notices.** Borrower shall give notice, or cause notice to be given, to Lender promptly upon the occurrence of:

(a)    any Default, Mortgage Loan Default or Mortgage Loan Event of Default;

(b)    any default or event of default under any Contractual Obligation of Borrower, or, to the knowledge of Borrower, Mortgage Borrower or Guarantor that could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform under the Loan Documents or the rights and remedies of Lender under the Loan Documents;

(c)    any litigation or proceeding affecting Borrower, or, to the knowledge of Borrower, affecting Mortgage Borrower or Guarantor, in which the amount involved in each case is $250,000 or more and not fully covered by insurance, or in which injunctive or similar relief is sought;

(d)    a change in the business, operations, property or financial or other condition or prospects of Borrower, or, to the knowledge of Borrower, Mortgage Borrower, or Guarantor which could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform under the Loan Documents or the rights and remedies of Lender under the Loan Documents.

**4.1.18 Special Distributions.** On each date on which amounts are required to be disbursed to an account of the Lender pursuant to the terms of the Mortgage Cash Management Agreement or are required to be paid to Lender under any of the Loan Documents, Borrower shall exercise its rights under Mortgage Borrower Operating Agreement to cause Mortgage Borrower to make to Borrower a distribution in an aggregate amount such that Lender shall receive the amount required to be disbursed to the account of the Lender or otherwise paid to Lender on such date.

**4.1.19 Curing.** Lender shall have the right, but shall not have the obligation, to exercise Borrower's rights under the Mortgage Borrower Operating Agreement (a) to cure a Mortgage Loan Default or Mortgage Loan Event of Default and (b) to satisfy any Liens, claims or judgments against the Property (except for Liens permitted by the Mortgage Loan Documents), in the case of either (a) or (b), unless Borrower or Mortgage Borrower shall be diligently pursuing remedies to cure to Lender's sole satisfaction. Borrower shall reimburse Lender on demand for any and all costs incurred by Lender in connection with curing any such Mortgage Loan Default or Mortgage Loan Event of Default or satisfying any Liens, claims or judgments against the Property.

**4.1.20 Mortgage Borrower Covenants.** Borrower shall cause Mortgage Borrower to comply with all obligations with which Mortgage Borrower has covenanted to comply under the Mortgage Loan Agreement and all other Mortgage Loan Documents

-53-

(including, without limitation, those certain affirmative and negative covenants set forth in Article IV of the Mortgage Loan Agreement) whether or not the related Mortgage Loan has been repaid, totally defeased or otherwise terminated, unless otherwise consented to in writing by Lender.

### Section 4.2    Borrower Negative Covenants.

Borrower covenants and agrees with Lender that:

**4.2.1    Due on Sale and Encumbrance; Transfers of Interests.**  Without the prior written consent of Lender, neither Borrower nor any other Person having a direct or indirect ownership or beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or indirect, in Borrower, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in this Agreement.

**4.2.2    Liens.**  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Collateral.

**4.2.3    Dissolution.**  Borrower shall not and shall not permit Mortgage Borrower to (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) in the case of Borrower, engage in any business activity not related to the ownership of an equity interest in Mortgage Borrower, (iii) in the case of Mortgage Borrower, engage in any business activity not related to the ownership and operation of the Property, (iv) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower or Mortgage Borrower, as applicable, except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPC Party to (A) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which such SPC Party would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation or bylaws of such SPC Party, in each case without obtaining the prior consent of Lender.

**4.2.4    Change in Business.**  Borrower shall not enter into any line of business other than the ownership of Mortgage Borrower. Borrower shall not permit Mortgage Borrower to enter into any line of business other than the ownership and operation of the Property. Borrower shall not change Borrower's name without first obtaining the prior written consent of the Lender. In the event Lender grants such consent, Borrower shall, at Borrower's sole cost and expense, take all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender. Borrower shall promptly notify Lender in writing of any change in Borrower's organizational identification number.

**4.2.5    Debt Cancellation.**  Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.  Borrower shall not permit Mortgage Borrower to cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance with the Mortgage Loan Documents) owed to Mortgage Borrower by any

Person, except for adequate consideration and in the ordinary course of Mortgage Borrower's business.

      **4.2.6**   <u>**Affiliate Transactions**</u>.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.  Borrower shall not permit Mortgage Borrower to enter into, or be a party to, any transaction with an Affiliate of Mortgage Borrower or any of the partners of Mortgage Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Mortgage Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

      **4.2.7**   <u>**Zoning**</u>.  Borrower shall not permit Mortgage Borrower to initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

      **4.2.8**   <u>**Assets**</u>.  Borrower shall not purchase or own any property other than the Collateral.  Borrower shall not permit Mortgage Borrower to purchase or own any property other than the Property and any property necessary or incidental for the operation of the Property.

      **4.2.9**   <u>**No Joint Assessment**</u>.  Borrower shall not permit Mortgage Borrower to suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

      **4.2.10** <u>**Principal Place of Business**</u>.  Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender thirty (30) days prior notice. Borrower shall not change its jurisdiction of organization without first obtaining the consent of Lender.

      **4.2.11** <u>**ERISA**</u>.  (a)  Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>").

      (b)     Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to any state statute regulating investments

of, or fiduciary obligations with respect to, governmental plans; and (C) one or more of the following circumstances is true:

(i)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)   Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

4.2.12 **Material Agreements**.  Borrower shall not and shall not permit Mortgage Borrower to, without Lender's prior written consent: (a) enter into, surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party, except as provided therein or on an arms'-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect, except on an arms'-length basis and commercially reasonable terms.

4.2.13 **Limitation on Securities Issuances**.  None of Borrower or any of its Subsidiaries shall issue any limited liability company membership interests or other securities other than those that have been issued as of the date hereof.

4.2.14 **Limitations on Distributions**.  Following the occurrence and during the continuance of an Event of Default, Borrower shall not make any distributions to its members.

4.2.15 **Other Limitations**.  Prior to the payment in full of the Debt, neither Borrower nor any of its Subsidiaries shall, without the prior written consent of Lender (which may be furnished or withheld at its sole and absolute discretion), give its consent or approval to any of the following actions or items:

(a)     except as permitted by Lender herein (i) any refinance of the Mortgage Loan, (ii) any prepayment in full of the Mortgage Loan, (iii) any Transfer of the Property or any portion thereof, or (iv) any action in connection with or in furtherance of the foregoing (including, but not limited to, any defeasance of the Mortgage Loan);

(b)     creating, incurring, assuming or suffering to exist any additional Liens on any portion of the Property except for Permitted Encumbrances.

(c)     any modification, amendment, consolidation, spread, restatement, waiver or termination of any of the Mortgage Loan Documents;

(d)     approve the terms of any Annual Budget;

(e)     the distribution to the partners, members or shareholders of Mortgage Borrower of property other than cash;

(f)     except as set forth in an Approved Annual Budget or as permitted under the Mortgage Loan Documents, any (i) improvement, renovation or refurbishment of all or any part of the Property to a materially higher standard or level than that of comparable properties in the same market segment and in the same geographical area as the Property, (ii) removal, demolition or material alteration of the improvements or equipment on the Property or (iii) material increase in the square footage or gross leasable area of the improvements on the Property if a material portion of any of the expenses in connection therewith are paid or incurred by Mortgage Borrower;

(g)     any material change in the method of conduct of the business of Borrower or any of its Subsidiaries (including the entering into of an operating lease with respect to any hotel), such consent to be given in the sole discretion of the Lender;

(h)     the settlement of any claim against Borrower or any of its Subsidiaries, other than a fully insured third party claim, such consent to be given in the sole discretion of the Lender; or

(i)     except as required by the Mortgage Loan Documents, any determination to restore the Property after a casualty or condemnation.

**4.2.16  Contractual Obligations**.  Other than the Loan Documents, the Borrower Operating Agreement (and the initial limited liability company membership interests in Borrower issued pursuant thereto), the Mortgage Borrower Operating Agreement and the Residual Indemnities, neither Borrower nor any of its assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which it or its assets are bound, except for such liabilities, not material in the aggregate, that are incidental to its activities as a limited partner or regular member, as applicable, of Mortgage Borrower.

**4.2.17  Mortgage Loan Refinancing.**  Borrower shall not consent to or permit a refinancing of the Mortgage Loan (unless the Loan is paid in full simultaneously with the payment of the Mortgage Loan) without the prior written consent of Lender.

## V.     INSURANCE, CASUALTY AND CONDEMNATION

### Section 5.1     Insurance.

(a)     Borrower shall cause Mortgage Borrower to maintain at all times during the term of the Loan the insurance required under Section 5.1 of the Mortgage Loan Agreement, including, without limitation, meeting all insurer requirements thereunder.  In addition, Borrower shall cause Lender to be named as an additional named insured under each of the insurance

policies described in Sections 5.1.1(a)(ii), (v), (vii), (viii), (ix) and (x) of the Mortgage Loan Agreement and Lender shall be identified in each policy as follows:  Morgan Stanley Mortgage Capital Inc., a New York corporation, its successors, assigns and participants as their respective interests may appear, as secured party.  In addition, Borrower shall cause Lender to be named as a named insured together with Mortgage Lender, as their interest may appear but subject to the terms of the Intercreditor Agreement, under the insurance policies required under Sections 5.1.1(a)(i), (iii), (iv) and (vi) of the Mortgage Loan Agreement and Lender shall be identified in each policy as follows:  Morgan Stanley Mortgage Capital Inc., a New York corporation, its successors, assigns and participants as their respective interests may appear, as secured party.  Borrower shall also cause all insurance policies required under this Section 5.1 to provide for at least thirty (30) days prior notice to Lender in the event of policy cancellation or material changes.  Borrower shall provide Lender with evidence of all such insurance required hereunder simultaneously with Mortgage Borrower's provision of such evidence to Mortgage Lender.

(b)       If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and shall bear interest at the Default Rate.

(c)       Notwithstanding the foregoing, all rights of Lender under this Article V are subject and subordinate to the rights of Mortgage Lender under Article V of the Mortgage Loan Agreement.

### Section 5.2      Casualty and Condemnation.

**5.2.1   Casualty.**  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty and otherwise in accordance with Section 5.3 of the Mortgage Loan Agreement.

**5.2.2   Condemnation.**  Borrower shall give Lender prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall cause Mortgage Borrower to deliver to Lender a copy of any and all papers served in connection with such proceedings.  Borrower shall cause Mortgage Borrower to permit Lender to participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments as may be reasonably requested by Lender to permit such participation.  Borrower shall cause Mortgage Borrower, at its expense, to diligently prosecute any such proceedings, and shall cause Mortgage Borrower to consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

-58-

**5.2.3  Restoration**.  Borrower shall, or shall cause Mortgage Borrower to, deliver to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under Section 5.3.2 of the Mortgage Loan Agreement in connection with a restoration of the Property after a Casualty or Condemnation.

## VI.    RESERVE FUNDS

**Section 6.1    Reserve Funds**.  Borrower shall cause Mortgage Borrower to comply with all of its obligations under Article 6 of the Mortgage Loan Agreement. Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason, Mortgage Borrower is no longer maintaining any of the Mortgage Reserve Accounts in accordance with the terms of the Mortgage Loan Documents (or any mortgage loan agreement in effect with respect to a refinancing consented to by Lender under this Agreement), to the extent permitted to do so pursuant to the Mortgage Loan Documents, (i) Borrower shall promptly establish and maintain with Lender and for the benefit of Lender reserves in replacement and substitution thereof, which substitute reserves shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents with respect to the Mortgage Reserve Accounts being replaced (including, but not limited to those contained in the Mortgage Cash Management Agreement, and Borrower shall, and shall cause Mortgage Borrower to, acknowledge and agree to the amendments to this Agreement relating to such substitution to cash management provided such amendments are substantially similar to those contained in the Mortgage Cash Management Agreement), and (ii) to the extent not prohibited by Mortgage Lender under the Mortgage Loan Documents, Borrower shall or shall cause Mortgage Lender to remit to Lender any funds from Mortgage Reserve Accounts that were remaining in such reserves at the time of the termination of such reserves for the purpose of funding the equivalent substitute reserves.

**6.2  Cash Management**.  (a) Borrower and Lender acknowledge and agree that all Rent and other income from the Property will be deposited and disbursed in accordance with the Mortgage Cash Management Agreement.  Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason (including, without limitation, the satisfaction of the Mortgage Loan), Mortgage Borrower is no longer maintaining the accounts established pursuant to the Mortgage Cash Management Agreement or if the cash management arrangement referred to in the Mortgage Loan Agreement and Mortgage Cash Management Agreement is no longer in full force and effect, to the extent not prohibited under the Mortgage Loan Documents, Borrower shall promptly enter into a substitute cash management agreement and related lockbox agreement with Bank (as defined in the Mortgage Cash Management Agreement) (or such other depository institution selected by Borrower and reasonably acceptable to Lender) on substantially the same terms as the agreements entered into as of the date hereof in connection with the related Mortgage Loan.

(b) Borrower acknowledges and agrees that it shall cause all amounts payable under any Interest Rate Protection Agreement to be deposited into the Deposit Account (as defined in the Mortgage Cash Management Agreement].  If, notwithstanding the provisions of this Section 6.2, Borrower or Manager receives any amounts payable under any Interest Rate Protection Agreement, then (i) such amounts shall be deemed to be collateral for the Loan, as applicable, and shall be held in trust for the benefit, and as the property, of Lender, (ii) such

amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts in the Deposit Account within one (1) Business Day of receipt.

## VII.    PROPERTY MANAGEMENT

### Section 7.1    The Management Agreement and the Franchise Agreement.

Borrower shall cause Mortgage Borrower to cause Manager to manage the Property in accordance with the Management Agreement and the Franchise Agreement, as applicable. Borrower shall cause Mortgage Borrower to (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement and the Franchise Agreement on the part of Mortgage Borrower to be performed and observed, (ii) promptly notify Lender of any notice to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement and/or the Franchise Agreement on the part of Mortgage Borrower to be performed and observed, and (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement. If Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Mortgage Borrower to be performed or observed, then, subject to any actions of the Mortgage Lender with respect to its rights under the Mortgage Loan Agreement, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or with respect to causing Mortgage Borrower to perform its obligations under the Management Agreement and Franchise Agreement, Borrower shall cause Mortgage Borrower to permit Lender to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement and/or the Franchise Agreement on the part of Mortgage Borrower to be performed or observed, provided that Lender shall have no obligation to do so.

### Section 7.2    Prohibition Against Termination or Modification.

Except as may be required pursuant to the Mortgage Loan Documents, Borrower shall not allow Mortgage Borrower to, without the express written consent of Lender: (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement, or enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, or consent to the assignment by the Manager of its interest under the Management Agreement; provided, however, with respect to a new manager such consent may be conditioned upon Borrower delivering a Rating Agency Confirmation as to such new manager and management agreement, or (ii) surrender, terminate, cancel, modify, renew or extend the Franchise Agreement; provided, that Borrower may cause Mortgage Borrower to, without Lender's consent, replace the Franchisor so long as the replacement franchisor is a Qualified Franchisor pursuant to a Replacement Franchise Agreement. If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, and shall cause Mortgage Borrower to, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender. Furthermore, in the event that the Franchise Agreement expires or is terminated (without limiting any obligation of Borrower to

cause Mortgage Borrower to obtain Lender's consent to any termination or modification of the Franchise Agreement in accordance with the terms and provisions of this Agreement), Borrower shall cause Mortgage Borrower to (a) promptly enter into a Replacement Franchise Agreement with Franchisor or another Qualified Franchisor, as applicable, and (b) provide Lender with an estoppel or comfort letter, in form and substance acceptable to Lender, from such Franchisor or another Qualified Franchisor, as applicable.

### Section 7.3    Replacement of Manager.

Lender shall have the right to require Borrower to cause Mortgage Borrower to replace the Manager with a Person which is not an Affiliate of, but is chosen by, Borrower and approved by Lender upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if at any time after the date which is twelve (12) months from the date hereof, the Debt Service Coverage Ratio falls below 1.10 to 1.00 (the "**Manager Termination Ratio**"), as determined by Lender in its sole discretion, and/or (iii) if Manager shall (I) be insolvent or a debtor in a bankruptcy proceeding, (II) be in default under the Management Agreement beyond any applicable notice and cure period or (III) have engaged in gross negligence, fraud or willful misconduct. The rights of Lender (x) to approve any change in the Management Agreement, (y) to cause the termination of the existing Manager and (z) to cause the designation of a Replacement Manager shall be subject to any rights of the Mortgage Lender under the Mortgage Loan Documents to take such actions, and the satisfaction of any conditions set forth in the Mortgage Loan Documents relating to the appointment of a Replacement Manager. Borrower shall provide to Lender any request received by Borrower for action relating to a Manager, including for any change in the Management Agreement, any termination of the existing Manager or approval of a replacement Manager, within three (3) Business Days of Borrower's receipt thereof. In the event both Lender and the Mortgage Lender shall have such rights relating to a Manager under the Loan Documents and Mortgage Loan Documents, respectively, Lender may exercise such rights, but only to the extent the Mortgage Lender shall not have previously exercised (or be deemed to have exercised) such rights.

### Section 7.4    Matters Concerning the Franchisor.

If (i) the Debt has been accelerated pursuant to Section 10.1(b) hereof, (ii) Franchisor shall become bankrupt or insolvent or (iii) a default occurs under the Franchise Agreement, Borrower shall cause Mortgage Borrower to, at the request of Lender, terminate the Franchise Agreement and replace the Franchisor with a Qualified Franchisor pursuant to a Replacement Franchise Agreement, it being understood and agreed that the franchise fee for such Qualified Franchisor shall not exceed then prevailing market rates.

## VIII.   PERMITTED TRANSFERS

### Section 8.1    Intentionally Omitted.

### Section 8.2    Permitted Transfers of Equity Interests.

Notwithstanding the restrictions contained in Section 4.2.1 hereof or in Article 6 of the Mortgage, the following transfers shall be permitted without Lender's consent: (a) a

transfer (but not a pledge) by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party, (b) the transfer (but not the pledge), in one or a series of transactions, of the stock, partnership interests or membership interests (as the case may be) in a Restricted Party, (c) the pledge to Lender of the respective interests in Mortgage Borrower, as collateral security for the Loan as more particularly set forth in the Loan Documents; (d) the sale by the Borrower of its interest in Mortgage Borrower to the Lender or its designee or a Qualified Transferee, in connection with the realization by the Lender upon any or all of the collateral security for the Loan upon the exercise by the Lender of its remedies under the Loan Documents (each a "**Mezzanine Foreclosure**"); (e) a Sale or Pledge made in connection with the Future Junior Mezzanine Option in accordance with the terms of Section 8.3 hereof or (f) the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock Exchange or another nationally recognized stock exchange; provided, however, with respect to the transfers listed in clauses (a) or (b) above, (A) Lender shall receive not less than thirty (30) days prior written notice of such transfers, (B) no such transfers shall result in a change in Control of Guarantor, or Affiliated Manager, (C) after giving effect to such transfers, Guarantor shall (I) own at least a 51% direct or indirect equity ownership interest in each of Borrower, Mortgage Borrower and any SPC Party; (II) Control Borrower, Mortgage Borrower and any SPC Party; and (III) control the day-to-day operation of the Property, (D) the Property shall continue to be managed by Affiliated Manager or a new manager approved in accordance with Section 7.3 hereof, (E) in the case of the transfer of any direct equity ownership interests in Borrower or in any SPC Party, such transfers shall be conditioned upon continued compliance with the relevant provisions of Section 3.1.24 hereof and (F) such transfer shall be permitted pursuant to the Franchise Agreement and shall not trigger any right of refusal, option to purchase or default thereunder.

### Section 8.3    Future Junior Mezzanine Option.

Notwithstanding the foregoing provisions of this Article 8, one or more constituent parties of Borrower (collectively, the "Future Junior Mezzanine Borrower"), other than any SPC Party, shall have the one-time right to incur junior mezzanine financing (the "Future Junior Mezzanine Loan") secured by the direct and/or indirect equity interests in Borrower owned by Future Junior Mezzanine Borrower (the "Future Junior Mezzanine Option"); provided, that, the following terms and conditions are each satisfied;

(i)    No Event of Default or Mortgage Loan Event of Default shall have occurred and be continuing;

(ii)    Each of Lender and Mortgage Lender shall have received at least thirty (30) and no more than ninety (90) days prior written notice of the exercise of the Future Junior Mezzanine Option;

(iii)    the principal amount of the Future Junior Mezzanine Loan (including, without limitation, all earn-out or other advances or negative amortization or similar features contemplated thereunder which would in any way increase the principal amount due thereunder) shall not exceed $5,000,000;

LEGAL02/30016305v7

(iv)    the loan term (including any extension terms) of the Future Junior Mezzanine Loan shall be co-terminus with or longer than the term of the Loan and the Mortgage Loan;

(v)    if the interest rate under the Future Junior Mezzanine Loan shall be a floating rate, Future Junior Mezzanine Borrower shall have obtained and shall maintain an Interest Rate Protection Agreement acceptable to each of Lender and Mortgage Lender;

(vi)    after giving effect to the Future Junior Mezzanine Loan, the LTV shall not exceed 65% (provided that for the purposes of calculating the foregoing, the principal amount of the Future Junior Mezzanine Loan shall be deemed to include the maximum amount of all possible earn-out or other advances or negative amortization or similar features contemplated in the Future Junior Mezzanine Loan which would in any way increase the principal amount due);

(vii)    the holder of the Future Junior Mezzanine Loan (the "Future Junior Mezzanine Lender") shall (i) at the time of the exercise of the Future Junior Mezzanine Option be a Qualified Equityholder and be acceptable to Lender, (ii) represent and warrant to Lender that, as of the date of the funding of the Future Junior Mezzanine Loan, it is solvent and not involved in any voluntary or involuntary action or proceeding as debtor under any applicable federal bankruptcy law, or any similar federal or state law, and (iii) agree in the Future Junior Mezzanine Intercreditor (defined below) that any subsequent transfer of the Future Junior Mezzanine Loan shall be to a Qualified Equityholder or to another Person approved by each of Lender and Mortgage Lender in their sole discretion, and if a Securitization of the Mortgage Loan and/or the Loan has occurred, with respect to whom a Rating Agency Confirmation shall have been obtained;

(viii)    Future Junior Mezzanine Lender shall have delivered to Lender (for execution by Lender) an intercreditor agreement executed by Future Junior Mezzanine Lender, which such intercreditor agreement shall be reasonably approved by Lender and Mortgage Lender and approved by the Rating Agencies (such intercreditor agreement, the "Future Junior Mezzanine Intercreditor");

(ix)    Future Junior Mezzanine Borrower shall have delivered to Lender, at Future Junior Mezzanine Borrower's sole cost and expense, new, revised and/or updated versions of opinions of counsel acceptable to Lender and Mortgage Lender, reflecting the Future Junior Mezzanine Loan, the Mortgage Loan and the Loan;

(x)    Future Junior Mezzanine Borrower, at Future Junior Mezzanine Borrower's sole cost and expense, shall have provided to Lender satisfactory UCC searches, together with tax lien, bankruptcy, judgment and litigation searches with respect to the Property, Borrower, Mortgage Borrower, Future Junior Mezzanine Borrower and Guarantor in the State in which the Property is located, in the State of its formation and in the jurisdictions where each such Person has its principal place of business;

(xi)    Future Junior Mezzanine Borrower shall have paid or reimbursed each of Lender and Mortgage Lender for all reasonable, out of pocket costs and expenses incurred by each of Lender and Mortgage Lender (including, without limitation, reasonable attorneys' fees and disbursements and any costs, expenses and/or fees of the Rating Agencies) in connection with

the Future Junior Mezzanine Option and Future Junior Mezzanine Borrower shall have paid or shall have caused Borrower to pay all title premiums, recording charges, filing fees, taxes or other expenses payable in connection with the Future Junior Mezzanine Option;

(xii)    Each of Borrower and Mortgage Borrower, as applicable, shall execute such amendments to the Loan Documents, the Mortgage Loan Documents, and such additional documents as may, in each case, be reasonably requested by Lender or required by the Rating Agencies, including, without limitation, amendments to the terms hereof and such additional documents required and amendments to the Mortgage Cash Management Agreement, and make appropriate adjustments to the definitions of "Guarantor", "Affiliated Manager" and other related definitions herein to reflect the change in Borrower and Mortgage Borrower sponsorship following a foreclosure of the Future Junior Mezzanine Loan; and

(xiii)   If a Securitization of the Mortgage Loan has occurred, Borrower shall deliver to Lender, a Rating Agency Confirmation with respect to Borrower's exercise of the Future Junior Mezzanine Option.

## IX.    SALE AND SECURITIZATION OF MORTGAGE

### Section 9.1    Sale of Loan and Securitization.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization. (The transaction referred to in clauses (i), (ii) and (iii) shall hereinafter be referred to collectively as "Secondary Market Transactions" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "Securitization". Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "Securities").

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transactions, including, without limitation, to:

(i)    (A) provide, or cause Mortgage Borrower to provide, updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor and Manager, (B) provide, or cause Mortgage Borrower to provide, updated budgets relating to the Property and (C) provide, or cause Mortgage Borrower to provide, updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's) with respect to the Property and the Adjacent Properties, property condition reports and other due diligence investigations of the Property (the "Updated Information"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)   provide opinions of counsel, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to non-

-64-

consolidation, fraudulent conveyance, matters of Delaware and federal bankruptcy law relating to single member limited liability companies, and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Mortgage Borrower and Borrower and Borrower's Affiliates, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)    provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require; and

(iv)    execute such amendments to the Loan Documents and Borrower or any SPC Party's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies or otherwise to effect the Securitization including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure (any of the foregoing, a "Loan Bifurcation"); provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity or the amortization of principal set forth in the Note, except in connection with a Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note.

(c)    If requested by Lender, Borrower shall, or cause Mortgage Borrower to, provide Lender with the following financial statements (it being understood that Lender shall request (i) full financial statements if it anticipates that the principal amount of the Loan at the time of Securitization may, or if the principal amount of the Loan at any time during which the Loan is included in a Securitization does, equals or exceeds 20% of the aggregate principal amount of all mortgage loans included in the Securitization and (ii) summaries of such financial statements if the principal amount of the Loan at any such time equals or exceeds 10% of such aggregate principal amount):

(i)    As of the Closing Date, a balance sheet with respect to the Property for the two most recent Fiscal Years, meeting the requirements of Section 210.3-01 of Regulation S-X of the Securities Act and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years, meeting the requirements of Section 210.3-02 of Regulation S-X, and, to the extent that such balance sheet is more than 135 days old as of the Closing Date, interim financial statements of the Property meeting the requirements of Section 210.3-01 and 210.3-02 of Regulation S-X (all of such financial statements, collectively, the "Standard Statements"); provided, however, if the Property that has been acquired by Borrower from an unaffiliated third party (an "Acquired Property") and the other conditions set forth in Section 210.3-14 of Regulation S-X for the provision of financial statements in accordance with such Section have been met (other than if the Property is a hotel, nursing home or other property that would be deemed to constitute a business and not real estate under Regulation S-X, provided that the other conditions set forth in Section 210.3-05 of Regulation S-X for provision of financial statements in accordance with such Section have been met (a "Business Property")), in lieu of the Standard Statements otherwise required by this Section 9.1(c)(i), Borrower shall instead provide the financial statements required by such Section 210.3-14 of Regulation S-X ; provided, further, however, with respect to any Business Property which is an Acquired

Property, Borrower shall instead provide the financial statements required by Section 210.3-05 (such Section 210.3-14 or Section 210.3-05 financial statements referred to herein as ("Acquired Property Statements").

(ii)        Not later than 30 days after the end of each fiscal quarter following the Closing Date, a balance sheet of the Property as of the end of such fiscal quarter, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for the period commencing on the day following the last day of the most recent Fiscal Year and ending on the date of such balance sheet and for the corresponding period of the most recent Fiscal Year, meeting the requirements of Section 210.3-02 of Regulation S-X (provided, that if for such corresponding period of the most recent Fiscal Year, Acquired Property Statements were permitted to be provided hereunder pursuant to paragraph (i) above, Borrower shall instead provide Acquired Property Statements for such corresponding period).    If requested by Lender, Borrower shall also provide "summarized financial information," as defined in Section 210.1-02(bb) of Regulation S-X, with respect to such quarterly financial statements.

(iii)        Not later than 60 days after the end of each Fiscal Year following the Closing Date, a balance sheet of the Property as of the end of such Fiscal Year, meeting the requirements of Section 210.3-01 of Regulation S-X, and statements of income and statements of cash flows of the Property for such Fiscal Year, meeting the requirements of Section 210.3-02 of Regulation S-X.    If requested by Lender, Borrower shall provide summarized financial information with respect to such annual financial statements.

(iv)        Upon ten (10) Business Days after notice from Lender in connection with the Securitization of this Loan, such additional financial statements, such that, as of the date (each a "Disclosure Document Date") of each Disclosure Document, Borrower shall have provided Lender with all financial statements as described in paragraph (i) above; provided that the Fiscal Year and interim periods for which such financial statements shall be provided shall be determined as of such Disclosure Document Date.

(v)        In the event Lender determines, in connection with a Securitization, that the financial statements required in order to comply with Regulation S-X or Legal Requirements are other than as provided herein, then notwithstanding the provisions of this Section, Lender may request, and Borrower shall promptly provide, such combination of Acquired Property Statements and/or Standard Statements as may be necessary for such compliance.

(vi)        Any other or additional financial statements, or financial, statistical or operating information, as shall be required pursuant to Regulation S-X or other Legal Requirements in connection with any Disclosure Document or any filing under or pursuant to the Exchange Act in connection with or relating to a Securitization (hereinafter an "Exchange Act Filing") or as shall otherwise be reasonably requested by Lender to meet disclosure, rating agency or marketing requirements.

All financial statements provided by Borrower pursuant to this Section 9.1(c) shall be prepared in accordance with the Approved Accounting Method, and shall meet the requirements of

LEGAL02/30016305v7

Regulation S-X and other applicable Legal Requirements. All financial statements relating to a Fiscal Year shall be audited by the independent accountants in accordance with generally accepted auditing standards, Regulation S-X and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-X and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

### Section 9.2    Securitization Indemnification.

(a)    Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in disclosure documents in connection with the Securitization, including, without limitation, an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, an "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and may be made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.

(b)    Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Mortgage Borrower, Borrower Affiliates, the Property, Manager, Guarantor and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Morgan Stanley Group"), and Morgan Stanley, and any other placement agent or underwriter with respect to the Securitization, each of their respective directors and each Person who controls Morgan Stanley or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the Morgan Stanley Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon

-67-

any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Morgan Stanley Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Morgan Stanley Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, Mortgage Borrower, operating statements and rent rolls with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

(c)     In connection with Exchange Act Filings, Borrower shall (i) indemnify Lender, the Morgan Stanley Group and the Underwriter Group for Liabilities to which Lender, the Morgan Stanley Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Morgan Stanley Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Morgan Stanley Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense

-68-

of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Morgan Stanley's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)    The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**Section 9.3    Rating Agency Costs.**

9.3.1    **Rating Agency Costs**.    In connection with any Rating Agency Confirmation or other Rating Agency consent, approval or review required hereunder, Borrower shall pay all of the costs and expenses of Lender, Servicer and each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

**Section 9.4    Reserves / Escrows.**

In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement, the Mortgage, the Note and the other Loan Documents shall be held in "eligible accounts" at "eligible institutions" and, if invested, invested in "permitted investments" as then defined and required by the Rating Agencies.

**Section 9.5    Mortgage Loan Securitization.**    Borrower also agrees to cooperate with Mortgage Lender in connection with the Securitization of the Mortgage Loan as set forth in Section 9.1 of the Mortgage Loan Agreement and, to the extent set forth therein, at Borrower's expense.

**Section 9.6    Conversion to Registered Form.**

At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") reasonably acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, such books and records as are necessary for the registration and transfer of the Note in a manner that shall cause the Note to be considered to be in registered form for purposes of Section 163(f) of the Code. The option to convert the Note into registered form once exercised may not be revoked. Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender. Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar. The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents.

## X.    DEFAULTS

### Section 10.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)    if (A) any monthly installment of principal and/or interest due under the Note or the payment due on the Maturity Date is not paid when due or (B) any other portion of the Debt is not paid when due (provided that such non-payment under (B) continues for five (5) days after notice that the same is due);

(ii)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(iii)    if Borrower, Mortgage Borrower, any SPC Party or Guarantor shall make an assignment for the benefit of creditors;

(iv)    if a receiver, liquidator or trustee shall be appointed for Borrower, any SPC Party or Guarantor or if Borrower, Mortgage Borrower, any SPC Party or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Mortgage Borrower, any SPC Party or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Mortgage Borrower, any SPC Party or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Mortgage Borrower, and SPC Party or Guarantor, upon the same not being discharged, stayed or dismissed within thirty (30) days; and provided further that the foregoing shall not apply as to any Guarantor, if a Replacement Guarantor has been provided within thirty (30) days;

(v)    if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and

the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(vi)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(vii)    if Borrower breaches any representation, warranty or covenant contained in Section 4 of the Pledge Agreement;

(viii)    if (A) Borrower or Mortgage Borrower violates or does not comply with any of the provisions of Section 4.1.6 hereof or (B) Borrower, Mortgage Borrower or any SPC Party breaches any representation, warranty or covenant contained in Section 3.1.24 hereof;

(ix)    if Borrower or Mortgage Borrower (as applicable) shall breach any of the terms of:

(1)    Section 2.4.2(b) (Payments upon Liquidation Event);

(2)    The provision of Section 4.1.1 as to Prescribed Laws;

(3)    Section 4.1.18 (Special Distributions);

(4)    Section 4.2.1 (Limitations on Transfers);

(5)    Section 4.2.2 (Liens);

(6)    Section 4.2.12 (Material Agreements);

(7)    Section 4.2.13 (Limitation on Securities Issuances);

(8)    Section 4.2.14 (Limitations on Distributions);

(9)    Section 4.2.15 (other than Section 4.2.15(b), (f), (g), (h) or (i)) (Other Limitations);

(10)    Section 4.2.16 (Contractual Obligations);

(11)    Section 4.2.17 (Refinancing); and

(12)    Section 8.2 (Permitted Transfers of Interest in Borrower).

(x)    Intentionally Omitted;

(xi)    if Guarantor breaches in any material respect any covenant, warranty or representation contained in the Guaranty;

(xii)    if a material default has occurred and continues beyond any applicable cure period under the Franchise Agreement if such default permits the Franchisor to terminate or cancel the Franchise Agreement;

(xiii)    if Mortgage Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation);

(xiv)    If a breach or default under any condition or obligation contained in the Interest Rate Protection Agreement is not cured within any applicable cure period provided therein;

(xv)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) through (xiv) above or not otherwise specifically specified as an Event of Default herein, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days plus time permitted for Excusable Delays;

(xvi)    if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt

(xvii)    if (A) this Agreement, the Note or any other Loan Document shall, in whole or in part, terminate, cease to be effective or cease to be a legally valid, binding and enforceable obligation of Borrower; (B) Borrower or any Subsidiary of Borrower shall take any action in connection therewith or in furtherance thereof; or (C) any party to any Loan Document (other than the Lender) shall assert in writing that such document has ceased to be in full force and effect; or (D) the Liens created pursuant to any Loan Document shall cease to be a fully perfected enforceable first priority security interest or any portion of the Collateral is Transferred without Lender's prior written consent; or

(xviii)    a Mortgage Loan Event of Default shall occur.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including,

without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Collateral is located, against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

### Section 10.2   Remedies.

(a)     Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights, remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, if an Event of Default is continuing all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral and the Collateral has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)     Lender shall have the right from time to time to partially foreclose upon the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose upon the Collateral to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose upon the Collateral to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Collateral as Lender may elect. Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge Agreement and the other Loan Documents to secure payment of sums secured by the Loan Documents and not previously recovered.

(c)     Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.

-73-

# Exhibit 3

MSMCI Loan No. 06-26034

## MEZZANINE GUARANTY OF PAYMENT AND GUARANTY OF RECOURSE OBLIGATIONS OF BORROWER

FOR VALUE RECEIVED, and to induce **MORGAN STANLEY MORTGAGE CAPITAL INC.**, a New York corporation, having an address at 1221 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, the "**Lender**"), to lend to **PLATINUM LODGING MEZZ, LLC**, an Ohio limited liability company ("**Borrower**"), whose principal place of business is 8330 Strasbourg Court, Dublin, Ohio 43017, the principal sum of TEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($10,500,000.00) (the "**Loan**"), evidenced by that certain Mezzanine Promissory Note (the "**Note**") and that certain Mezzanine Loan Agreement (the "**Loan Agreement**") and secured by, among other things, a pledge by Borrower of (i) its 99.5% membership interest in Platinum Lodging, LLC, an Ohio limited liability company ("**Mortgage Borrower**") and (ii) 100% of its shareholder interest in Water Park Management Company Inc., an Ohio corporation, the managing member of and the holder of a 0.5% membership interest in Mortgage Borrower, as evidenced by that certain Pledge and Security Agreement, dated as of the date hereof, executed by Borrower for the benefit of Lender (the "**Pledge Agreement**"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

1.  As of this 3rd day of August, 2006, the undersigned, **MATTHEW STUDER**, having an address at 4130 Daventry Road, Columbus, Ohio 43220, **FRED GRAFT**, having an address at 1123 Worthington Heights, Columbus, Ohio 43235, **ERNIE MALAS**, having an address at 2481 Stonehaven Place, Columbus, Ohio 43220 and **PETER CORATOLA**, having an address at 8330 Strasbourg Court, Dublin, Ohio 43017 (hereinafter collectively referred to as "**Guarantor**"), jointly and severally hereby absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of (i) the Debt (as defined below) and (ii) the Guaranteed Recourse Obligations of Borrower (as defined below).

2.  It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Pledge Agreement, or the Other Security Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

3.  The term "**Debt**" as used in this Mezzanine Guaranty of Payment and Guaranty of Recourse Obligations of Borrower (this "**Guaranty**") shall mean the principal sum evidenced by the Note and the Loan Agreement and secured by the Pledge Agreement, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Pledge Agreement or the Other Security Documents, including without limitation, (i) all penalties and late charges on such obligations to the extent provided for in the Loan Agreement, the Note, the Pledge Agreement or the Other Security Documents, and (ii) all reasonable legal and other costs or expenses paid or

LEGAL02/30003968v5

incurred by or on behalf of Lender in the enforcement of the Loan Agreement, the Note, the Pledge Agreement, the Other Security Documents or this Guaranty.

4.    The term **"Guaranteed Recourse Obligations of Borrower"** as used in this Guaranty shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 11.22 of the Loan Agreement.

5.    Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Debt. Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the **"Bankruptcy Code"**) which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization. Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Debt, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any of Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any of Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Debt and until so delivered, shall be held in trust for Lender as security for the Debt.

6.    Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all expenses (including counsel fees) incurred by Lender in connection with the collection of the Guaranteed Recourse Obligations of Borrower or any portion thereof or with the enforcement of this Guaranty.

7.    All moneys available to Lender for application in payment or reduction of the Debt may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Debt as Lender may elect.

8.    Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

2

9.    Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Pledge Agreement, or the Other Security Documents, against any person obligated thereunder or against the owner of the Collateral (as defined in the Pledge Agreement), or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or exchange of any Collateral covered by the Pledge Agreement or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Pledge Agreement or the Other Security Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, the Pledge Agreement or the Other Security Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Debt, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt due and payable on the happening of any default or event by which under the terms of the Note, the Pledge Agreement or the Other Security Documents, the Debt shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

10.    Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Pledge Agreement, or any of the Other Security Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided in connection with the Pledge Agreement or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

11.    As a further inducement to Lender to make the Loan and in consideration thereof, Guarantor further covenants and agrees (a) that in any action or proceeding brought by Lender against Guarantor on this Guaranty, Guarantor shall and does hereby waive trial by jury, (b) Guarantor will maintain a place of business or an agent for service of process in the State of New York (the "State") and give prompt notice to Lender of the address of such place of business and of the name and address of any new agent appointed by it, as appropriate, (c) the failure of Guarantor's agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon, (d) if, despite the foregoing, there is for any reason no agent for service of process of Guarantor available to be served, and if Guarantor at that time has no place of business in the State then Guarantor irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the first paragraph hereof, Guarantor hereby waiving personal service thereof, (e) that within thirty days after such mailing, Guarantor so served shall appear or

3

answer to any summons and complaint or other process and should Guarantor so served fail to appear or answer within said thirty-day period, said Guarantor shall be deemed in default and judgment may be entered by Lender against the said party for the amount as demanded in any summons and complaint or other process so served, (f) Guarantor initially and irrevocably designates CT Corporation System with offices on the date hereof at 111 Eighth Avenue, New York, NY 10011 to receive for and on behalf of Guarantor service of process in the State with respect to this Guaranty, (g) with respect to any claim or action arising hereunder, Guarantor (i) irrevocably submits to the nonexclusive jurisdiction of the courts of the State and any United States District Court located in the State, and appellate courts from any thereof, and (ii) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (h) nothing in this Guaranty will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

12.    This is a guaranty of payment and not of collection and upon any default of Borrower under the Note, the Pledge Agreement or the Other Security Documents, Lender may, at its option, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the Collateral or any other collateral for the Loan. Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

13.    Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

14.    If any party hereto shall be a partnership, the agreements and obligations on the part of Guarantor herein contained shall remain in force and application notwithstanding any changes in the individuals composing the partnership and the term "Guarantor" shall include any altered or successive partnerships but the predecessor partnerships and their partners shall not thereby be released from any obligations or liability hereunder.

15.    Guarantor (and its representative, executing below, if any) has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

16.    All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

17.    This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall

4

constitute a single agreement of Guaranty. The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

18.    This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.    This Guaranty shall be deemed to be a contract entered into pursuant to the laws of the State and shall in all respects be governed, construed, applied and enforced in accordance with applicable federal law and the laws of the State, without reference or giving effect to any choice of law doctrine.

20.    Guarantor hereby covenants and agrees as follows:

(a)    Guarantor shall at all times during the term of the Loan maintain a combined minimum Net Worth (as such term is hereinafter defined) of not less than $75,000,000.00 (excluding receivables from Affiliates (as defined in the Loan Agreement)), as determined by Lender.

(b)    Guarantor shall maintain a combined minimum Liquidity of not less than $5,000,000.00, as determined by Lender from time to time.

(c)    For all purposes of this Guaranty, except as otherwise expressly provided:

(i)    "Net Worth" shall mean, at any date of determination, an amount equal to the aggregate of (a) the total assets of each Guarantor determined in accordance with generally accepted accounting principals as modified by Lender's then-current underwriting criteria with assets valued at market values, *minus* (b) the total liabilities of each Guarantor determined in accordance with generally accepted accounting principals as modified by Lender's then-current underwriting criteria;

(ii)    "Liquidity" shall mean, for each Guarantor, (a) unencumbered Cash and Cash Equivalents (as such term is hereinafter defined) of such Guarantor, and (b) publicly-traded, marketable securities (valued in accordance with GAAP) of each Guarantor;

(iii)    "Cash and Cash Equivalents" shall mean all unrestricted or unencumbered (A) cash and (B) any of the following: (x) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by an agency thereof and backed by the full faith and credit of the United States; (y) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof which, at the time of acquisition, has one of the two highest ratings obtainable from any two (2) of S&P, Moody's or Fitch (or, if at any time no two of the foregoing shall be rating such obligations, then from such other

5

nationally recognized rating services as may be acceptable to Lender) and is not listed for possible down-grade in any publication of any of the foregoing rating services; (z) commercial paper of a corporation having a net worth of not less than $500,000,000.00, other than commercial paper issued by Borrower and/or Guarantor and/or any Affiliate of any of the foregoing which, at the time of acquisition, has a rating of at least either A-1+ or such comparable rating from S&P or Moody's, respectively; (aa) domestic certificates of deposit or domestic time deposits or repurchase agreements issued by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having combined capital and surplus of not less than $1,000,000,000.00, which commercial bank has a rating of at least either "AA" or such comparable rating from S&P or Moody's, respectively; (bb) any funds deposited or invested by any Guarantor in accounts maintained with Lender and which are not held in escrow for, or pledged as security for, any obligations of Borrower and/or any Guarantor and/or any Affiliate of any of the foregoing; (cc) money market funds having assets under management in excess of $2,000,000,000.00 and/or (dd) any unrestricted stock, shares, certificates, bonds, debentures, notes or other instrument which constitutes a "security" under the Security Act of 1933 (other than any of the foregoing representative interests in Borrower and/or Guarantor and/or any Affiliate) which are freely tradeable on any nationally recognized securities exchange and are not otherwise encumbered by Guarantor; and

(iv) "Indebtedness" shall mean, as of any date of determination, with respect to any Guarantor, the aggregate sum of the following items, but only to the extent that such items are a personal "recourse" obligation of such Guarantor which can be satisfied out of assets of such Guarantor which have not been pledged as collateral therefor: (i) the unpaid principal balance of all indebtedness or liability for money borrowed or owed by any Guarantor from time to time (including any renewals, extensions and refinancings thereof), whether or not the indebtedness was heretofore or hereafter created, issued, incurred, assumed or guarantied; (ii) the unpaid principal balance of all indebtedness or liability for the deferred purchase price of property or services incurred (including trade obligations); (iii) all obligations as lessee under leases which have been or should be recorded as capitalized leases; (iv) all current obligations in respect of any unfunded vested benefits under any Plan covered by Title IV of ERISA; (v) all obligations, contingent or otherwise relative to the stated amount of all letters of credit issued for either of the Guarantor's account, whether or not drawn, to the extent such letters of credit are not collateralized with a mortgage on real estate, a pledge of other assets or cash or marketable securities in separate segregated pledged collateral accounts; (vi) all obligations arising under bankers' acceptance facilities issued for the account of any Guarantor; (vii) all guarantees and endorsements to provide funds for payments or otherwise to assure a creditor against loss; and (viii)

6

all obligations secured by any mortgage, lien, pledge, or security interest or other charge or encumbrance on property, but only if such obligations have been personally assumed by such Guarantor, and then, only to the extent such assumed obligations exceed the value of such collateral.

21.     Each Guarantor shall comply, as applicable, with the respective financial reporting requirements set forth in Section 4.1.6 of the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

7

**IN WITNESS WHEREOF**, Guarantor has duly executed this Guaranty as of the day and year first above written.

GUARANTOR:

_____
Matthew Studer, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

GUARANTOR:

_____
Fred Graft, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Alston & Bird

GUARANTOR:

_____
Ernie Malas, an individual

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

GUARANTOR:

_____
Peter Coratola, an individual

[NO FURTHER TEXT ON THIS PAGE]

Exhibit 4

Exhibit A

INTERCREDITOR AGREEMENT

by and between

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

as Senior Lender

and

MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation

as Mezzanine Lender

Dated as of August 3, 2006

Premises: Holiday Inn Hotel & Suites
4560 Hilton Corporate Drive
Columbus, Ohio 43232

LEGAL02/30017356v5

Exhibit A

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Agreement"), dated as of August 3, 2006 by and between MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation having an address at 1221 Avenue of the Americas, New York, New York 10020 ("Senior Lender"), and MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation having an address at 1221 Avenue of the Americas, New York, New York 10020 ("Mezzanine Lender").

### RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Loan Agreement, dated as of July 18, 2006, between PLATINUM LODGING, LLC, an Ohio limited liability company ("Borrower") and Senior Lender (the "Senior Loan Agreement"), Senior Lender has made or is about to make a loan to Borrower in the original principal amount of $28,500,000.00 (the "Senior Loan"), which Senior Loan is evidenced by a certain Promissory Note, dated as of July 18, 2006, made by Borrower to Senior Lender in the amount of the Senior Loan (the "Senior Note"), and secured by, among other things, a Mortgage and Security Agreement, dated as of July 18, 2006, made by Borrower in favor of Senior Lender (the "Senior Mortgage"), which Senior Mortgage encumbers the real property described on Exhibit A attached hereto and made a part hereof, and all improvements thereon and appurtenances thereto (collectively, the "Premises"); and

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated as of August 3, 2006, between PLATINUM LODGING MEZZ, LLC, an Ohio limited liability company ("Mezzanine Borrower") and Mezzanine Lender (the "Mezzanine Loan Agreement"), Mezzanine Lender is the owner and holder of a loan to Mezzanine Borrower in the original principal amount of $10,500,000.00 (the "Mezzanine Loan"), which Mezzanine Loan is evidenced by a certain Promissory Note, dated as of August 3, 2006, made by Mezzanine Borrower in favor of Mezzanine Lender in the amount of the Mezzanine Loan (the "Mezzanine Note"), and secured by, among other things, a Pledge and Security Agreement, dated as of August 3, 2006, from Mezzanine Borrower pursuant to which Mezzanine Lender is granted a first priority security interest in all of Mezzanine Borrower's ownership interests in Borrower and its managing member (the "Pledge Agreement"); and

WHEREAS, as of the date hereof and in connection with the funding of the Mezzanine Loan, Borrower has made a principal prepayment on the Senior Loan in the amount of $4,000,000.00, thereby reducing the principal balance of the Senior Loan to $24,500,000.00; and

WHEREAS, Senior Lender and Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents (as such term is hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on the terms and conditions herein below set forth, and to evidence certain agreements with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

Section 1.    Certain Definitions; Rules of Construction.

(a)    As used in this Agreement, the following capitalized terms shall have the following meanings:

"Affiliate" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common control with the Person or Persons in question.

"Agreement" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"Award" has the meaning provided in Section 9(d) hereof.

"Borrower" has the meaning provided in the Recitals hereto.

"Borrower Group" has the meaning provided in Section 10(c) hereof.

"Business Day" means any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"CDO" has the meaning provided in the definition of the term "Qualified Transferee."

"CDO Asset Manager" with respect to any Securitization Vehicle which is a CDO, shall mean the entity which is responsible for managing or administering the Mezzanine Loan as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of the Mezzanine Loan).

"Certificates" means any securities (including all classes thereof) representing beneficial ownership interests in the Senior Loan or in a pool of mortgage loans including the Senior Loan issued in connection with a Securitization of the Senior Loan.

"Continuing Senior Loan Event of Default" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired.

"Control" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession,

directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "controlling" and "under common control with" shall have the respective correlative meaning thereto.

"Directing Mezzanine Lender" has the meaning provided in Section 4(c) hereof.

"Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

"Enforcement Action" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or Borrower, including, without limitation, the taking of possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Premises.

"Equity Collateral" means the equity interests of Borrower and its managing member pledged pursuant to the Pledge Agreement.

"Equity Collateral Enforcement Action" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral.

"Event of Default" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred, is continuing (i.e., has not been cured by Borrower or by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower).

"Intervening Trust Vehicle" with respect to any Securitization Vehicle which is a CDO, shall mean a trust vehicle or entity which holds the Mezzanine Loan as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

"Loan Pledgee" has the meaning provided in Section 15 hereof.

"Loan Purchase Price" has the meaning provided in Section 13(a) hereof.

"Mezzanine Borrower" has the meaning provided in the Recitals hereto.

"Mezzanine Lender" has the meaning provided in the first paragraph of this Agreement.

"Mezzanine Loan" has the meaning provided in the Recitals hereto.

"Mezzanine Loan Agreement" has the meaning provided in the Recitals hereto.

"Mezzanine Loan Cash Management Agreement" means any cash management agreement executed in connection with, or the cash management provisions of, the Mezzanine Loan Documents.

"Mezzanine Loan Documents" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with all documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Mezzanine Loan Modification" has the meaning provided in Section 7(b) hereof.

"Mezzanine Note" has the meaning provided in the Recitals hereto.

"Monetary Cure Period" has the meaning provided in Section 11(a) hereof.

"Permitted Fund Manager" means any Person that on the date of determination is (i) an entity that is a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of the definition thereof or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"Person" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"Pledge" has the meaning provided in Section 15 hereof.

"Pledge Agreement" has the meaning provided in the Recitals hereto.

"Premises" has the meaning provided in the Recitals hereto.

"Proceeding" has the meaning provided in Section 10(c) hereof.

"Property Manager" means FOCUS LODGING GROUP, LLC, an Ohio limited liability company, or any successor thereto as property manager of the Premises.

"Protective Advances" means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs,

Exhibit A

insurance premiums or other items (including capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, including, with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 11 hereof.

"Purchase Option Notice" has the meaning provided in Section 13(a) hereof.

"Qualified Manager" shall mean a property manager of the Premises which (i) is a reputable management company having at least five (5) years' experience in the management of hospitality properties with similar uses as the Premises and in the jurisdiction in which the Premises are located, (ii) has, for at least five (5) years prior to its engagement as property manager, managed at least 10,000 full service or extended stay hotel rooms and (iii) is not the subject of a bankruptcy or similar insolvency proceeding.

"Qualified Transferee" means (i) Mezzanine Lender, (ii) True North Mezzanine Investment Fund, LLC, (iii) Winston Hotels, (iv) Ashford Hospitality Trust REIT or (v) one or more of the following:

      (A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

      (B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

      (C)    an institution substantially similar to any of the foregoing entities described in clauses (v)(A) or (v)(B) that satisfies the Eligibility Requirements;

      (D)    any entity Controlled by any of the entities described in clause (i), clause (ii), clause (iii), clause (iv) or clauses (v)(A) or (v)(C) above;

      (E)    a Qualified Trustee (or in the case of a CDO, a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the Mezzanine Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("CDO") secured by, or (C) a financing through an "owner trust" of, a Mezzanine Loan (any of the foregoing, a "Securitization Vehicle", provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of a Mezzanine Loan to such Securitization Vehicle); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer

of such Securitization Vehicle has a Required Special Servicer Rating (such entity, an "Approved Servicer") and such Approved Servicer is required to service and administer such Mezzanine Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a Qualified Trustee, or a CDO Asset Manager which is a Qualified Transferee, are each a Qualified Transferee under clause (i), clause (ii), clause (iii), clause (iv) or clauses (v)(A), (v)(B), (v)(C) or (v)(D) of this definition; or

        (F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (v)(A), (B), (C) or (D) of this definition.

        "Qualified Trustee" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

        "Rating Agencies" shall mean, prior to a Securitization, each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Senior Lender and, after a Securitization, shall mean any of the foregoing that have rated any of the Certificates.

        "Rating Agency Confirmation" means each of the Rating Agencies shall have confirmed in writing that the occurrence of the event with respect to which such Rating Agency Confirmation is sought shall not result in a downgrade, qualification or withdrawal of the applicable rating or ratings ascribed by such Rating Agency to any of the Certificates then outstanding. In the event that no Certificates are outstanding or the Senior Loan is not part of a Securitization, any action that would otherwise require a Rating Agency Confirmation shall require the consent of the Senior Lender, which consent shall not be unreasonably withheld or delayed.

        "Redirection Notice" has the meaning provided in Section 15 hereof.

        "Required Special Servicer Rating" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Mortgage Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or

withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"S&P" means Standard & Poors Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Securitization" means the sale or securitization of the Senior Loan (or any portion thereof) in one or more transactions through the issuance of securities, which securities may be assigned ratings by the Rating Agencies.

"Senior Lender" has the meaning provided in the first paragraph of this Agreement.

"Senior Loan" has the meaning provided in the Recitals hereto.

"Senior Loan Agreement" has the meaning provided in the Recitals hereto.

"Senior Loan Cash Management Agreement" means any cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents.

"Senior Loan Default Notice" has the meaning provided in Section 11(a) hereof.

"Senior Loan Documents" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"Senior Loan Liabilities" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"Senior Loan Modification" has the meaning provided in Section 7(a) hereof.

"Senior Mortgage" has the meaning provided in the Recitals hereto.

"Senior Note" has the meaning provided in the Recitals hereto.

"Separate Collateral" means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Cash Management Agreement, and (iii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents, in each case not directly constituting security for the Senior Loan.

Exhibit A

"SPE Constituent Entity" means Water Park Management Company, Inc., an Ohio corporation.

"Third Party Agreement" has the meaning provided in Section 5(a) hereof.

"Third Party Obligor" has the meaning provided in Section 5(a) hereof.

"Transfer" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, paragraphs, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)    the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)    the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Exhibit A

Section 2.    Approval of Loans and Loan Documents.

(a)    Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents. Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.    Representations and Warranties.

(a)    Mezzanine Lender hereby represents and warrants as follows:

(i)    Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee (as hereinafter defined) as contemplated by the provisions of Section 15 hereof.

LEGAL02/30017356v5                                       - 10 -

Exhibit A

(iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine

Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

      (x)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan. The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

      (b)    Senior Lender hereby represents and warrants as follows:

      (i)    Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof. To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

      (ii)    Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

      (iii)    There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

      (iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

      (v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

      (vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

      (vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

      (viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)    The Senior Loan is not cross-defaulted with any other loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

Section 4.    Transfer of Mezzanine Loan or Senior Loan.

(a)    Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) a Rating Agency Confirmation has been given with respect to such Transfer, in which case the related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement, or (ii) such Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Lender.

(b)    At least five (5) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Lender and, if any Certificates are outstanding, to the Rating Agencies, a certification that such transfer will be made in accordance with this Section 4, such certification to include the name and contact information of the Qualified Transferee.

(c)    If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "Directing Mezzanine Lender") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated,

the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)    Mezzanine Lender acknowledges that any Rating Agency Confirmation may be granted or denied by the Rating Agencies in their sole and absolute discretion and that such Rating Agencies may charge customary fees in connection with any such action.

(e)    Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.

Section 5.    Foreclosure of Separate Collateral.

(a)    Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreement and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) without a Rating Agency Confirmation unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, (ii) the Premises will be managed by a Qualified Manager promptly after the transfer of title to the Equity Collateral, and (iii) if not in place prior to the transfer of title to the Equity Collateral, hard cash management and adequate reserves for taxes, insurance, debt service, ground rents, capital repair and improvement expenses, tenant improvement expenses and leasing commissions and operating expenses will be implemented under the Senior Loan promptly after the transfer of title to the Equity Collateral; provided, that the implementation of such hard cash management and reserves would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b). Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to the Rating Agencies within ten (10) business days of the transfer of title to the Equity Collateral. The Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this Section 5(a) have been satisfied to Senior Lender and the Rating Agencies upon consummation of any transfer of the Equity Collateral pursuant to this Section 5(a). Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the removal of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a "Third Party Obligor"), such transferee or an Affiliate thereof reasonably satisfactory to the Senior Lender shall: (A) execute and deliver to Senior Lender a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a "Third Party Agreement"), in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant to which the Third Party Obligor shall undertake the obligations set forth therein, and (B) if there are

Certificates then outstanding, deliver (or cause to be delivered) to Senior Lender and each Rating Agency, an opinion of counsel that the substitution of the original Third Party Obligor and the original Third Party Agreement with a substitute Third Party Obligor and a substitute Third Party Agreement, would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b).

(b)      Nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral.

(c)      In the event Mezzanine Lender or any purchaser at a UCC sale obtains title to the Separate Collateral, Senior Lender hereby acknowledges and agrees that any transfer or assumption fee in the Senior Loan Agreement shall be waived as a condition to such transfer and any such transfer shall not constitute a breach or default under the Senior Loan Documents, provided the conditions in Section 5(a) are met. Senior Lender also acknowledges and agrees that it will not impose any unreasonable fees or delays in connection with such Transfer.

Section 6.      Notice of Rating Confirmation.  Mezzanine Lender promptly shall notify Senior Lender of any intended action relating to the Mezzanine Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Senior Lender in obtaining such confirmation. Senior Lender promptly shall notify Mezzanine Lender of any intended action relating to the Senior Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Mezzanine Lender in obtaining such confirmation. Mezzanine Lender shall pay all fees and expenses of the Rating Agencies in connection with any request for any Rating Agency Confirmation pursuant to this Agreement.

Section 7.      Modifications, Amendments, Etc.

(a)      Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Senior Loan Modification") of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower, (v) amend or modify the provisions limiting transfers of interests in the Borrower or the Premises, (vi) modify or amend the terms and provisions of the Senior Loan Cash Management Agreement with respect to the manner, timing and method of the application of payments under the Senior Loan Documents, (vii) cross default the Senior Loan with any other indebtedness, (viii) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Senior Loan, (ix) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), or (x) extend the period during which voluntary prepayments are prohibited or during which

prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge; provided, however, in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that under no conditions shall clause (i) (with respect to increase principal amount only), or clause (x) be modified without the written consent of Mezzanine Lender. In addition and notwithstanding the foregoing provisions of this Section 7, any amounts funded by the Senior Lender under the Senior Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Senior Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(a).

(b)     Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "Mezzanine Loan Modification") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises or (vi) cross default the Mezzanine Loan with any other indebtedness. Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, . Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall clause (i), with respect to increases in principal amounts only, clause (ii), clause (iii) (with respect to shortening the maturity only), clause (iv) or clause (v) be modified without the written consent of the Senior Lender. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)     Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

Exhibit A

(d)     Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

Section 8.     Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)     Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a). Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

(b)     Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents.

(c)     This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

Section 9.     Payment Subordination.

(a)     Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid. If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, Senior

Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)    Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), provided that no Event of Default shall then exist under the Senior Loan Documents, Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts.

(c)    Mezzanine Lender may take any Equity Collateral Enforcement Action which is permitted under Section 5 hereof; provided, however, that (i) Mezzanine Lender shall, prior to commencing any Equity Collateral Enforcement Action, give the Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) Mezzanine Lender shall provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action.

(d)    In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "Award"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to

repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender.

Section 10.    Rights of Subrogation; Bankruptcy.

(a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

(b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)    Subject to Section 30 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower or any SPE Constituent Entity under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "Proceeding"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause either the Borrower or any entity which controls Borrower (the "Borrower Group") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower or any SPE Constituent Entity adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower or any SPE Constituent Entity; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower or any SPE Constituent Entity; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower or any SPE Constituent Entity, the Premises (or any portion thereof) or any

other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower or any SPE Constituent Entity; (vii) seek to consolidate the Premises or any other assets of the Borrower or any SPE Constituent Entity with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)     If Mezzanine Lender is deemed to be a creditor of Borrower or any SPE Constituent Entity in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower or any SPE Constituent Entity without the prior consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such filing shall not be as a creditor of the Borrower, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower or any SPE Constituent Entity in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; provided, however, that with respect to any proposed plan of reorganization in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender being "impaired" (as such term is defined in the United States Bankruptcy Code) and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

Section 11.     Rights of Cure.

(a)     Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents, Senior Lender shall provide written notice of the default which would permit the Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "Senior Loan Default Notice") and shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 11(a). If the default is a monetary default relating to a liquidated sum of money, Mezzanine Lender shall have until five (5) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure provision, if any, (a "Monetary Cure Period") to cure such monetary default; provided, however, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) defend and hold harmless Senior Lender for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior

Exhibit A

Lender on any required (pursuant to applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances. Mezzanine Lender shall not be required, in order to effect a cure hereunder (other than the cure by Mezzanine Lender of a default in the payment of the Senior Loan in full on the maturity date thereof or the reimbursement of interest on advances for monthly payment of principal and/or interest and/or on any Protective Advances, as aforesaid), to pay any interest calculated at the default rate under the Senior Loan Documents to the extent the same is in excess of the rate of interest which would have been payable by Borrower in the absence of such default (and irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and no interest shall accrue at the default rate as against Mezzanine Lender for such period. Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than four consecutive months unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Separate Collateral. If the default is of a non-monetary nature, Mezzanine Lender shall have the same period of time as the Borrower under the Loan Documents to cure such non-monetary default; provided, however, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default for so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed thirty (30) days, unless such non-monetary default is of a nature that can not be cured within such thirty (30) days, in which case, Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, (iii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of Borrower and (iv) during such non-monetary cure period, there is no material impairment to the value, use or operation of the Premises. Any additional cure period granted to the Mezzanine Lender hereunder shall automatically terminate upon the bankruptcy (or similar insolvency) of the Borrower.

(b) To the extent that any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that (i) such Qualified Transferee shall have caused Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed and (ii) all defaults under the Senior Loan which remain uncured as of the date of such acquisition have been cured by such Qualified Transferee or waived by Senior Lender except for defaults that are not susceptible of being cured by such Qualified Transferee; provided, that such defaults which are not susceptible of being cured do not materially impair the value, use or operation of the Premises. Notwithstanding any contrary or inconsistent provision of this Agreement, the Senior Loan Documents or the Mezzanine Loan Documents, no acquisition or other fee or similar charge shall be due in connection with such

Qualified Transferee's acquisition of any interest in Borrower or the Premises as the result of a Equity Collateral Enforcement Action or assignment in lieu of foreclosure or other negotiated settlement in lieu of any of the foregoing.

       (c)    So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Cash Management Agreement, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay outstanding principal balance of the Senior Loan.

      Section 12.    No Actions; Restrictive Provisions.  Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager.  In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager (including any asset manager) or leasing agent for the Premises, which replacement manager, asset manager and/or leasing agent shall either (a) be subject to Senior Lender's reasonable approval and, if any Certificates are then outstanding, be subject to a Rating Agency Confirmation or (b) be a Qualified Manager.  Notwithstanding anything in this Section 12 to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender.

      Section 13.    Right to Purchase Senior Loan.

       (a)    If the Senior Loan has been accelerated, any Enforcement Action has been commenced and is continuing under the Senior Loan Documents or the Senior Loan is a "specially serviced mortgage loan" under the applicable pooling and servicing agreement (each of the foregoing, a "Purchase Option Event"), upon ten (10) Business Days prior written notice to Senior Lender (the "Purchase Notice"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the outstanding principal balance thereof, together with all accrued interest and other amounts due thereon (including, without limitation, any late charges, default interest, exit fees, advances and post-petition interest), any Protective Advances made by Senior Lender and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances), including all costs and expenses (including legal fees and expenses) actually incurred by Senior Lender in enforcing the terms of the Loan Documents (the "Loan Purchase Price").  Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender, at the sole cost and expense of Mezzanine Lender to assign the Senior Loan

Exhibit A

and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan and as to Senior Lender's not having assigned or encumbered its rights in the Loan). The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) upon a transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure or (ii) if a Purchase Option Event ceases to exist.

(b)     Mezzanine Lender covenants not to enter any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee or yield maintenance charge in connection with a prepayment of the Senior Loan by the Borrower.

Section 14.    Additional Understandings.  For as long as the Mezzanine Loan remains outstanding:

(a)     Notices of Transfer; Consent.  Senior Lender promptly shall notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan or seeks or requests Senior Lender's consent to, or take any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan.  In the event of a request by the Borrower for Senior Lender's consent to either (i) the sale or transfer of all or any material portion of the Premises or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, Senior Lender shall, if Senior Lender has the right to consent, obtain the prior written consent of Mezzanine Lender prior to Senior Lender's granting of its consent or agreement thereto.

(b)     Annual Budget.  The Mezzanine Lender shall have the right to approve the annual operating budget of Borrower in accordance with the terms of the Mezzanine Loan Documents. Notwithstanding anything contained herein, in the Senior Loan Documents or in the Mezzanine Loan Documents, the Mezzanine Lender may require Borrower to submit the annual budget to the Mezzanine Lender for approval prior to any submission to the Senior Lender. Upon Mezzanine Lender's approval, the Mezzanine Lender shall submit the approved budget to the Senior Lender for its approval.  The Mezzanine Lender shall consent to any changes in the budget reasonably requested by the Senior Lender.  In the event that the approval of the Mezzanine Lender is not obtained on a timely basis, the then current existing operating budget shall remain in effect with an increase in any non-discretionary expense item to either (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.

Section 15.    Financing of Mezzanine Loan.  Notwithstanding any other provision hereof, Senior Lender consents to Mezzanine Lender's pledge (a "Pledge") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency (a "Loan Pledgee"), on the terms and conditions set forth in this Section 15; provided that a Loan Pledgee

which is not a Qualified Transferee may not take title to the Equity Collateral without a Rating Agency Confirmation. Upon written notice by Mezzanine Lender to Senior Lender that the Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by Mezzanine Lender under this Agreement of which default Senior Lender has actual knowledge; (b) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; (d) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of <u>Section 11</u> of this Agreement as if such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a "<u>Redirection Notice</u>") to Senior Lender by Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Senior Lender shall remit to Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed by Senior Lender to have been delivered by Loan Pledgee. Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in the writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this <u>Section 15</u> shall remain effective unless and until Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

Section 16.    <u>Intentionally Omitted</u>.

Section 17.    <u>Obligations Hereunder Not Affected</u>.

(a)    All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

Exhibit A

    (i)     any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

    (ii)     any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

    (iii)     any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

    (iv)     any change, restructuring or termination of the corporate structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower; or

    (v)     any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or a Senior Lender subject to the terms hereof.

    (b)     This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment had not been made.

    Section 18.    <u>Notices</u>. All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 18</u>. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To Mezzanine Lender:

Morgan Stanley Mortgage Capital Inc.
1221 Avenue of the Americas
27th Floor
New York, New York 10020
Attention: Stephen Holmes

Section 19.    Estoppel.

(a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 20.    Further Assurances.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

Section 21.    No Third Party Beneficiaries; No Modification.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person. This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought. If any Certificates are outstanding, this Agreement shall not be amended unless a Rating Agency Confirmation has been obtained with respect to such amendment.

Section 22.    Successors and Assigns.  This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender.

Section 23.    Counterpart Originals.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

Section 24.    Legal Construction.  In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

Section 25.    No Waiver; Remedies.  No failure on the part of the Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise

thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.    No Joint Venture.  Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.    Captions.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28.    Conflicts.  In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29.    No Release.  Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents or to release Mezzanine Borrower from (x) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (y) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30.    Continuing Agreement.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or by deed-in-lieu of foreclosure, (c) transfer of title to the Mezzanine Lender of the Separate Collateral or (d) payment in full of the Mezzanine Loan; provided, however, that any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

Section 31.    Severability.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32.    Expenses.

(a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is

the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by Mezzanine Borrower out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof.

Section 33.    <u>Injunction</u>.  Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other.  Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.    <u>Mutual Disclaimer</u>.

(a)    Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)    Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other.

Exhibit A

[NO FURTHER TEXT ON THIS PAGE]

Exhibit A

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

MORGAN STANLEY MORTGAGE CAPITAL
INC., a New York corporation

By: _____
Name:
Title:           CYNTHIA ECKES
                 VICE PRESIDENT

MEZZANINE LENDER:

MORGAN STANLEY MORTGAGE CAPITAL
INC., a New York corporation

By: _____
Name:
Title:           CYNTHIA ECKES
                 VICE PRESIDENT

Exhibit A

EXHIBIT A

[ATTACH LEGAL DESCRIPTION OF PREMISES]

Exhibit A

## EXHIBIT B

### Senior Loan Documents

*All Senior Loan Documents are dated July 18, 2006, unless otherwise stated below*

1. Loan Agreement between Borrower and Senior Lender;
2. First Amendment to Loan Agreement between Borrower and Senior Lender dated August 3, 2006;
3. Promissory Note made by Borrower to Senior Lender in the original principal amount of $28,500,000;
4. Mortgage and Security Agreement given by Borrower to Senior Lender;
5. Assignment of Leases and Rents made by Borrower in favor of Senior Lender;
6. Environmental Indemnity Agreement made by Borrower and Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively ("Guarantor") for the benefit of Senior Lender;
7. Guaranty of Payment and Guaranty of Recourse Obligations made by Guarantor for the benefit of Senior Lender in connection with certain obligations under the Senior Loan;
8. Conditional Assignment of Management Agreement by Borrower in favor of Senior Lender, as agreed to by FOCUS LODGING GROUP, LLC, an Ohio limited liability company (the "Manager");
9. Authorization to Wire Funds executed by Borrower;
10. Borrower's Closing Certificate executed by Borrower;
11. Borrower's Certification executed by Borrower;
12. Title Escrow Instruction Letter acknowledged and agreed to by Borrower and the title company described therein;
13. Post Closing Agreement executed by Borrower;
14. Cash Management Agreement executed by Borrower, Senior Lender and the Manager dated August 3, 2006; and
15. Restricted Account Agreement executed by Borrower, Senior Lender and JPMorgan Chase Bank, N.A. dated August 3, 2006.

Exhibit A

## EXHIBIT C

### Mezzanine Loan Documents

*All Mezzanine Loan Documents are dated August 3, 2006*

1. Loan Agreement between Mezzanine Borrower and Mezzanine Lender;
2. Promissory Note made by Mezzanine Borrower to Mezzanine Lender in the original principal amount of $10,500,000;
3. Pledge and Security Agreement given by Mezzanine Borrower to Mezzanine Lender;
4. Environmental Indemnity Agreement made by Mezzanine Borrower and Matthew Studer, Fred Graft, Ernie Malas and Peter Coratola, individually and collectively ("Guarantor") for the benefit of Mezzanine Lender;
5. Guaranty of Payment and Guaranty of Recourse Obligations made by Guarantor for the benefit of Mezzanine Lender in connection with certain obligations under the Mezzanine Loan;
6. Conditional Assignment of Management Agreement by Borrower, Mezzanine Borrower in favor of Senior Lender, as agreed to by FOCUS LODGING GROUP, LLC, an Ohio limited liability company (the "Manager");
7. Borrower's Certification executed by Mezzanine Borrower; and
8. Title Escrow Instruction Letter acknowledged and agreed to by Mezzanine Borrower and the title company described therein.

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK **JUDGE BUCHWALD**

HIGHLAND PARK CDO I GRANTOR
TRUST, SERIES A

08 Civ. **08 CV 01670**

    Plaintiff,

    v.

    **COMPLAINT**

MATTHEW STUDER, FRED GRAFT, ERNIE
MALAS, and PETER CORATOLA,

    Defendants.



RECEIVED
FEB 2 0 2008
U.S.D.C. S.D. N.Y.
CASHIER

        Plaintiff Highland Park CDO I Grantor Trust, Series A ("Highland"), as successor-in-

interest to Morgan Stanley Mortgage Capital, Inc., ("Morgan Stanley"), by its attorneys, Orrick,

Herrington & Sutcliffe LLP, hereby alleges for its Complaint against Defendants Matthew Studer, Fred

Graft, Ernie Malas, and Peter Coratola, as follows:

### NATURE OF THE ACTION

    1.    This is a straightforward debt collection action. Defendants guaranteed a $10.5 million

loan made by Morgan Stanley (and subsequently assigned to Plaintiff) to a holding company in which

Defendants had an interest. The borrower needed the loan in relation to an ownership interest in a

Holiday Inn hotel in Ohio. The borrower failed to repay the loan on the maturity date of February 9,

2008. Plaintiff subsequently issued demand letters to both the borrower and each of the Defendants to

cure the default. To date, the loan remains in default.

    2.    Pursuant to the governing guaranty agreement, Defendants agreed to jointly and severally

guaranty the prompt and unconditional payment of the loan, and granted Plaintiff the right to "proceed

directly and at once, without notice, against Guarantor to collect and recover the full amount of the

liability…without proceeding against Borrower or any other person." Plaintiff seeks to recover the

outstanding loan amount, plus interest and fees, as permitted under the guaranty agreement.

1

<u>PARTIES</u>

3.      Plaintiff Highland is a Cayman Islands trust, having an address at The Bank of New York Trust Company, National Association, 601 Travis Street, 16th Floor, Houston, Texas 77002, Attention: Global Corporate Trust Highland Park CDO I, and is a successor-in-interest to Morgan Stanley, a New York Corporation.

4.      Defendant Matthew Studer ("Studer") is an individual domiciled in the State of Ohio.

5.      Defendant Fred Graft ("Graft") is an individual domiciled in the State of Ohio.

6.      Defendant Ernie Malas ("Malas") is an individual domiciled in the State of Ohio.

7.      Defendant Peter Coratola ("Coratola") is an individual domiciled in the State of Ohio.

<u>JURISDICTION AND VENUE</u>

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of a state and a citizen of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1331 because the Defendants have irrevocably submitted, by contract, to personal jurisdiction in state courts or federal courts located in the State of New York.

<u>THE RELEVANT AGREEMENTS</u>

10.     On August 3, 2006, Morgan Stanley, together with its successors and assigns, executed a Mezzanine Loan Agreement ("Loan Agreement") with Platinum Lodging Mezz, LLC ("Borrower").  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.  Morgan Stanley subsequently assigned to Highland its interests arising under the Loan Agreement relevant to the Complaint.

11.     Pursuant to the Loan Agreement, Morgan Stanley (as assignor to Plaintiff) agreed to make a mezzanine loan ("Loan") to Borrower in the amount of $10.5 million.  Borrower executed a Mezzanine Promissory Note ("Note") in the stated principal amount of  $10.5 million payable to the

order of Morgan Stanley (as assignor to Plaintiff). A true and correct copy of the Note is attached hereto as Exhibit B.

12.     The Maturity Date of the Loan was February 9, 2008. The failure of Borrower to repay the Loan in full on or before the Loan's Maturity Date constituted an event of default whereby all obligations due under the Loan would be accelerated, and become automatically due.

13.     Upon execution of the Loan Agreement by Borrower, on August 3, 2006, each of the Defendants signed a "Mezzanine Guaranty of Payment and Guaranty of Recourse Obligations of Borrower" ("Guaranty Agreement"), and each thereby agreed to personally guaranty the Loan. A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit C.

14.     Under the Guaranty Agreement, Studer, Graft, Malas and Coratola agreed jointly and severally to absolutely and unconditionally guarantee the prompt and unconditional payment of all amounts owing by Borrower under the Loan, in addition to other stated costs and fees.

15.     The Guaranty Agreement further provided that Studer, Graft, Malas and Coratola were responsible for all other sums that became due and payable, including without limitation all penalties and late charges on such obligations to the extent provided for in the Loan Agreement, the Note, and/or other security documents. In addition, Defendants were obligated to pay reasonable legal and other costs or expenses paid or incurred by or on behalf of Morgan Stanley, including its assigns (i.e., Plaintiff), in the enforcement of the Loan Agreement, the Note, any other security documents, and/or the Guaranty Agreement.

16.     Pursuant to the Guaranty Agreement, the Lender could "proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person...."

17.     Under the terms of the Guaranty Agreement, each Defendant waived his right to a jury trial, and agreed to submit to the nonexclusive jurisdiction of the courts of the State of New York and

3

any United States District Court located in the State of New York, and any appellate courts from any

thereof, in connection with any legal action arising out of or relating to the Guaranty Agreement.

## DEFAULT

18.    The Loan matured on February 9, 2008.  The Borrower failed to repay the Loan and is

now in default under the Loan Agreement.

19.    Although not required, Plaintiff served the Borrower and each Defendant with a demand

letter on February 12, 2008 requesting that the default be cured.  A true and correct copy of the demand

letters are attached hereto as Exhibit D.

20.    Having received no response thereto, Plaintiff hereby exercises its rights under the

Guaranty Agreement to enforce each Defendant's personal guaranty.

## CAUSE OF ACTION (BREACH OF CONTRACT)

21.    Defendants Studer, Graft, Malas and Coratola are jointly and severally liable for the full

amount of the Loan, plus interest and other fees and costs specified in the Guaranty Agreement. Each

signed the Guaranty Agreement and evidenced his unconditional promise to pay the amount of the Loan

owing under the Loan Agreement in the event Borrower defaulted on the Loan Agreement.

22.    The Borrower defaulted by not repaying the Loan on February 9, 2008.  Neither the

Borrower nor any of the Defendants have responded to Plaintiff's demand for cure nor have they made

any payments whatsoever to Plaintiff.

23.    Plaintiff has satisfied any and all of its conditions, covenants and obligations incumbent

on it pursuant to the Guaranty Agreement.

24.    There is now due, owing, and unpaid from Defendants Studer, Graft, Malas and Coratola

the sum of $10,500,000 plus accrued interest, attorneys' fees and legal costs.

WHEREFORE, Plaintiff Highland prays as follows:

1.    For damages of $10,500,000 plus accrued interest;

2.    For attorneys' fees and legal costs; and

4

3.    For such other and further relief as the Court deems proper.

Dated:  New York, New York
         February 18, 2008

Respectfully submitted,

By: _____

Michael Stolper
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY  10103-0001
(212) 506-5000

Attorneys for Plaintiff Highland Park CDO I
Grantor Trust, Series A

5

# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HIGHLAND PARK CDO I GRANTOR
TRUST, SERIES A,

    Plaintiff,

v.

MATTHEW STUDER, FRED GRAFT,
ERNIE MALAS, AND PETER
CORATOLA,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 CV 01670

Judge Buchwald

**NOTICE OF CLAIM OF INTEREST
(CORRECTED)**

To: Highland Park CDO I Grantor Trust, Series A
  c/o The Bank of New York Trust Company, National Association
  601 Travis Street, 16th Floor
  Houston, TX 77002
  Attn: Global Corporate Trust Highland Park CDO I

  Matthew Studer
  4181 Kenny
  Columbus, OH 43220

  Fred Graft
  1123 Worthington Heights
  Columbus, OH 43235

  Ernie Malas
  2481 Stonehaven Place
  Columbus, OH 43220

  Peter Coratola
  8330 Strasbourg Court
  Dublin, OH 43017

Notice is given that, pursuant to Section 9-607 of the New York Uniform Commercial

Code[1], the proceeds of any judgment or settlement paid in this matter must be paid directly to

---
[1] This Notice is filed to correct the citation to the Uniform Commercial Code.

Wells Fargo Bank, N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage

Pass-Through Certificates Series 2006-XLF (the "Secured Party") at one of the following:

|  |  |
|---|---|
| If by mail: | Midland Loan Services, Inc. |
|  | PNC Bank Lockbox |
|  | Lockbox Number 642303 |
|  | P.O. Box 642303 |
|  | Pittsburgh, PA 15264-2303 |
|  |  |
| If by overnight mail: | Midland Loan Services, Inc. |
|  | PNC Bank Lockbox |
|  | c/o JP Morgan Chase Lockbox 974754 |
|  | 14800 Frye Road, TX1-0006 |
|  | Fort Worth, TX 76155 |
|  |  |
| If by wire transfer: | PNC Bank NA |
|  | ABA#: 043000096 |
|  | Midland Loan Services Inc |
|  | Credit #: 1006967647 |
|  | Ref Loan #: 030257021 |

The right of the Secured Party to payment arises pursuant to that certain Intercreditor

Agreement, a copy of which is attached as **Exhibit A**, dated August 3, 2006 between Morgan

Stanley Mortgage Capital Inc. ("Senior Lender") and Morgan Stanley Mortgage Capital Inc.

("Mezzanine Lender").  Senior Lender assigned its interest in the Intercreditor Agreement, along

with its interest in all related loan documents, to the Secured Party.  Mezzanine Lender assigned

its interest in the Intercreditor Agreement, along with its interest in all related loan documents, to

Plaintiff.

Pursuant to the Intercreditor Agreement, Plaintiff's interest in payment of the mezzanine

debt that is the subject of this action is subordinated to the interests of Secured Party under that

certain Promissory Note dated July 18, 2006 in the original principal amount of $28,500,000,

that Promissory Note being guaranteed by Defendants Matthew Studer, Fred Graft, Ernie Malas

and Peter Coratola.

Specifically, section 9(a) of the Intercreditor Agreement provides in part that (emphasis added):

> If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, **Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan**. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents.

The Senior Loan matured on February 8, 2008 and Secured Party has not been paid in full. This constitutes a Continuing Senior Loan Event of Default under the Intercreditor Agreement such that Plaintiff's right to payment, if any, is subordinated to Secured Party's right to payment. Moreover, the instant action was filed by Plaintiff without providing any notice to Secured Party, and may have been filed in order to circumvent Plaintiff's obligation to pay any amount realized by judgment or settlement of this action to Secured Party.

The failure to pay the judgment or settlement amount in accordance with these instructions will result in your liability to the Secured Party as provided by the Michigan Uniform Commercial Code.

Demand is made that Plaintiff serve this Notice upon the Defendants pursuant to the Federal Rules of Civil Procedure.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

s/ Gregory L. Curtner
Gregory L. Curtner (GC 5395)
500 Fifth Avenue, Suite 1815
New York NY 10110
Telephone: (212) 704-4400
curtner@millercanfield.com

3

*CERTIFICATE OF SERVICE*

I hereby certify that on **March 25, 2008,** I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: **Michael T. Stolper.**

s/ Gregory L. Curtner
Gregory L. Curtner (GC 5395)
500 Fifth Avenue, Suite 1815
New York NY  10110
Telephone: (212) 704-4400
curtner@millercanfield.com

# Exhibit 7

Gregory L. Curtner (GC 5395)
Susan I. Robbins (GC 5759)
MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
500 Fifth Avenue, Suite 1815
New York, NY 10110
Telephone: (212) 704-4400

Attorneys for Intervenor

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

| | |
|---|---|
| HIGHLAND PARK CDO I GRANTOR TRUST, SERIES A,<br><br>                Plaintiff,<br><br>v.<br><br>MATTHEW STUDER, FRED GRAFT, ERNIE MALAS, AND PETER CORATOLA,<br><br>                Defendants. | Civil Action No. 08 CV 01670<br><br>Hon. Naomi Reice Buchwald<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF SENIOR LENDER TO INTERVENE WITH ANNEXED MOTION TO DISMISS THE COMPLAINT OF MEZZANINE LENDER** |

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

Wells Fargo Bank, N.A., as Trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-Through Certificates Series 2006-XLF (the "Senior Lender") acting through Midland Loan services, Inc., in its capacity as Special Servicer of the Trust, by and through its attorneys, Miller, Canfield, Paddock and Stone, PLC, has moved to intervene and, in the annexed motion, has moved to dismiss the Complaint of Plaintiff Highland Park CDO I Grantor Trust, Series A (the "Mezzanine Lender"). For its Memorandum of Law in support thereof the Senior Lender states as follows.

## I.      Introduction

The Mezzanine Lender filed suit in this Court against four individuals who serve as Guarantors of loans made to Platinum Lodging, LLC ("Platinum") by both the Senior Lender and the Mezzanine Lender.  (Exh.[1] C to the Complaint and Exh. A.)  The Senior Lender sued the Guarantors in Ohio state court.  (Exh. B)  By filing its lawsuit, the Mezzanine Lender has violated an Intercreditor Agreement (Exh. C) with the Senior Lender which contains subordination provisions that bar the action by the Mezzanine Lender against the Guarantors.  For the reasons stated below, the Senior Lender should be allowed to intervene to enforce the Intercreditor Agreement by moving to dismiss the Mezzanine Lender's Complaint for violating the subordination provisions of the Intercreditor Agreement.  (Exh. C.)

## II.     Governing Provisions of the Intercreditor Agreement

Section 8(a) of the Intercreditor Agreement governing "Subordination of Mezzanine Loan and Mezzanine Loan Documents" provides that:

> Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and securities created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a).  Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior loan or any other assets of the Borrower.  (Exh. C at 17.)

Section 9(a) governing "Payment Subordination" provides that:

---

[1]  References to "Exh." herein are to the exhibits attached to the Notice of Motion, except as indicated.

Except (i) as otherwise provided in this Agreement[2] and (ii) in connection of the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral[3] in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all obligations of Borrower to Senior Lender under the senior Loan Documents are paid." (Exh. C at 17.)

Finally, Section 24 governing "Legal Construction" provides that:

In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York. (Exh. C at 26.)

These provisions of the Intercreditor Agreement are the legal basis for the motion to intervene and annexed motion to dismiss, as further set forth herein.

## III.    Argument

### A.    The Court Should Grant the Senior Lender's Motion to Intervene.

The Senior Lender has moved under Fed. R. Civ. P. 24 for intervention as of right or, in the alternative, for permissive intervention. The standards to be applied in this Circuit for intervention as of right are:

---

[2] This clause is not involved in this matter.

[3] "Separate Collateral" is defined in the Intercreditor Agreement and "means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Cash Management Agreement, and (iii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents, **in each case not directly constituting security for the Senior Loan**." (Exh. C at 8; emphasis added.) The capitalized, defined terms are not involved in this matter as indicated by the emphasized carve-out language.

> [T]he applicant must (1) file a timely motion, (2) claim an interest relating to the property or transaction that is the subject of the action, (3) be so situated that without intervention the disposition of the action may impair that interest, and (4) show that the interest is not already adequately represented by existing parties.

*Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001).  For the reasons stated below, the Senior Lender should be allowed to intervene as of right.

### 1.   The Motion to Intervene is Timely.

Here, the Senior Lender has filed its motion to intervene and annexed motion to dismiss within a timeframe consistent with the Court-endorsed scheduling letter submitted by counsel for the Mezzanine Lender (Exh. 1 hereto).  Cases typically hold that a delay of many months if not years is necessary before a motion to intervene is held to be untimely.  *See Medical Diagnostic Imaging, PLLC v. Carecore National, LLC*, 2008 WL 780922 at *4 (S.D.N.Y. 2008)(collecting cases: delays of 15 months, 17 months, one year, 14 months and 2 years are untimely).  Since the instant motion has been filed within weeks of the Complaint at the outset of the case, it is timely.

### 2.   The Senior Lender Claims An Interest Relating to the Property or Transaction That Is The Subject of the Action.

The interests of the Senior Lender and the Mezzanine Lender are in the self-same hotel in Columbus, Ohio.  *Compare* Mezzanine Lender's Complaint ¶ 1 ("The borrower needed the loan in relation to an ownership interest in a Holiday Loan hotel in Ohio") *with* Exh. B, Senior Lender's First Amended Complaint ¶ 8 ("Platinum is the fee owner of the real property located at 4560 Hilton Corporate Drive, Columbus, Ohio 43232 . . . ). The Senior and Mezzanine Loans are both with respect to this same hotel and are subject to the Intercreditor Agreement whose subordination provisions are the focus of the annexed motion to dismiss.  Thus, the Senior Lender's interest is the required "'direct,

substantial, and legally protectable'" interest.  *Brennan v. New York City Bd. of Ed.*, 260 F.3d (2d Cir. 2001)(citation omitted).

        3.        **The Senior Lender's Interest Will Be Impaired If It is Not Allowed to Intervene.**

      The Senior Lender has filed a lawsuit in Ohio to, *inter alia*, recover from the Guarantors; the Senior Lender seeks to intervene in this case to keep the Mezzanine Lender from violating loan subordination rights and impairing the ability of the Senior Lender to recover from the very same Guarantors.  If the Senior Lender is not allowed to intervene, its guaranty and subordination rights may be subject to conflicting adjudications in this Court and the Ohio state court.[4]

        4.        **The Parties Already in the Case Will Not Adequately Protect the Interests of the Senior Lender.**

      It is clear from the failure of the Mezzanine Lender to bring to the Court's attention the Intercreditor Agreement, which governs the relationship of the Mezzanine and Senior Lenders, that the Mezzanine Lender will not adequately represent the interests of the intervening Senior Lender.  To the contrary, the Mezzanine Lender's action in bringing its complaint against the Guarantors violates the Intercreditor Agreement and undermines the ability of the Senior Lender to collect from the Guarantors.  It is also unlikely that the Guarantors will adequately represent the interests of the Senior Lender since they are obligated to both Senior and Mezzanine Lenders and presumably base their litigation position on what favors the Guarantors.  Thus for all these reasons, the Senior Lender should be permitted to intervene as of right under Fed. R. Civ. P. 24(a)(2).

---

[4]  Upon the motion of the Borrower and the Guarantors, the Ohio state court recently entered an order joining the Mezzanine Lender as a party defendant in that case.  (Exh. 2 hereto.)  Thus, the Senior Lender, the Mezzanine Lender, the Guarantors and the Borrower are now all present in one court.

5.    **In the Alternative, The Senior Lender Should Be Granted Permissive Intervention.**

In the alternative, the Senior Lender should be allowed to intervene as a permissive intervenor under Fed. R. Civ. P. 24(b)(1)(B). "Even where intervention as of right is not available, a court may grant permissive intervention if the 'applicant's claim or defense and the main action have questions of law or fact in common.'" *Blohm & Voss GmbH v. M/V Olympia Explorer*, 2006 WL 2472044 at *2 (S.D.N.Y. 2006)(quoting rule). For the reasons stated above, the Senior Lender has satisfied the required showing for permissive intervention.

B.    **The Court Should Grant the Senior Lender's Herein Annexed Motion to Dismiss.**

While the Court must (in considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6)) "accept as true the facts alleged in the . . . complaint," the complaint is "'deemed to include any written instrument attached to it as an exhibit,' 'statement or document incorporated by reference,' and other document that is fairly 'integral' to the allegations." *Greene v. Hanover Direct, Inc.*, 2007 WL 4224372 at *3 (S.D.N.Y 2007)(citation omitted).

1.    **The Intercreditor Agreement is Integral to the Complaint and Dispositive of the Mezzanine Lender's Claims.**

Here, the Intercreditor Agreement is not merely integral to but dispositive of the Mezzanine Lender's claims. As has happened in the instant case, lenders often arrange

> financing through Intercreditor Agreements in which two or more banks would lend to a borrower on a secured basis. An Intercreditor Agreement serves to delineate the order of the banks' claims against that borrower, which clarifies priority of creditors in the event of default.

*Bank of New York v. Amoco Oil Company*, 831 F.Supp. 254, 260 n. 6 (S.D.N.Y. 1993). *See also Trafalgar Power inc. V. Aetna Life Ins. Co.*, 427 F.Supp.2d 202, 206 (N.D.N.Y. 2006)(enforcing "an intercreditor agreement under which Algonquin agreed not to exercise its rights as creditor or remedies of the B Note against TPI without the consent and approval of Aetna, so long as TPI remained indebted to Aetna.")  Furthermore, "[u]nder New York law, which governs . . . the Intercreditor Agreement, the Court must give effect to the intentions of the parties entering into an agreement." *In re Solutia, Inc.*, 2007 WL 1302609 at *9 (Bkrtcy. S.D.N.Y. 2007)(citing cases).

> ### 2.    The Subordination Provisions of the Intercreditor Agreement Bar the Mezzanine Lender's Claims.

Section 8(a) of the Intercreditor Agreement provides that the "Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and securities created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents."  (Exh. C at 17.)  Section 9(a) of the Intercreditor Agreement further provides that "all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents."  (Exh. C at 17.)  Under New York law, "the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).

The Mezzanine Lender's Complaint against the Guarantors ignores the Intercreditor Agreement, fails to attach it or bring it to the attention of the Court, and seeks relief on the Guaranty which is contrary to the Mezzanine Lender's obligation to subordinate its rights to those of the Senior Lender.  Even accepting the allegations in the Complaint as true, the Mezzanine Lender fails to state a claim as to the Guarantors because the Mezzanine Lender's rights and remedies are subordinated to those of the Senior Lender.

## IV.    Conclusion and Relief Requested

For the reasons stated above, the Senior Lender prays this Honorable Court permit the Senior Lender to intervene, dismiss the Complaint of the Mezzanine Lender, award the Senior Lender its costs and attorney fees as provided in the Intercreditor Agreement, and grant the Senior Lender such other and further relief as is just and equitable.


Dated:  New York, New York
        June 10, 2008

                        Respectfully submitted,

                        MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


                        By:  s/Gregory L. Curtner
                              Gregory L. Curtner (GC 5395)
                              Counsel for Intervenor Wells Fargo Bank, N.A., as
                              Trustee for the Morgan Stanley Capital I Inc.
                              Commercial Mortgage Pass-Through Certificates
                              Series 2006-XLF
                              Miller, Canfield, Paddock and Stone, P.L.C.
                              500 Fifth Avenue, Suite 1815
                              New York, New York 10110
                              Telephone: (212) 704-4400
                              Email: curtner@millercanfield.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2008, I electronically filed the foregoing paper with the Clerk of the court using the ECF system, which will send notification of such filing to the following:

Michael T. Stolper, Esq. mstolper@orrick.com;

Dennis Michael O'Bryan, Esq. dob@obryanlaw.net;

Yasmin Rukhshanda Saeed, Esq. ysaeed@bkgllplaw.com; and

Marc J. Kessler, Esq. mkessler@hahnlaw.com

s/Gregory L. Curtner
Gregory L. Curtner (GC 5395)
Counsel for Intervenor Wells Fargo Bank, N.A., as
Trustee for the Morgan Stanley Capital I Inc.
Commercial Mortgage Pass-Through Certificates
Series 2006-XLF
Miller, Canfield, Paddock and Stone, P.L.C.
500 Fifth Avenue, Suite 1815
New York, New York 10110
Telephone: (212) 704-4400
Email: curtner@millercanfield.com

DELIB:2974115.2\131318-00022